## Case Nos. 2017-1974, -2033

*In the*

# United States Court of Appeals

*for the*

# Federal Circuit

POLARA ENGINEERING INC, a California corporation,
*Plaintiff – Cross-Appellant*

v.

CAMPBELL COMPANY, an Idaho corporation,
*Defendant – Appellant*

*Appeal from a Decision of the United States District Court for the Central District of California,
Case No. 8:13-cv-00007-DFM · Honorable Douglas F. McCormick, U.S. Magistrate Judge*

## APPELLANT'S OPENING BRIEF

CHRISTOPHER T. HOLLAND, ESQ.
LORI HOLLAND, ESQ.
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, California 94104
(415) 200-4980 Telephone
cholland@hollandlawllp.com
lholland@hollandlawllp.com

June 30, 2017

*Attorneys for Appellant,
Campbell Company*

 

## <u>CERTIFICATE OF INTEREST</u>
### Federal Circuit Case Nos. 17-1974, -2033

Counsel for Defendant/Appellant Campbell Company certifies the following:

1.      The full name of every party or amicus represented by me is: Campbell Company.

2.      The name of the real party in interest represented by me is listed in paragraph 1, above.

3.      All parent corporations and publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.      The names of all law firms and the partners or associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not already listed on the docket for the current case:  Thomas Scott Tate, Esq. and Melissa Siu-May Lor, Esq. of Schnader Harrison Segal and Lewis LLP.

Dated:  June 30, 2017                    Respectfully submitted,

/s/ Christopher T. Holland
Christopher T. Holland
Lori L. Holland
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, CA  94104
Telephone:  415-200-4980
Fax:  415-200-4989

*Attorneys for Defendant-Appellant Campbell Company*

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................iv

I.      STATEMENT OF RELATED CASES..........................................1

II.     JURISDICTIONAL STATEMENT ...............................................1

III.    STATEMENT OF THE ISSUES ...................................................2

IV.     INTRODUCTION AND STATEMENT OF THE CASE .............3

  A. Introduction ........................................................................3

  B. Statement of the Case.........................................................5

V.      STATEMENT OF THE FACTS .....................................................7

  A. The '476 Patent and Prosecution History..........................7

  B. The District Court's Claim Construction and Related
    Jury Instruction..................................................................9

  C. The Inventor Reduced the Asserted Claims to Practice
    in January 2002 .................................................................12

  D. Polara Publicly Used the Asserted Claims at Multiple
    Locations More than One Year Before the '476 Patent's
    Filing Date of August 5, 2004..........................................14

  E. The Asserted Claims Are Not Novel or Non-Obvious .......17

  F. Campbell Believed in Good Faith, Based on Advice of Counsel,
    that the '476 Patent Was Not Infringed and/or Invalid......21

  G. The Court Improperly Prevented Campbell from Presenting
    Evidence of Non-Infringement to Refute Willfulness ........25

VI.     SUMMARY OF THE ARGUMENT .............................................26

VII.    ARGUMENT...................................................................................30

  A. Standard of Review ...........................................................30

  B. The District Court Erred by Denying Campbell's JMOL on
    the Jury's Validity Verdict in View of Prior Public Use, which
    Was Not Supported by Substantial Evidence......................31

1.  The Parties Do Not Dispute that the Claimed System Was in Public Use as of March 2002.........................................31

2.  The Claimed System Was Reduced to Practice as Early as January 2002.........................................................................32

3.  The Evidence Establishes that the Experimental Use Exception Does Not Apply Here ...............................................34

C.  Campbell Was Prejudiced by the District Court's Failure to Instruct the Jury on the Court's Claim Constructions........................41

D.  The District Court Erred by Denying Campbell's JMOL on the Jury's Verdict of No Anticipation, which Was Not Supported by Substantial Evidence ......................................................................44

E.  The District Court Erred by Denying Campbell's JMOL on the Jury's Verdict of Non-Obviousness, which Was Not Supported by Substantial Evidence ......................................................................48

F.  The District Court Erred By Denying Campbell's JMOL on the Jury's Verdict of Willful Infringement, which Was Not Supported by Substantial Evidence...............................................52

G.  The District Court Abused Its Discretion in Enhancing Damages ...............................................................................................55

VIII.  CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................57

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
  299 F.3d 1336 (Fed. Cir. 2002) ...................................................36

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) .............................................11, 42

*Clock Spring, L.P. v. Wrapmaster, Inc.*,
  560 F.3d 1317 (Fed. Cir. 2009................................34, 35, 36, 39, 40

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
  471 F.3d 1369 (Fed. Cir. 2006) ...................................................49

*EZ Dock v. Schafer Sys., Inc.*,
  276 F.3d 1347 (Fed. Cir. 2002) ...................................................39

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  136 S. Ct. 1923 (2016)..........................................................*passim*

*Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*,
  855 F.3d 1356 (Fed. Cir. 2017) ...................... 32, 33, 34, 36, 37, 38

*Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*,
  370 F.3d 1131 (Fed. Cir. 2004) ...................................................30

*In re Omeprazole Patent Litig.*,
  536 F.3d 1361 (Fed. Cir. 2008) ...................................................34

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) ...................................................55

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
  424 F.3d 1374 (Fed. Cir. 2005) ...................................................31

*Kearns v. Chrysler Corp.*,
  32 F.3d 1541 (Fed. Cir. 1994) ...............................................30, 31

*KSR Int'l Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007)..............................................................51, 52

*LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*,
  958 F.2d 1066 (Fed. Cir. 1992) ...................................................36

*Mintz v. Dietz & Watson, Inc.*,
   679 F.3d 1372 (Fed. Cir. 2012) ....................................................48

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
   587 F.3d 1324 (Fed. Cir. 2009) ....................................................52

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   2017 WL 130236 (N.D. Cal. Jan. 13, 2017).................................57

*Read Corp. v. Portec, Inc.*,
   970 F.3d 816 (Fed. Cir. 1992) ......................................................56

*Schering Corp. v. Geneva Pharm.*,
   339 F.3d 1373 (Fed. Cir. 2003) .............................................44, 45

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004) .............................................42, 43

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
   837 F.3d 1358 (Fed. Cir. 2016.......................................................55

*Zacharin v. United States*,
   213 F.3d 1366 (Fed. Cir. 2000) ....................................................33

*Zenon Envtl., Inc. v. U.S. Filter Corp.*,
   506 F.3d 1370 (Fed. Cir. 2007) ....................................................45

## STATUTES AND RULES

28 U.S.C. § 1295 ................................................................................1

28 U.S.C. § 1331 ................................................................................1

28 U.S.C. § 1338 ................................................................................1

28 U.S.C. § 2107 ................................................................................1

35 U.S.C. § 102 ...........................................................31, 39, 44, 48

35 U.S.C. § 103 ..............................................................................48

35 U.S.C. § 112 ...................................................3, 27, 35, 37, 41

Fed. Circ. R. 47.5 ..............................................................................1

Fed. R. App. P. 4(a) ..........................................................................1

## I.     STATEMENT OF RELATED CASES

Counsel for Defendant/Appellant Campbell Company ("Campbell") hereby provides the following information pursuant to Federal Circuit Rule 47.5:

No appeal in or from the civil action in the District Court was previously before this or another appellate court.

Counsel for Campbell is not aware of any appeal or other action constituting a related case, nor is counsel for Campbell aware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision on appeal.

## II.     JURISDICTIONAL STATEMENT

The District Court had jurisdiction over this patent infringement matter under 28 U.S.C. §§ 1331 and 1338.  Following a jury trial and the June 30, 2016 Jury Verdict, the District Court entered the following orders on the parties' post-trial motions:  (1) Order Re: Posttrial Motions, dated February 27, 2017; and (2) Order Entering Permanent Injunction, dated March 31, 2017.   The District Court entered final judgment on March 31, 2017, and thus those orders are final and appealable.  Campbell timely filed its Notice of Appeal on April 28, 2017, in accordance with 28 U.S.C. § 2107 and Fed. R. App. P. 4(a).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

1

### III.    <u>STATEMENT OF THE ISSUES</u>

1.    Whether the jury's verdict that Claims 1-4 ("the Asserted Claims") of U.S. Patent No. 7,145,476 ("the '476 Patent") were valid and its related finding of "experimental use" lacked substantial evidence in view of the irrefutable evidence of multiple public uses more than one year prior to the '476 Patent application being filed.

2.    Whether the jury's verdict of validity of the '476 Patent lacked substantial evidence in view of the significant prior art evidence that refuted novelty and/or non-obviousness.

3.    Whether the jury's verdict of willful infringement lacked substantial evidence in view of the overwhelming evidence that Campbell acted in good faith in investigating the '476 Patent well-before this suit was filed.

4.    Whether the District Court erred by not instructing the jury regarding the court's prior constructions of the disputed terms of the Asserted Claims of the '476 Patent, including the term "digital data signals," and regarding the jury's obligation to apply those constructions when considering the issues, and whether that error was prejudicial.

5.    Whether the District Court erred in denying Campbell's Rule 50 Motion for Judgment as a Matter of Law on issues of invalidity and willfully infringement.

6.     Whether the District Court abused its discretion in enhancing damages based on the jury's willfulness finding, given that nothing in the record suggests "egregious" misconduct beyond typical infringement, as required for such damages under the U.S. Supreme Court decision *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).

## IV.   INTRODUCTION AND STATEMENT OF THE CASE

### A.   Introduction

This appeal should not exist, because the underlying District Court action against Campbell should have been summarily dismissed long ago, due to the clear and substantial evidence that proved that Plaintiff/Appellee Polara Engineering, Inc. ("Polara") only obtained the '476 Patent after multiple public uses of the alleged invention, all of which occurred more than one year prior to the filing of the underlying patent application.  Every single one of those public uses met the criteria necessary for patenting under 35 U.S.C. § 112, and the first named inventor admitted during his trial testimony that nothing at all was added to the claimed invention after those clear public uses of the claimed invention.  Therefore, the '476 Patent is and always has been invalid, and the verdict as well as the entirety of the post-trial rulings must be set aside as a result.

Even if that overwhelming public use evidence somehow were not fatal to Polara's '476 Patent (which it is), the additional prior art evidence adduced during

3

trial simply underscores that the asserted '476 Patent claims lacked any novelty and/or were obvious at the time of their filing, thereby further rendering all of those claims invalid.

In addition to those infirmities in the underlying results, the jury's finding of willfulness, and the District Court's decision to enhance damages based on that finding, were both factually and legally unsustainable in view of this Court's standards in *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016), which in no way were met by the trial record. Specifically, the District Court awarded significantly enhanced damages to Polara, despite the absolute lack of any evidence of piracy, copying, or any of the other *Halo* factors, and in contrast the clear, documented record of Campbell's good faith belief that the '476 Patent was invalid due to its own and other third party prior art.

Other grounds for overturning the jury's verdict and otherwise entering judgment on behalf of Campbell also exist here, including the District Court's failure to properly instruct the jury on previously construed claim terms, as well as its failure to grant post-trial Rule 50 Motions which could have corrected its previous errors. All of those issues are discussed in further detail below, and any one of them is sufficient grounds upon which to grant Campbell's appeal and overturn the District Court's judgment. Certainly all of them collectively mandate that in its place, judgment be entered in favor of Campbell, and the '476 Patent

finally be adjudged invalid, as it has been since the date its application first appeared in the U.S. Patent and Trademark Office.

## B.    Statement of the Case

Polara filed this patent infringement suit against Campbell on January 2, 2013.  Polara, a manufacturer of accessible pedestrian traffic signal systems and pedestrian push buttons, alleged that Campbell was infringing Polara's '476 Patent. The '476 Patent, which was filed on August 5, 2004 and issued on December 5, 2006, is directed to a two-wire push button station control system for a traffic light controlled intersection.  Appx85-96.  Polara alleged that Campbell, a manufacturer of traffic-industry products, had developed and sold an "Advisor Advanced Accessible Pedestrian Station," or "AAPS," that infringed the '476 Patent.  In its Answer and Counterclaims, Campbell asserted that it did not infringe the '476 Patent and that the '476 Patent was invalid and/or unenforceable.

Polara subsequently moved for summary judgment of infringement of Claims 1-4 of the '476 Patent.  Claim 1 recites:

> 1. A control system by which vibro-tactile messages are provided to alert pedestrians when to cross a traffic light controlled intersection, said control system comprising:
> at least one push button station located at the traffic light controlled intersection to be crossed by pedestrians, said push button station including a push button head that is depressed by the pedestrians and message generating means adapted to cause said push button head to vibrate to provide a tactile indication to a visually impaired pedestrian when to cross the intersection; and

a control unit that is responsive to the depression of the push button head of said push button station to transmit to the push button station both power and digital data signals over a single pair of wires by which to power and control the operation of said message generating means.

Appx95.  Claim 2 depends from Claim 1 and further provides that "said at least one push button station also includes a microcontroller to receive the power and digital data signals from said control unit, said microcontroller providing output signals to control the operation of said message generating means."  Appx95.

Claim 3 depends from Claim 2 and requires that "said message generating means of said at least one push button station includes a vibration driver connected to said microcontroller to cause said push button head to vibrate and thereby provide said tactile indication to the visually impaired pedestrian that it is safe to cross the intersection."  Appx95.  Claim 4 also depends from Claim 2 and provides that "said message generating means of said at least one push button station includes a sound chip in which prerecorded messages are stored and from which an audible indication is provided to the visually impaired pedestrian whether to enter the intersection depending upon the flow of vehicular traffic therethrough."  Appx95.

On June 10, 2014, the District Court granted Polara's summary judgment motion, finding that Campbell's AAPS infringed Claims 1-4 of the '476 Patent. Appx1-15.  A jury trial was then held on damages, Polara's willful infringement claim, and Campbell's invalidity and unenforceability defenses.  The jury returned its special verdict on June 30, 2016, finding that Campbell had not shown that

Claims 1-4 were invalid or unenforceable, that Polara was entitled to a reasonable royalty, and that Campbell had willfully infringed the '476 Patent.  Appx523-527.

The parties filed post-trial motions on September 12, 2016, which included: (1) Campbell's Motion for Judgment as a Matter of Law ("JMOL") under Federal Rule of Civil Procedure 50(b) challenging, among other matters, the jury's findings that the '476 Patent was valid and willfully infringed; and (2) Polara's Motion for an Order Entering Judgment of Willfulness and to Award Treble Damages ("Enhanced Damages Motion").

The District Court denied Campbell's JMOL and granted Polara's Enhanced Damages Motion, increasing damages by two-and-a-half times based on the jury's finding of willful infringement.  Appx16-79.  Then, on March 31, 2017, the District Court entered a permanent injunction preventing future sales of Campbell's AAPS and entered final judgment.  Appx80-83.  This appeal followed.

## V.    STATEMENT OF THE FACTS

### A.    The '476 Patent and Prosecution History

The Asserted Claims of the '476 Patent (also referred to herein as "the Claimed System") are directed to a system for controlling an intersection to enable both sighted and visually impaired pedestrians to cross once vehicular traffic has been halted.  The Claimed System is a type of Accessible Pedestrian Signal system ("APS"), which informs pedestrians when it is appropriate to cross using visual

7

signals as well as vibro-tactile and audible signals. According to the '476 Patent, one point of novelty of the Claimed System is using a single pair of wires to transmit power and data signals in order to generate message signals for pedestrians. Appx91 (2:6-8).

Specifically, Claim 1 requires that the system's control unit "transmit to the push button station both power and data signals over a single pair of wires by which to power and control the operation of said message generating means." Appx95 (9:66-10:4).

During prosecution of the '476 Patent, the U.S. Patent and Trademark Office ("PTO") rejected pending Claims 1, 2, and 4 as being obvious in view of Bidault (U.S. Patent No. 5,241,307) and Spilo (U.S. Patent No. 3,886,496). Appx3385-3390. In particular, the PTO found that Bidault disclosed all of the limitations of Claim 1 except for the requirement that the digital data signals control operation of a message generating means, which was disclosed in Spilo and thus obvious. Appx3386-3387. In response, the patentee amended Claim 1 to include, among other limitations, the requirement that the power and digital data signals be transmitted over a "single pair of wires" (versus the previously presented "single line"). Appx3391-3400. The PTO allowed the pending claims as amended. Appx3405-3410.

However, as Campbell established clearly and convincingly at trial, the asserted claims were not, in fact, novel or non-obvious, and should have never issued over the prior art.

### B. The District Court's Claim Construction and Related Jury Instruction

The District Court construed the disputed claim terms of the '476 Patent in deciding Polara's motion for summary judgment of infringement.  Appx1-15. Specifically, the parties disputed the meaning of the following terms in the final clause of Claim 1: "[C]ontrol the operation of [the vibrating pushbutton]"; "[C]ontrol unit that is responsive to the depression of [a] push button … to transmit … both power and digital data signals"; and "[D]igital data signals."  Appx9-15.

But the District Court did not "construe" those terms in the traditional sense of providing discrete definitions of the terms.  Instead, the District Court construed the terms by reading Claim 1 on the accused AAPS device and finding the claim limitation present in the device, as follows:

> "[C]ontrol the operation of [the vibrating pushbutton]": "By gathering information from all pushbuttons and broadcasting information that causes a pressed pushbutton to vibrate, Campbell's AAPS satisfies claim 1's 'control' limitation."  Appx10.

> "[C]ontrol unit that is responsive to the depression of [a] push button … to transmit … both power and digital data signals": "Because the AAPS Advanced Pedestrian Controller responds to a pressed button by sending both power and an updated message to all pushbutton stations, AAPS satisfies claim 1's 'responsive' limitation."  Appx12.

9

> "[D]igital data signals":  "It is undisputed that the AAPS Advanced
> Pedestrian Controller sends EoP data packets to pushbuttons using
> OFDM technology to encode digital data onto electrical waveforms.
> Campbell's AAPS therefore satisfies the 'digital data signals'
> limitation."  Appx13.

No other stand-alone constructions were provided by the District Court.  Even so,

those constructions, as they were, were used by the District Court in finding

infringement.

With respect to "digital data signals," that term was at issue on infringement

because the AAPS sends EoP packets – orthogonal frequency division modulation

("OFDM") – to transmit data.  Appx12.  Campbell argued that such packets are not

"digital data signals" as claimed by the '476 Patent.

By comparison, Polara strenuously argued for a broad construction of

"digital data signals" to cover AC (alternating current) signals, like those used by

the AAPS:

> [T]he inventors describe in a preferred embodiment one
> implementation of the claimed invention using a DC-based system
> that utilizes digital data pulses to transmit digital data … [b]ut all will
> agree that this is not the only way to implement data-over-power.
> **The AC-based EoP system utilized by Campbell is clearly another**
> [.]

Appx3904 (emphasis added).

The District Court agreed that "digital data signals" was not limited to the

embodiments in the specification, and defined the term as covering AC systems

such as the AAPS.  Appx13.

That term retained particular significance at trial, because Polara argued to the jury that Campbell's invalidating prior art references did not disclose "digital data signals" because they used AC waveforms to encode information, as explained further below.  Of course, that argument ran directly contrary to Polara's claim construction position in its summary judgment motion that AC systems, such as the AAPS, are covered by the claims.

Polara was able to exploit that ambiguity because the District Court failed to instruct the jury regarding its prior infringement claim constructions, and that the jury was required to apply those constructions when considering the disclosures of the prior art.  It is axiomatic that "[c]laim terms must be construed the same way for the purpose of determining invalidity and infringement." *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003).  That did not happen here.

Instead, the District Court only instructed the jury on the construction of "message generating means" (which had not previously been construed but was stipulated by the parties), and told the jury that all other claim terms must be given their "ordinary and customary meaning."  Appx464.  As such, the jury (and District Court on JMOL) – under the encouragement of Polara's "experts" – applied a narrower construction of "digital data signal" (which excluded AC systems) when considering the prior art versus the broad construction that was

11

used to find infringement.  To be clear, neither Polara nor its experts explained to the jury how the District Court had previously construed "digital data signal." Thus, that construction was never before the jury in any fashion.

Campbell addressed this issue with the District Court in response to Polara's proposed jury instruction regarding a claim term that was never previously construed by the District Court.  Appx342-359.  In particular, Campbell requested that the jury instructions on claim construction "use the exact language that the Court used to define those terms[.]"  Appx358-359.  As can be seen from the given jury instructions, that did not occur.  Appx445-522.  And as explained further below, that prejudicial error resulted in a jury verdict of patent validity that is infirm on both the facts and the law.

### C.   The Inventor Reduced the Asserted Claims to Practice in January 2002

At trial, the inventor of the '476 Patent, Leslie Beckwith, testified that in January 2002, he reduced the Asserted Claims to practice in Polara's laboratory. Specifically, Mr. Beckwith explained that that version of the Claimed System transmitted power and "communicated digital data signals from the control unit over the two wires to the pushbutton as expected," and it "had all the functionality" of Claims 1-4:

12

Q. So before you put it in the parking lot, all you had was the working embodiment, the working device itself correct?

A.  We had informal sketches.

Q.  Okay, but the device worked?

A. Yes.

Q. And it communicated from the control unit over the two wires to the push button as you expected?

A. Yes.

Q. And it had all the functionality that's described in claims 1, 2, 3, and 4 there; correct?

A. Yes.

Appx2538-2540 (111:8-19).  In short, according to the inventor's own admissions,

the Claimed System worked as intended in the lab at Polara.

Mr. Beckwith further testified that later in January 2002, the Claimed

System worked as intended over a longer distance when Polara demonstrated it in

the parking lot at Polara.  Appx2481 (53:18-20).  The success of that

demonstration was confirmed by Polara's President and owner, John McGaffey,

who testified as follows:

Q.: So sometime there.

So the purpose of that embodiment [parking lot at Polara in January of 2002] was a control unit, the pushbutton station with vibrating pushbutton and longer wire, correct?

A.: Yes.

Q.: Okay and that successfully operated; correct?

A.: In our parking lot, it did, yes.

Q.: Okay. So as for the claims in the patent which the control unit, pushbutton station, two wires, digital data signals, and power, controlling, that was all there in the parking lot over the longer wires in early 2002: correct?

A.: Yes.

Appx2820-2822 (177:15-178:1).

Thus, the undisputed evidence shows that the Claimed System was reduced to practice and was ready for patenting as of January 2002, which according to well-settled Federal Circuit precedent precludes any claim by Polara that later public uses were permissible "experimental uses," as discussed below.

### D.   Polara Publicly Used the Asserted Claims at Multiple Locations More than One Year Before the '476 Patent's Filing Date of August 5, 2004

After Polara reduced the Asserted Claims to practice, it publicly used the Claimed System at multiple locations more than a year before the '476 Patent's filing date, thus rendering the patent invalid.  In particular, Messrs. Beckwith and McGaffey testified that in March 2002, the Claimed System was publicly installed and used at the intersection of Gilbert and Commonwealth in Fullerton, California ("the Gilbert Installation").  Appx2480-2482 (52:2-22), Appx 2508-2510 (81:2-7), Appx2996-2997 (178:2-8).  According to Mr. Beckwith, the public installation included all of the limitations of Claims 1-4, as well as the unclaimed feature of

having the claimed "single pair of wires" placed in an existing underground electrical conduit below the street level.  Appx2402-2404 (206:5-207:11).

Mr. Beckwith also testified that the only modification Polara made to the Gilbert Installation involved the unclaimed configuration of placing the single pair of wires underground in a conduit with other electrical lines.  That underground configuration resulted in "noise" from existing power lines in the conduit interfering with communications from the Claimed System.  Appx2510 (82:4-16). Mr. Beckwith testified that he resolved that issue by simply replacing an inductor with a transformer in the Claimed System.  Appx2533-2535 (105:7-107:19), Appx2997-2999 (178:2-180:7).  The device was reinstalled at the same location three weeks later (April 2002) and successfully operated at that location without any further changes for a few months.  Appx2997-2999 (178:2-180:7).

After the successful Gilbert Installation, in the Fall of 2002, Polara again placed the Claimed System in public use at a different Fullerton intersection:  State College and Nutwood ("State College Installation").  Appx2999-3001 (180:8-181:21).  The State College Installation was in public use for over a year. Appx2999-3001 (180:8-181:21).

According to Mr. McGaffey, the State College Installation was to "exercise the system" given the higher volume of pedestrian traffic at that intersection. Appx2241-2242 (44:6-45:3), Appx2480-2482 (52:21-53:7).  He also testified that

the purpose of the installation was to test the underground wire configuration to address potential "noise issues" and mud in the underground conduit. Appx2241-2242 (44:6-45:3). Mr. McGaffey wanted to see the underground configuration "operate in a larger intersection" prior to "announcing" the Claimed System and offering it for sale. Appx2998-3000 (180:18-181:18). In other words, the installations were for "commercial development" and not to test any claimed features.

In fact, Mr. Beckwith admitted that the State College Installation was not used to test any claimed features of the '476 Patent. Appx2535-2538 (107:20-110:23). Rather, that installation was done solely for commercial development. Appx2538 (110:18-20).

Curiously, except for a January 10, 2002 marketing letter sent by Polara's marketing department to Mark Miller at the City of Fullerton, there are no documents or records that otherwise relate to the Gilbert or State College Installations, including the design change made to the Gilbert device or any testing, inspection, use, or analyses of the devices. Appx2485-2486 (57:1-58:9), Appx2533-2534 (105:23-106:19), Appx3728-3729. The only "evidence" that Polara offered at trial to support its "experimental use" narrative was conclusory testimony of Beckwith and McGaffey that they were "testing" the system. However, upon further examination, Mr. Beckwith admitted that such testing was

16

related to non-claimed features of the system, which is not a permitted public use under the Patent Laws.

In the end, Polara's marketing effort with the installations was successful, as Mr. Miller attending the installations and the City of Fullerton subsequently purchased the Polara device (the "Navigator 2").  Appx2477-2479.

### E.    The Asserted Claims Are Not Novel or Non-Obvious

As indicated, Polara was required to amend its claims to specify that the Claimed System sends power and digital data signals "over a single pair of wires." However, as established at trial, there was nothing new or non-obvious about that configuration.  Specifically, as confirmed by Campbell's technical expert, Dr. Jones, Wilkinson (U.S. Patent No. 4,851,836, issue date July 25, 1989), which was cited but not relied on by the PTO, discloses transmitting both power and "encoded messages" over a single pair of wires to both power and control the operation of a vibrating pushbutton in a cross-walk system, along with all of the other limitations of Claims 1-4:

> The power supply unit 17 provides an extra low A.C. votage [*sic*] which is half wave during the DON'T WALK mode and full wave during the WALK mode. **Thus, only two wires are needed to power and control the system.** The local power supply unit 18 within the pedestrian push-button housing rectifies the A.C. signal from the power supply unit 17 to provide the D.C. voltages required. The local power supply unit 18 also decodes the full wave/half wave signal to provide the WALK and DON'T WALK signals to the main timing network 10.

Appx3379-3383 (3:50-61) (emphasis added), Appx3043-3046 (30:5-32:18).

Moreover, as confirmed by Dr. Jones, the claimed power/data configuration was also embodied in the commercial pedestrian systems known as the Campbell Enlightened and the third-party Tassimco PIU 500, which were sold starting in 1999 and 1998, respectively:

> Q. Okay. Now, Wilkinson both powered and controlled over two wires; correct? We just went over that; didn't we?
>
> A. Yes, it did.
>
> Q. Tassimco both powered and controlled over two wires; correct?
>
> A. As far as I saw, yes. In fact, looking back at the -- like I say, I didn't test it out, but looking at the button schematic, yes, two wires.
>
> Q. And the Campbell Enlightened device both powered and controlled over two wires; correct?
>
> A. Which device was that?
>
> Q. The Campbell Enlightened.
>
> A. Oh, yes. I'm sorry. Of course, two wires. Yes.
>
> Q. Powering and signal, two wires.
>
> A. Over two wires. That's right.

Appx3127-3128 (113:23-114:12).

By way of background, the Tassimco 2-wire PIU 500 device had a control unit that both powered and controlled the operation of a pushbutton utilizing just a single pair of wires. Appx2602-2604 (175:15-176:21), Appx2606-2607 (179:1-150), Appx2608-2609 (181:5-9), Appx3364-3370, Appx2751-2754 (121:15-

124:19), Appx3650-3653.  The control unit manipulated voltages (not power), thereby transmitting digital signals to the pushbutton to control it.  Appx2752-2753 (124: 14-19), Appx3047-3049 (35:10-17), Appx2051-2053 (38:17-39:9). Campbell's Enlightened system also had a control unit that both powered and controlled the operation of a pushbutton utilizing just a single pair of wires by manipulating voltages, in the same manner (rectified and partially rectified signals) as described in Wilkinson. Appx2609 (181:5-9), Appx3052-3053 (39:10-40:20), Appx3055-3060 (41:8-46:13).

Dr. Richard Wall – Campbell's partner in the AAPS project – testified the "pre-2000" 2-wire pedestrian control systems he investigated supplied power and used "binary communications," which are "data signals."  Appx2807-2808 (177:19-178:15).  Dr. Wall also testified that the transmission of "data signals" over two wires in the "pedestrian controls" field had been done since before the year 2000.  Appx2806-2808 (177:19-178:15), Appx2811-2812 (181:12-182:12). Moreover, Polara's technical expert, Dr. Harris, admitted the Enlightened 2 wire device, which transmitted "voltage symbols," not only transmitted "signals" but also "power." Appx3106-3108 (93:9-18).

Also, Dr. Harris admitted the transmission of "digital signals" over just "a single pair of wires" was "obvious:"

> Q. I'm quite a bit older than you, so let's back it up a little bit. Let's bring it to the time frame of 2004.

19

A. You're the expert here.

Q. As of the time frame of 2004, it was obvious that you could send digital data signals over two wires; correct?

A. It was, yes. In other contexts, yes, you could send digital data signals over two wires.

Appx3131 (117:12-18).

In other words, Dr. Harris not only recognized that Wilkinson transmitted both power and signals to "power and control the vibrating pushbutton/message generator," but he also agreed that the use of digital signals in place of the encoded signals over the two wires, was likewise obvious.

Finally, Dr. Harris agreed the use of a "control unit" was obvious at the time of the '476 Patent application, and that microcontrollers (Claim 2) were in "heavy use" at the time of the application and "pretty obvious." Appx3112-3113 (98:16-99:23). Dr. Harris further agreed the use of a vibrating pushbutton (Claims 1 and 3) was "obvious" since 1989 when Wilkinson issued. Appx3117 (103:18-21), Appx3127 (113:13-18). Furthermore, Dr. Harris testified that the use of a sound chip (Claim 4) was also obvious. Appx3112-3115 (101:4-11, 99:23-101:11).

At trial, the primary point of contention regarding Wilkinson, Tassimco, and/or the Enlightened systems was whether their alternating current ("AC") signals are "digital data signals," as claimed by the '476 Patent and as construed by the District Court as covering the AAPS AC-based system. (Wilkinson is an AC-based system, Tassimco is a DC-based system, and Enlightened is a combination

20

DC/AC-based system.)  However, as set forth below, the District Court committed

reversible error by failing to instruct the jury regarding the court's prior broad

construction of "digital data signal" used to find infringement, such that the jury

could consider those three prior art references under the proper construction, as

required.  Instead, the District Court only instructed the jury on the meaning of

"message generating means."  Appx464.  Thus, both the jury at trial and the

District Court on JMOL applied an incorrect and overly-narrow construction, even

though claim terms are to be construed the same for infringement and invalidity.

The District Court's error was prejudicial and compels reversal of the jury and the

court's validity findings.

### F. Campbell Believed in Good Faith, Based on Advice of Counsel, that the '476 Patent Was Not Infringed and/or Invalid

In 2007, Dr. Richard Wall of the University of Idaho approached Campbell's

Phil Tate to discuss development of an innovative "peer to peer network based

broadcast system" that operated an entire intersection full of pushbuttons over a

single pair of wires, which differed from the Claimed System of the '476 Patent of

using a single pair of wires to control just a single phase of pedestrian traffic.

Appx2798-2800 (169:16-170:10), Appx2805 (175:7-11).

When Dr. Wall approached Tate, Campbell had been interested in

developing another product to add a 2-wire device to supplement its 4-wire APS

device market needs. Appx2619-2620 (192:5-24), Appx2622 (194:19-25).  Also, at

21

the time, Tate was aware of the '476 Patent.  Therefore, he reviewed the '476

Patent with Dr. Wall, who noted several differences between the '476 Patent and

the network device they were contemplating, eventually known as the "AAPS."

Appx2809-2812 (180:22-181:9).  Namely, Dr. Wall found there were at least

eleven "architectural differences" between the '476 Patent and the AAPS.

Appx3362, Appx2799-2800 (170:10-25), Appx2797-2799 (168: 23-169:12).

Dr. Wall identified some similarities, namely two wire "communications over

powerline," but as Dr. Wall testified, "data over powerline" had been practiced

since the 1930's.  Appx2596-2597 (169:2-18), Appx 2800-2802 (171:3-8).

Moreover, Dr. Wall and Tate discussed certain specific reasons that the

AAPS device was not covered by the '476 Patent claims.  Specifically, Dr. Wall

clarified that the AAPS communicated bi-directionally in a completely different

structure that was regularly distributed (4 messages per second – whether a

pushbutton was depressed or not) by a broadcast server system, as opposed to the

traditional "master/slave" system found in the claims of the '476 Patent.   By

comparison, the AAPS operates over its own "ethernet system." Appx2801-2802

(172:2-16), Appx2805-2807 (175:15-21, 176:14-22, 176:25-177:10).

As reflected in Claim 1 of the '476 Patent, the Claimed System operates

only "in response to the depression of a pushbutton" to transmit both power and

digital data signals to both "power" and "control" a pushbutton. Appx3091-3092

(78:15-23).  In contrast, the Campbell AAPS constantly supplies a steady power

("18Volts DC") and regularly sends broadcasts at a rate of four updates per second

to all pushbuttons, whether the button is depressed or not; it does neither in

response to the depression of a pushbutton as required by Claim 1.  Appx5.

Furthermore, Dr. Wall reviewed the limitations of Claim 11 (upon which

Clams 12 to 20 depend) and explained that those limitations are simply not

contained within the AAPS.  Appx2808-2810 (179:4-22).

Notably, Campbell maintained those non-infringement arguments

throughout this case, up and until the District Court's summary judgment ruling.

In addition to reviewing the '476 Patent with Dr. Wall, an expert in the field,

Mr. Tate also sought the opinion of Campbell's patent attorney, Robert Shaver.

After reviewing the patent and file history, Mr. Shaver advised Mr. Tate that

AAPS would likely be found non-infringing and that the '476 Patent was likely

invalid over the prior art, including over the three "two wire" pedestrian

pushbutton devices discussed herein.  Appx2560-2562 (133:9-11), Appx2577-2579

(149:19-150:6).  That opinion was reiterated in writing by Mr. Shaver's

associate/intern Joe Lindsey, who concluded that the '476 Patent could easily be

proved invalid.  Appx3832-3833.  Neither Mr. Shaver, nor anyone else, ever told

Mr. Tate anything to the contrary.  Appx2594-2596 (167:24-168:8).

23

While consulting with Mr. Shaver, Mr. Tate explored several avenues with Dr. Wall regarding the new device (zero, 2 or 3 wires) and instructed Wall to explore the use of a third wire.  Appx2567-2569 (140:1-10), Appx2571 (143:2-7).  Also, Tate learned that Wall had given his input to University of Idaho's legal counsel regarding the different architecture and counsel signed off on the project going forward.  Appx2573-2575 (146:7-17), Appx2622-2626 (195:4-197:5).  Tate understood that the university's legal counsel agreed that the AAPS project did not infringe and/or the '476 Patent was invalid.  Appx2583-2586 (156:13-157:15).  As Tate testified, the university would not have proceeded had it believed the effort would have infringed a valid patent.  Appx2596 (168:9-18).

The Campbell/Dr. Wall APPS project proceeded and a U.S. patent application was filed August 18, 2009, based on an earlier-filed provisional application.  Appx3854-3887.  The parties did not hide their knowledge of the '476 Patent, and in fact cited the patent as potentially relevant prior art in an Information Disclosure Statement.  Appx2553-2556 (126:2-15), Appx3854.  The AAPS project proceeded and was placed on the market in 2010.

Because Campbell did not receive any cease and desist demand from Polara regarding the AAPS in the three years prior to this lawsuit, Campbell had no reason to doubt the legal advice it has received from multiple sources.

24

### G.    The Court Improperly Prevented Campbell from Presenting Evidence of Non-Infringement to Refute Willfulness

During trial, the District Court instructed the jury that while Campbell had already been found to infringe, that finding should not impact the jury's consideration of other issues.   Appx457.  Subsequently, in an improper attempt to influence the jury, Polara repeatedly raised the infringement finding to challenge Mr. Tate's testimony regarding Campbell's good faith investigation of the '476 Patent, stating that Campbell had received another "opinion" and had been "instructed by the Court" that the AAPS infringed: "A federal judge in this building said that your device infringes."  Appx2593-2595 (166:24-25), Appx3280-3282 (124:5-8).

Those pronouncements to the jury were improper and prejudicial, particularly since Mr. Tate was not allowed to explain to the jury his good faith belief – based on consultation with patent counsel – regarding non-infringement, for fear of "opening the door" and allowing additional prolonged questioning on a topic and finding which the jury had been instructed was not relevant to its deliberations.

Moreover, the District Court improperly rejected Campbell's request that the Special Verdict Form require the jury to consider Campbell's "willfulness" throughout the period of alleged infringement – not just when Campbell received the District Court's infringement finding – which as explained below is required

25

under Supreme Court precedent.  Appx304-313.  Those errors resulted in a verdict

that is legally and factually insufficient.

## VI.    SUMMARY OF THE ARGUMENT

This Court should reverse the jury's verdict and the resulting Judgment and

permanent injunction on several grounds.

First, the jury's verdict that the Asserted Claims are valid despite Polara's

undisputed open and unrestricted public use of the Claimed System at two

locations in Fullerton, California approximately two years before the filing date of

the '476 Patent lacked substantial evidence.  Specifically, the jury's related finding

of "experimental use" was simply not supported by the evidence.

Instead, the evidence – including the inventor's own testimony – established

that Polara reduced the Claimed System to practice in January 2002.  Because

"experimental use" ends with reduction to practice, Polara's subsequent public

uses of the Claimed System cannot be considered "experimental" so as to avoid the

public use bar.

Moreover, the evidence establishes beyond dispute that Polara's public uses

were to test non-claimed features of the Claimed System, and were not undertaken

for the purposes of filing a patent application.  In fact, **the inventor admitted**

**that there was nothing preventing him from filing a patent application on the**

26

**Claimed System at the time of the public uses**.  This fact alone is fatal to

Polara's '476 Patent under this Court's long-standing precedent.

Also, in denying Campbell's JMOL, the District Court ignored

uncontroverted evidence showing that: (1) the inventor admitted that he reduced

his invention to practice in January 2002, before the alleged "testing,"; (2) neither

the City of Fullerton nor any users of the installations were required to sign any

confidentiality agreement; (3) the test period for each installation was

approximately one year, well-beyond the time needed to make any modifications

to the system, as explained above; (4) Polara has absolutely no records of the

alleged "experimentations" or of the actions taken by Polara to test the system or

otherwise make improvements; and (5) the inventor admitted that the installations

were meant to commercially exploit the Claimed System and not test any claimed

features.

When all of those factors are fairly considered, the only conclusion to be

drawn is that Polara created its "experimental use" narrative in a last-ditch attempt

to preserve the validity of its untimely-filed patent.  Simply put, the substantial

evidence presented at trial establishes that by March 2002, Mr. Beckwith's

Claimed System was ready for patenting, and he could have filed a patent

application that met the requirements of 35 U.S.C. § 112 by that date.  Therefore,

the jury and District Court erred in finding that the experimental use exception to the public use bar applied here, and that finding should be overturned.

Second, the jury's verdict of validity based on novelty and/or non-obviousness lacked substantial evidence. As a preliminary matter, and as the District Court recognized, the "dispositive issue" regarding whether the prior art devices introduced by Campbell at trial – the Wilkinson, Tassimco, and Enlightened devices – anticipated or rendered obvious the Claimed System was whether those AC and/or DC-based devices used "digital data signals" as recited in Claim 1. On that issue, the District Court erred by not instructing the jury regarding the court's prior constructions of the disputed claim terms of the '476 Patent, including "digital data signals," and regarding the jury's obligation to apply those constructions when considering the issues, and that error was prejudicial. Notably, the District Court had previously found that Campbell's AAPS AC-based system infringed the Asserted Claims because even though it encoded data on an AC waveform, those AC signals are encompassed by the term "digital data signals." However, at trial and on JMOL, the jury and the District Court applied a narrower construction of "digital data signals" that excluded AC signals, such as those used by the Wilkinson and Enlightened prior art systems. Thus, two different constructions were applied on infringement and validity, which is expressly forbidden by this Court's precedent.

When the proper construction is applied to the prior art devices, the only conclusion a reasonable jury could draw is that the Claimed System is anticipated or at least rendered obvious by the prior art devices.

Third, the jury's verdict of willful infringement lacked substantial evidence in view of the overwhelming evidence that Campbell acted in good faith in investigating the '476 Patent.  In particular, the Supreme Court in *Halo* explained that conduct warranting a willfulness is typically "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate."  *Halo*, 136 S. Ct. at 1935.

In this case, the evidence simply does not support such a characterization of Campbell's actions.  Rather, the circumstances show that Campbell – of its own initiative and not under any threat of litigation from Polara – acted responsibly and reasonably in investigating the '476 Patent with counsel and an expert in the field before embarking on the AAPS project.  Simply put, this is not an "egregious case[] of misconduct beyond typical infringement," as required to find willfulness under *Halo*.  *Halo*, 136 S. Ct. at 1935.[1]

Finally, the Court should find that the District Court abused its discretion in enhancing damages in any amount based on the jury's willfulness finding, given

---

[1] For the same reasons, the Court should also reverse the District Court's denial of Campbell's JMOL motion on the issues of validity and willful infringement.

that nothing in the record suggests "egregious" misconduct, and reverse the District Court's enhanced damages award.

## VII.  **ARGUMENT**

### A.    **Standard of Review**

This Court reviews a "district court's denial of a [Rule 50] motion for JMOL without deference, applying the same standard employed by the district court." *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139 (Fed. Cir. 2004).  That standard requires this Court to "determine whether viewing the evidence in the light most favorable to the non-moving party, and giving the non-movant the benefit of all reasonable inferences, there is sufficient evidence of record to support a jury verdict in favor of the non-movant." *Id*.

This Court will "reverse a denial of a motion for JMOL only if the jury's factual findings, presumed or express, are not supported by substantial evidence or, if they are, that the legal conclusions implied from the jury's verdict cannot in law be supported by those findings."  *Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1547-48 (Fed. Cir. 1994).  The "substantial evidence" standard requires this Court "to decide for [itself] whether reasonable jurors viewing the evidence as a whole could have found the facts needed to support the verdict in light of the applicable law." *Id*. at 1548.   If this Court "concludes that no reasonable findings of fact, supported by substantial evidence, could support the verdict that was incorporated into the

30

trial court's judgment," then this Court "must conclude that the trial court erred in not granting the motion for [JMOL]." *Id.* (brackets in original).

This Court reviews the District Court's determination to award enhanced damages based on a finding of willful infringement for abuse of discretion. *Halo,* 136 S. Ct. at 1934.

**B.    The District Court Erred by Denying Campbell's JMOL on the Jury's Validity Verdict in View of Prior Public Use, which Was Not Supported by Substantial Evidence**

**1.    The Parties Do Not Dispute that the Claimed System Was in Public Use as of March 2002**

Under the applicable version of 35 U.S.C. § 102(b), a patent is invalid if "the invention was … in public use or on sale in this country [] more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b). The public use bar applies if the invention is "in public use" and "ready for patenting."  *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379 (Fed. Cir. 2005).

Here, there is no dispute that both the Gilbert and State College Installations were public.  In fact, there is no evidence that any observer or user of the installations was required to, or in fact did, sign any confidentially agreement. Appx2246-2247 (49:3-12).  To the contrary – the public openly used the system at each installation for several months.

There is also no dispute that all of the limitations of Claims 1-4 were involved in the demonstrations.  That is, the installations consisted of a control unit that communicated over a single pair of wires with a pedestrian pushbutton equipped with a microcontroller to react to either "Walk" or Don't Walk" signals to cause the pushbutton to vibrate and give audio responses from a sound chip.  Appx2402-2404 (206:5-207:11).

Even so, Polara contended at trial that the installations were permissible "experimental uses" of the Claimed System.  However, there is no actual evidence supporting that litigation-inspired defense, as explained below.  Rather, the evidence makes clear that Polara used the installations to help commercially exploit an "invention" that had already been well-reduced to practice.

### 2.    The Claimed System Was Reduced to Practice as Early as January 2002

As this Court recently affirmed, "[t]here are at least two ways in which an invention can be shown to be ready for patenting: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 855 F.3d 1356, 1371 (Fed. Cir. 2017) (internal quotations omitted).  An invention is reduced to practice when "the inventor (1) constructed an embodiment ... that met all the limitations and

32

(2) determined that the invention would work for its intended purpose." *Id*. at 1371–72 (internal quotations omitted).

As indicated, Mr. Beckwith testified that the Claimed System he tested in Polara's laboratory in January 2002 had all of the functionality found in Claims 1-4. Appx2538-2540 (111:8-19). Mr. Beckwith further testified that later in January 2002, the Claimed System worked as intended in the parking lot at Polara. Appx2820-2822 (177:15-178:1). Thus, the Claimed System was reduced to practice and was ready for patenting as of that date. That factor is important because "once an invention has been reduced to practice, it can no longer meet the experimental use exception," which is the exception Polara relies on here in an improper attempt to avoid the consequences of its commercial exploitation of the Claimed System more than one year before the '476 Patent's filing date. *Zacharin v. United States*, 213 F.3d 1366, 1369 (Fed. Cir. 2000).

Specifically, Polara contends that the Claimed System was not ready for patenting in January 2002 because its functionality and "durability" needed to be tested in a live intersection. However, as explained below, the substantial evidence presented at trial compels the opposite conclusion: **the Claimed System operated as intended and as claimed as early as January 2002, and certainly by the time the system was publicly installed at the two Fullerton locations**.

### 3.    The Evidence Establishes that the Experimental Use Exception Does Not Apply Here

This Court has long held that use may be experimental "only if it is designed to (1) test claimed features of the invention or (2) to determine whether an invention will work for its intended purpose—itself a requirement of patentability." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1327 (Fed. Cir. 2009); *accord In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1373 (Fed. Cir. 2008). "But, there is no experimental use unless claimed features or overall workability are being tested **for purposes of the filing of a patent application**." *Clock Spring,* 560 F.3d at 1327 (emphasis added).  Moreover, "[L]ater refinements do not preclude reduction to practice, [and] it is improper to conclude that an invention is not reduced to practice merely because further testing is being conducted." *Helsinn*, 855 F.3d at 1372 (brackets in original).  Additionally, to show experimental use, a patentee must establish that "before the critical date, [the patentee] was unable to file a patent application that met the requirements of 35 U.S.C. § 112." *Id*. at 1375.

In denying Campbell's JMOL regarding invalidating public use, the District Court found that Polara presented "substantial evidence of experimental use" at the Fullerton installations because Polara was testing the "durability" of a "life safety device" that "must be capable of enduring different weather conditions, volumes of pedestrian traffic, and electrical-noise interference."  Appx27-28.  The District

Court also relied heavily on the discussion in the specification and "summary" of the '476 Patent that existing pairs of underground wires could be used to transmit power and data to support is conclusion that testing of an underground wiring system, as took place in Fullerton, was required to establish patentability. Appx28. But again, the underground wiring configuration is not found in Claims 1-4, and is simply an **unclaimed** embodiment of the invention. Finally, the District Court cited evidence that some modifications were made to the installed devices, however, those did not involve any features of Claims 1-4. Appx24-25.

Under this Court's well-settled precedent, the jury and District Court placed too high of a standard on the requirement that the Claimed System "work for its intended purpose," and indeed went well-beyond the requirements of 35 U.S.C. § 112.

With respect to testing for "durability," as in *Clock Spring*, there is no evidence that Polara was testing the durability of the Claimed System "for the purposes of [a] patent application to the PTO." *Clock Spring*, 560 F.3d at 1327. Rather, Mr. Beckwith testified that the public uses concerned commercial development of the underground-wired version of the Claimed System (the "Navigator 2"):

> Q. All of those uses you were talking about, those were all commercial issues for developing a device; correct?

35

A. Correct.

Appx2538 (110:18-20).

In fact, Mr. Beckwith admitted that the ongoing testing at the Gilbert and

State Collect Installations did not prevent him from filing a patent application, and

that there was no reason he could not have done so in the Fall of 2002.  Appx2537-

2539 (109:23-110:13).  Therefore, if durability were being tested, it was not for

purposes of the patent application, and cannot bring the experimental use exception

into play.  *See Clock Spring*, 560 F.3d at 1328.

Also, there is no evidence that the purpose of the installations was to test any

claim limitations as required for experimental use.  Durability is not a claim

limitation, nor is the underground wiring configuration.  *See Allen Eng'g Corp. v.*

*Bartell Indus., Inc.*, 299 F.3d 1336, 1355 (Fed. Cir. 2002) ("experimental [use] ...

does not apply to experiments performed with respect to non-claimed features of

an invention") (citation omitted, brackets in original); *see also LaBounty Mfg., Inc.*

*v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 1074 (Fed. Cir. 1992) ("It is well

settled that 'testing' of a device to determine suitability for a customer's particular

(unclaimed) need is not experimental use[.]").

Under similar circumstances, this Court has found that the experimental use

exception does not apply.  Specifically, in *Helsinn Healthcare*, the Court reversed

the District Court's finding after a bench trial that the claimed invention was not

reduced to practice before the critical date, as required for the on-sale bar to apply. *Helsinn Healthcare*, 855 F.3d at 1373.  In doing so, the Court held that the District Court erred in finding that the claimed pharmaceutical invention needed to establish "efficacy" under FDA standards and undergo related Phase III studies required by the FDA before it could be considered "reduced to practice."  *Id.*  In particular, this Court held that the District Court "applied too demanding a standard" because "Phase III studies and final FDA approval are not pre-requisites for the invention here to be ready for patenting," given that the evidence established that the "patented invention would work for its intended purpose" as claimed.  *Id.*

This Court also emphasized that an invention is "ready for patenting" if the patentee is able to file a patent application that meets the requirements of 35 U.S.C. § 112:

> Under the District Court's unduly restrictive standard, Helsinn could not have filed a valid patent application before the critical date of January 30, 2002. Such a standard would preclude the filing of meritorious patent applications in a wide variety of circumstances. The evidence that the formulation was ready for patenting is overwhelming, and the District Court's contrary conclusion—applying the wrong standard—was clearly erroneous. There is simply no tenable argument that, before the critical date, Helsinn was unable to file a patent application that met the requirements of 35 U.S.C. § 112.

*Id.* at 1375.

Similarly, here, there is substantial evidence – including the inventor's own testimony – showing that the inventor Mr. Beckwith could have filed a patent application for the invention of Claims 1-4 with a sufficient and enabling disclosure as early as January 2002, if not by March 2002.  That is, Mr. Beckwith testified that the installations tested only non-claimed features of the system, that no claim limitations were refined due to the installations, and that nothing prevented him from filing a patent application in March 2002.  Appx2537-2539 (109:23-110:20).  Therefore, applying *Helsinn Healthcare*, the District Court clearly erred by requiring that the Claimed System first be tested for "durability" and "safety" – both unclaimed features – before it was ready for patenting, and that finding should be reversed.

Even if the Court finds substantial evidence of experimental use at the Gilbert Installation, Polara resolved the only impediment to the workably of that device (*i.e.*, the noise problem resulting from the unclaimed underground wire configuration) within three weeks of the initial installation, and the device was then back in public use in March/April 2002.  As Mr. Beckwith testified, no other changes were made to that device before it was put into production.  Appx2533-2535 (105:7-107:19), Appx2997-2999 (178:2-180:7).  Thus, the Claimed System "worked for its intended purpose" and was ready for patenting in March/April

2002, and Polara's continuing public use after that date is invalidating under

35 U.S.C. § 102(b).

Furthermore, the District Court's reliance on *EZ Dock v. Schafer Sys., Inc.*,

276 F.3d 1347 (Fed. Cir. 2002) to effectively graft a "durability" limitation into

Claims 1-4 was misplaced.  There, the patentees specifically changed the pylon

shape of their floating dock design based on how the original design performed

while being publicly used, and that design change made its way into the claims of

the patent application.  *Id*. at 1354.  The *EZ Dock* court denied summary judgment

regarding defendant's on-sale bar defense, and noted that "when an inventor can

show changes during experimentation that result in features later claimed in the

patent application, this evidence is a strong indication" of experimental use.  *Id*. at

1353.

By comparison, here, Mr. Beckwith testified that none of the limitations of

Claims 1-4 was refined or changed based on the Fullerton installations, and that the

installations were primarily to test unclaimed features of the invention, *i.e.*,

"durability" and the underground wire configuration.  Appx2535-2538 (107:20-

110:23).  Thus, *EZ Dock* is inapposite.

Finally, while the District Court briefly referred to the *Clock Spring* factors

in concluding that the evidence presented at trial supported Polara's claim of

experimental use, the court's analysis in that regard was insufficient and ignores

key evidence presented at trial.[2]  Appx26-30.

Most critically, the court ignored uncontroverted evidence (discussed above)

showing that: (1) neither the City of Fullerton nor any users of the installations

were required to sign any confidentiality agreement; (2) the test period for each

installation was several months, well-beyond the time needed to make any

modifications to the system; (3) Polara has absolutely no records of the alleged

"experimentations" or of the actions taken by Polara to test the system or otherwise

make improvements; and (4) the inventor admitted that the installations were

meant to commercially exploit the Claimed System and not test any claimed

features.

When all of those factors are fairly considered, the only conclusion to be

drawn is that by March 2002, Mr. Beckwith's Claimed System was ready for

patenting, and he could have filed a patent application that met the requirements of

---

[2] Those factors include: "(1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, (9) the degree of commercial exploitation during testing, (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers." *Clock Spring*, 560 F.3d at 1327.

35 U.S.C. § 112 by that date.  As such, the jury and District Court erred in finding

that the experimental use exception to the public use bar applied here, and that

finding should be overturned, and a judgment that the '476 Patent is invalid should

be entered in its place.

### C.    Campbell Was Prejudiced by the District Court's Failure to Instruct the Jury on the Court's Claim Constructions

As indicated, the District Court failed to instruct the jury regarding the

meaning of various claim terms, including most critically "digital data signals."

During summary judgment, Polara argued for a broad construction of digital data

signals to cover AC signals, like those used by the AAPS: **The AC-based EoP

system utilized by Campbell is clearly another** [.]"  Appx3904 (emphasis

added).

The District Court agreed that "digital data signals" was not limited to the

embodiments in the specification, and defined the term as covering AC systems

such as the AAPS:

> It is undisputed that the AAPS … sends EoP data packets to
> pushbuttons using OFDM technology to encode digital data onto
> electrical waveforms.  Campbell therefore satisfies the "digital data
> signals" limitation.

Appx13.

However, the District Court never instructed the jury that "digital data

signals" can mean both DC and AC signals, or that the jury was required to apply

that interpretation when considering the prior art.  *See Amgen*, 314 F.3d at 1330.
In fact, the jury was never presented with the court's prior construction of that
term, or with Campbell's non-infringement argument based on the AAPS's use of
AC signals to communicate information.  Due to the District Court's error, one
broad construction was applied on infringement, and a second, more narrow
"construction" was used by the jury in assessing the prior art and rejecting
Campbell's invalidity arguments.

The District Court's failure to instruct the jury on claim construction was
legally erroneous and had prejudicial affect against Campbell.  *See Sulzer Textil
A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004) ("The question of
whether a jury instruction on an issue of patent law is erroneous is a matter of
Federal Circuit law and is reviewed de novo … [a] jury verdict will be set aside,
based on erroneous jury instructions, if the movant can establish that those
instructions were legally erroneous, and that the errors had prejudicial effect.")
(internal quotations omitted).

As explained by this Court, "is the duty of trial courts in patent cases in
which claim construction rulings on disputed claim terms are made prior to trial
and followed by the parties during the course of the trial to inform jurors both of
the court's claim construction rulings on all disputed claim terms and of the jury's
obligation to adopt and apply the court's determined meanings of disputed claim

42

terms to the jury's deliberations of the facts." *Id*. at 1366.  This Court has also made clear that "the trial court in a patent case must at minimum take steps to assure that the jury understands that it is not free to consider its own meanings for disputed claim terms[.]" *Id*.  Applying those principles here, the District Court plainly erred by not instructing the jury on the meaning of disputed claim terms.

Additionally, the District Court's error was prejudicial because "the outcome of the case would have been different had the correct instruction been given" regarding the meaning of "digital data signals." *Id*. at 1367.  In fact, as the District Court recognized, the issue of "digital data signals" was "dispositive" on invalidity:  "[a]t trial, **the dispositive issue regarding invalidity was whether an alternating power signal like the signal disclosed in Wilkinson was a digital-data signal**." Appx31 (emphasis added).  Yet, the District Court never applied its prior construction of that term during trial or in denying Campbell's JMOL on invalidity.   Instead, it ignored that broad construction – which had previously resulted in a finding of infringement – and opined that "Polara presented ample evidence that Wilkinson and the other prior art did not disclose the digital-data-over-power limitation of Claims 1 through 4." *Id.* at 17.

Nevertheless, had the jury been properly instructed that "digital data signals" encompass AC-based systems, like the AAPS device that was found to infringe, the only reasonable conclusion the jury could have drawn from the evidence is that

the asserted claims were anticipated and/or rendered obvious by the Wilkinson, Tassimco, and/or Enlightened devices.  Therefore, the jury's verdict of validity (and the District Court's related JMOL denial) must be overturned based on the court's erroneous jury instructions.

### D.   The District Court Erred by Denying Campbell's JMOL on the Jury's Verdict of No Anticipation, which Was Not Supported by Substantial Evidence

In denying Campbell's JMOL regarding invalidity in view of the prior art, the District Court found that there was substantial evidence supporting the conclusion that the Wilkinson, Tassimco, and/or Enlightened devices did not communicate "digital data signals" because those systems used AC and DC signals to encode data.  But, again, the District Court had previously construed "digital data signals" to encompass AC systems, like the accused AAPS device.  Applying that same construction, as must occur with both an invalidity and an infringement analysis, neither the District Court nor the jury could have found that those prior art devices failed to disclose "digital data signal," and thus anticipate or at least render obvious the asserted claims.

With respect to anticipation, a patent is invalid under 35 U.S.C. § 102 for anticipation if a single prior art reference discloses each and every limitation of the claimed invention.  *Schering Corp. v. Geneva Pharm.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Moreover, "a prior art reference may anticipate without disclosing a

feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." *Id*. Anticipation is a question of fact that this Court reviews for clear error. *Zenon Envtl., Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1377 (Fed. Cir. 2007).

Here, there can be no dispute, when applying the proper claim construction, that Wilkinson discloses each and every limitation of Claims 1-4 of the '476 Patent. Specifically, as to Claim 1, Wilkinson discloses the following:

> 1. A control system by which vibro-tactile messages are provided to alert pedestrians when to cross a traffic light controlled intersection, said control system comprising: [***Wilkinson***: "An audio-tactile pedestrian signalling system for use in conjunction with traffic control signal installation having a transducer (16) providing audio and tactile signals by means of signal generator (11, 12, 13, 14)." Appx3379 (Abstract)]

> at least one push button station located at the traffic light controlled intersection to be crossed by pedestrians, [***Wilkinson***: "The tranducer for the audio-tactile signal is located within the push-button assembly and acts on the front surface of the push-button housing." Appx3381 (1:24-26)]

> said push button station including a push button head that is depressed by the pedestrians and message generating means adapted to cause said push button head to vibrate to provide a tactile indication to a visually impaired pedestrian when to cross the intersection; and [***Wilkinson***: "An audio-tactile pedestrian signalling system for use in conjunction with traffic control signal installation having a transducer (16) providing audio and tactile signals by means of signal generator (11, 12, 13, 14)." Appx3379 (Abstract)]

> a control unit that is responsive to the depression of the push button head of said push button station to transmit to the push button station both power and digital data signals over a single pair of wires

by which to power and control the operation of said message generating means. [*Wilkinson*:  The power supply unit 17 provides an extra low A.C. votage [*sic*] which is half wave during the DON'T WALK mode and full wave during the WALK mode. **Thus, only two wires are needed to power and control the system.** The local power supply unit 18 within the pedestrian push-button housing rectifies the A.C. signal from the power supply unit 17 to provide the D.C. voltages required. The local power supply unit 18 also **decodes the full wave/half wave signal** to provide the WALK and DON'T WALK signals to the main timing network 10."  Appx3382 (3:50-60) (emphasis added)].

Moreover, at trial, Campbell's expert Dr. Jones confirmed for the jury that all of the limitations of Claim 1 are disclosed in Wilkinson:

Q.  Can you walk through this and describe the various limitations or features of the Beckwith patent that are found just in this passage [from Wilkinson].

A.   Yes.  So the power supply unit would be, for example, the controller; and it provides an AC voltage, which is a half wave or a full wave. So this would be two possible states.  So if you're in state A, you're expressing one type of message, half wave. If you're in state B, you'd be expressing another type of message. So this would constitute a digital signal. In addition, it is sending power. It actually says two wires are needed, power and control.  So power and control are there. There is a push-button station that has a push button inside of it.

Further down you can actually see -- or actually further up here in starting up on line 10 of column three, there's an audio tactile signal generator.

So this is actually the vibrating head, so it's -- this is actually a combined embodiment where not only can you feel this button vibrating, but you can also hear it. So it has the additional element that there's an emitted sound that comes from it as well as having it vibrate.

So we step through the important elements of that claim, all of the constituent elements. And if everything is provided in a piece of prior art, then this piece of prior art actually anticipates that claim element.

Appx3045-3046 (31:10-32:9).

The remaining asserted claims of the '476 Patent, Claims 2-4, are also fully

anticipated by Wilkinson, as follows:

2. The control system recited in claim 1, wherein said at least one push button station also includes a microcontroller to receive the power and digital data signals from said control unit, said microcontroller providing output signals to control the operation of said message generating means. [*Wilkinson*:  The power supply unit 17 provides an extra low A.C. votage [*sic*] which is half wave during the DON'T WALK mode and full wave during the WALK mode. **Thus, only two wires are needed to power and control the system.** The local power supply unit 18 within the pedestrian push-button housing rectifies the A.C. signal from the power supply unit 17 to provide the D.C. voltages required. The local power supply unit 18 also **decodes the full wave/half wave signal** to provide the WALK and DON'T WALK signals to the main timing network 10." Appx3382 (3:50-60) (emphasis added)].

3. The control system recited in claim 2, wherein said message generating means of said at least one push button station includes a vibration driver connected to said microcontroller to cause said push button head to vibrate and thereby provide said tactile indication to the visually impaired pedestrian that it is safe to cross the intersection. [*Wilkinson*:  "The tranducer for the audio-tactile signal is located within the push-button assembly and acts on the front surface of the push-button housing."; "The transducer 16 is vibrated by a loudspeaker style magnet and voice coil assembly."  Appx3381 (1:24-26), Appx3382 (3:64-66)].

4. The control system recited in claim 2, wherein said message generating means of said at least one push button station includes a sound chip in which prerecorded messages are stored and from which an audible indication is provided to the visually impaired pedestrian

47

whether to enter the intersection depending upon the flow of vehicular traffic therethrough. [**Wilkinson**:  "a tranducer within the housing operative under the control of the signal generating means to produce pre-determined audio and tactile signals."  Appx3381 (2:43-45)].

Put simply, the substantial evidence presented to the jury establishes that Wilkinson anticipates Claims 1-4, thus rendering those claims invalid.  Thus, it was clear error for the jury and the District Court to find the asserted claims valid under 35 U.S.C. § 102 in view of Wilkinson.

### E.    The District Court Erred by Denying Campbell's JMOL on the Jury's Verdict of Non-Obviousness, which Was Not Supported by Substantial Evidence

Alternatively, Campbell presented substantial evidence at trial that the asserted claims are at least rendered obvious by one or more of Wilkinson and the Tassimco and/or Enlightened prior art devices.  Under 35 U.S.C. § 103, a patent claim is invalid as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art."  *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1375–76 (Fed. Cir. 2012).

This statutory test requires the following factual inquiries: "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness."  *Id*.  This Court "reviews obviousness without deference as a

48

legal conclusion with underlying factual determinations which are reviewed for clear error." *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc*., 471 F.3d 1369, 1377 (Fed. Cir. 2006).

Here, during prosecution of the '476 Patent application, the PTO Examiner determined that the pending claims, including the claim limitation "the transmission of both power and digital data signals over a single line," were obvious in view of Bidault and Spilo.  Both Dr. Jones and Dr. Harris agreed with the Examiner in that regard, as explained above.

In response to the Examiner's rejection for obviousness, the patentee amended the pending claims by deleting transmission of power and digital data signals "over a single line" and the substituting transmission "over a single pair of wires."  Appx3391-3400.

While the amended claims were allowed, the claimed invention remained "obvious" since the Wilkinson device was designed to operate over just a single pair of wires.  As Wilkinson described, and as the Tassimco and Enlightened devices demonstrated, a push button could be, and was already known to be, controlled by signals and power transmitted over the same single pair of wires.  Thus, the addition of "transmitting both power and digital signal over a single pair of wires" to PTO's analysis was an obvious addition of known prior art.

While the Examiner cited Wilkinson as prior art of interest, she did not recognize that Wilkinson describes the same device operating over a single pair of wires, and of course, Polara did not point that fact out to her.  As a result, she merely noted that Wilkinson described a device which disclosed a tactile signal for the visually impaired.  Appx3389.  However, as explained above, Wilkinson does, in fact, disclose power and data over a single pair of wires.

Wilkinson clearly describes a device with a control unit that transmits both power and **encoded signals** over a single pair of wires to power and control the operation of a vibrating pushbutton.  Appx3382 (3:50-60).  And as indicated, the PTO had already found the use of digital signals would have been obvious.  When reading Bidault in view of Spilo's "digital signals," it would also have been obvious to replace the "encoded signals" in Wilkinson as well.[3]  Whether one considers the addition of a "single pair of wires" to Bidault, or the addition of "digital signals" in place of "encoded signals" to Wilkinson, those combinations of known elements were obvious.

Furthermore, both Dr. Jones and Dr. Harris agreed that the transmission of power and "signals" over a single pair of wires from a pedestrian control unit to a pushbutton was also obvious, and that it was also "obvious" that "digital data

---

[3] Dr. Jones testified at length that the full and half-rectified waves in the Campbell Enlightened device (the same as the Wilkinson "encoded signals") were digital signals.  Appx3055-3060 (41:8-46:13).

signals" could be sent over those two wires.  Appx3127-3128 (113:23-114:12), Appx3131 (117:12-18).  As the Examiner noted, the use of digital data signals was obvious as of 2004, and the result of the addition was predictable as it contributed greater speed and efficiency to exactly what the control units in Bidault and Wilkinson had done: supply power and signals to control the operation of a message generator in a push button station.

Even if one concludes that the signals of the Wilkinson, Tassimco, and Enlightened devices are not "digital data signals," the same results are found by combining well-known prior art "digital data signals" to those devices:  a control unit operating remote pushbuttons by sending both power and signals over just two wires.  As the PTO noted during prosecution, the addition of digital over analog signals merely enhanced the claimed invention.  As the Supreme Court explained in *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007), "when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious."

Whether one views Polara's amendment to its initial patent claims as adding the limitation of the obvious digital signals to the Wilkinson device, or instead adding the "2-wire" limitation found in Wilkinson to Bidault and Spilo, the Claimed System consists only of known, obvious elements found in the prior art

51

that in combination yield exactly the result expected.

As noted in *KSR*, when, as here, there is a design need or market pressure to solve a problem (use existing two wires) and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. *KSR*, 550 U.S. at 421. If those options lead to success, it is likely the product not of innovation but of ordinary skill and common sense. *Id.; see also Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (the obviousness analysis "may include recourse to logic, judgment, and common sense available to the person of ordinary skill that does not necessarily require explication in any reference or expert opinion").

Simply put, the substantial evidence presented to the jury establishes that sending power and "digital data signals" over "a single pair of wires" was obvious. Thus, that limitation does not distinguish the Claimed System from the prior art. As such, the jury and the District Court's finding of non-obviousness should be overturned.

### F. The District Court Erred By Denying Campbell's JMOL on the Jury's Verdict of Willful Infringement, which Was Not Supported by Substantial Evidence

As this Court is aware, in *Halo*, the Supreme Court rejected the previous *Seagate* test for willfulness (as well as the test's "clear and convincing" standard),

and instructed district courts to "continue to take into account the particular circumstances of each case" such that a willfulness finding and enhanced damages be reserved only for "egregious cases of misconduct beyond typical infringement." *Halo,* 136 S. Ct. at 1935.

Specifically, the Supreme Court explained that enhanced damages are "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior." *Id*. at 1932. The Court further explained that conduct warranting enhanced damages is typically "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or – indeed – characteristic of a pirate." *Id*.

Here, the evidence simply does not support any such characterization of Campbell's actions. Rather, the circumstances show that Campbell – of its own initiative and not under any threat of litigation from Polara – acted responsibly and reasonably in investigating the '476 Patent with counsel and an expert in the field (Dr. Wall) before embarking on the AAPS project.

Moreover, Campbell did not rely on the "ingenuity" of its attorneys in formulating invalidity/non-infringement arguments only after being sued, which the type of defendant criticized in *Halo*. Rather, once it became aware of the '476 Patent, Campbell obtained legal counsel regarding why the '476 Patent was invalid and/or not infringed, and Campbell continued to assert those defenses at trial. Nevertheless, Campbell was not allowed to present its pre-litigation non-

infringement defenses to the jury to refute willfulness, which improperly prevented the jury from having a full picture of all of the circumstances surrounding Campbell's investigation.

In addition, even though in-litigation defenses are no longer part of an enhanced damages analysis, *Halo* did not alter the well-established rule that a party's alleged willfulness (or lack thereof) can change over time. *See Halo*, 136 S. Ct. at 1933 ("culpability is generally measured against the knowledge of the actor at the time of the challenged conduct"). As such, the District Court erred in not requiring the jury to assess Campbell's alleged willfulness throughout the period of alleged infringement. Instead, the jury was simply required to answer "Yes" or "No" to the question of willfulness.

In denying Campbell's JMOL, the District Court focused exclusively on evidence that it contended supported a "significant risk" of an infringement finding, asserting that Campbell should have designed around the patent. Appx47-49. However, the District Court completely ignored evidence showing that Campbell believed in good faith that the patent was rendered obvious by several prior art references. Since one cannot infringe an invalid patent, Campbell was not required to design around the '476 Patent to proceed in good faith, as the District Court suggested. Also, in criticizing Campbell's decision not to stop selling the AAPS after the infringement finding, the District Court failed to consider that

Polara never sought a preliminary injunction.  *See In re Seagate Tech., LLC*, 497

F.3d 1360, 1374 (Fed. Cir. 2007), *abrogated on other grounds by Halo*, 136 S. Ct

1923.  ("A patentee who does not attempt to stop an accused infringer's activities

[with a preliminary injunction] should not be allowed to accrue enhanced damages

based solely on the infringer's post-filing conduct.").

In sum, *Halo* made clear that enhanced damages should be awarded only in

cases of "egregious misconduct" by a defendant.  Polara presented no such

evidence, and the jury's willfulness finding and the District Court's related JMOL

denial should be reversed.

### G.    The District Court Abused Its Discretion in Enhancing Damages

In *Halo*, the Supreme Court emphasized that an award of enhanced damages

in not mandatory following a finding of willfulness, and instead courts should

consider whether the case presents an "egregious case of misconduct beyond

typical infringement."  *Halo*, 136 S. Ct. at 1935; *accord WesternGeco L.L.C. v.

ION Geophysical Corp.*, 837 F.3d 1358, 1364 (Fed. Cir. 2016).

Here, the evidence simply does not support a finding of egregious

misconduct, despite the District Court's contention that "five of the nine <u>Read</u>

factors – deliberate copying, no good faith belief in non-infringement or invalidity,

duration of infringement, the absence of remedial actions, and motivation for

harm – weigh in favor of enhancement." Appx73 (*see Read Corp. v. Portec, Inc.*, 970 F.3d 816, 826-27 (Fed. Cir. 1992)).

First, there is no evidence that Campbell deliberately copied the Polara design. Instead, the evidence shows that Dr. Wall conceived of the idea for the AAPS at the University of Idaho, well before meeting with Campbell and the subsequent investigation into the '476 Patent. Appx2798-2800 (169:16-170:10), Appx2805 (175:7-11).

Second, given that it did not allow such evidence to be admitted, the District Court completely ignored substantial evidence regarding Campbell's pre-litigation, good faith non-infringement arguments, and simply rejected Campbell's invalidity arguments as unreasonable. In doing so, the District Court failed to consider the totality of the circumstances surrounding Campbell's investigation and consultation with counsel.

Third, by focusing on the duration of Campbell's alleged pre-suit "infringement" and lack of "remedial action," the District Court's approach was not only legally incorrect under *Halo*, but illogical, since: (a) no allegation of infringement even existed until this case was filed; and (b) the District Court's ultimate ruling of infringement did not occur until nearly two and a half years after that. And the substantial evidence shows that Campbell took no "remedial action"

because it had no reason to believe it infringed a valid patent before that ruling, and it continued to challenge that ruling through its invalidity arguments.

Finally, the only evidence the District Court cites to support its belief that Campbell was "motivated to harm" Polara is the fact that the parties sell competing products. But such evidence does not show egregious misconduct. *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2017 WL 130236, at *5 (N.D. Cal. Jan. 13, 2017) ("Simply because a company seeks to gain a business advantage, however, does not mean that the company has a motivation to harm, … and the Court finds this factor weighs against enhancement") (internal citations and quotations omitted).

Because nothing in the record suggests "egregious" misconduct beyond typical infringement, the District Court abused its discretion in finding that the record merited enhanced damages. That finding should be overturned.

## VIII.  <u>CONCLUSION AND STATEMENT OF RELIEF SOUGHT</u>

For all of the reasons set forth above, this Court should reverse the jury's verdict and the resulting Judgment and permanent injunction on one or more of the following grounds: (1) the jury's verdict of patent validity despite prior public use and its related finding of "experimental use" lacked substantial evidence; (2) the jury's verdict of validity based on novelty and/or non-obviousness lacked substantial evidence; (3) the District Court erred by not instructing the jury

regarding the court's prior constructions of the disputed claim terms of the '476 Patent, including "digital data signal," and regarding the jury's obligation to apply those constructions when considering the issues, and that error was prejudicial; and/or (4) the jury's verdict of willful infringement lacked substantial evidence in view of the overwhelming evidence that Campbell acted in good faith in investigating the '476 Patent.

For the same reasons, the Court should also reverse the District Court's denial of Campbell's JMOL motion on those issues.

Also, the Court should find that District Court abused its discretion in enhancing damages in any amount based on the jury's willfulness finding, given that nothing in the record suggests "egregious" misconduct beyond typical infringement, and reverse the District Court's enhanced damages award.

Finally, the Court should enter judgment that the '476 Patent is invalid.

Dated:  June 30, 2017                         Respectfully submitted,

/s/ Christopher T. Holland
Christopher T. Holland
Lori L. Holland
HOLLAND LAW LLP
220 Montgomery Street, Suite 800
San Francisco, CA  94104
Telephone:  415-200-4980
Fax:  415-200-4989

*Attorneys for Defendant-Appellant*
*Campbell Company*

58

# ADDENDUM

**ADDENDUM**
**TABLE OF CONTENTS**

| Docket Entry | Description | Page |
|---|---|---|
| 155 | Order Granting in Part Plaintiff's Motion for Summary Judgment and Denying Defendant's Motion for Summary Judgment of Non-Infringement, Filed June 10, 2014 | Appx1 |
| 494 | Order re: Post-Trial Motions, Filed February 27, 2017 | Appx16 |
| 498 | Order Entering Permanent Injunction, Filed March 31, 2017 | Appx80 |
| 499 | Judgment, Filed March 31, 2017 | Appx83 |
| — | U.S. Patent No. 7,145,476 B2 (Issue Date: December 5, 2006) | Appx85 |

1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **CENTRAL DISTRICT OF CALIFORNIA**
10                        **SOUTHERN DIVISION**
11

12  **POLARA ENGINEERING, INC.,**                )
                                                 )
13              **Plaintiff,**                   )    **Case No.: SACV 13-00007-CJC(JPRx)**
                                                 )
14          **v.**                               )
                                                 )
15                                               )
    **CAMPBELL COMPANY,**                        )    **ORDER GRANTING IN PART**
16                                               )    **PLAINTIFF'S MOTION FOR**
                                                 )    **SUMMARY JUDGMENT AND**
17              **Defendant.**                   )    **DENYING DEFENDANT'S MOTION**
                                                 )    **FOR SUMMARY JUDGMENT OF**
18                                               )    **NON-INFRINGEMENT**
                                                 )
19  _____         )

20

21  **I.    INTRODUCTION**

22

23         This is a patent infringement action between Polara Engineering, Inc. and

24  Campbell Company.  Polara and Campbell are competitors in the field of accessible

25  crosswalk systems.  These systems allow both sighted and visually impaired pedestrians

26  to safely cross intersections.  Polara alleges that Campbell's system infringes Polara's

27  '476 patent (U.S. Patent No. 7,145,476), which claims an accessible pedestrian system

28  with a control unit that both powers and controls each pedestrian pushbutton station

Appx1

using only a single pair of wires.  Polara now moves for summary judgment of infringement and no invalidity of claims 1 through 4 of the '476 patent.  (Dkt. No. 105 [Mem. in Supp. of Polara's Mot. for Summ. J. ("Polara MSJ")].)  Campbell cross-moves for summary judgment of non-infringement of claim 1 and also moves to invalidate claims 1 and 21.  (Dkt. No. 94-1 [Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("Campbell MSJ")]; Dkt. No. 93-1 [Def.'s Mem. of P. & A. in Supp. of Mot. to Invalidate Beckwith '476 Claims 1 & 21 ("Campbell Mot. Invalidate")].)

The Court finds that Campbell's Advisor Advanced Accessible Pedestrian Station infringes claims 1 through 4 of the '476 patent, and that Polara is thus entitled to summary judgment of infringement as to those claims.  Accordingly, the Court GRANTS IN PART Polara's motion for summary judgment and DENIES Campbell's motion for summary judgment.[1]

## II.    BACKGROUND

### A.  The Patent-in-Suit

The '476 patent claims a system for controlling an intersection to enable both sighted and visually impaired pedestrians to safely cross once vehicular traffic has been halted.  (Dkt. No. 106 [Statement of Uncontroverted Material Fact & Conclusions of Law in Supp. of Polara MSJ ("Polara UF")][2] No. 2.)  The claimed system is an Accessible Pedestrian Signal system ("APS system"), which informs pedestrians when it is appropriate to cross using not only visual signals ("WALK" or "DON'T WALK") but

---

[1]  In a separate minute order, the Court addresses the parties' cross-motions regarding validity of the '476 patent.

[2]  Unless otherwise indicated, references to the parties' statements of uncontroverted facts or to other evidence submitted by the parties are to facts that are not substantively disputed.

Appx2

also vibro-tactile and audible signals.  (*See* Polara Exh. A [" '476 Patent"] at 1:36−47.)[3]

This increased functionality comes with a cost, however, as most intersections require

retrofitting — sometimes expensive — to lay the additional wiring necessary to operate

APS systems.  (*Id.* at 1:53−64.)  The claimed invention allows cities to avoid these

expenditures by taking advantage of the existing underground wire pairs to transmit

"data over power" — that is, sending data signals that trigger a tactile or auditory

message for pedestrians over the same powerlines that are used to power the pushbutton

stations.  (*See* Polara UF Nos. 5, 6.)


Claim 1 — the independent claim upon which claims 2, 3, and 4 depend —

recites:

> A control system by which vibro-tactile messages are provided to alert
> pedestrians when to cross a traffic light controlled intersection, said control
> system comprising:
>> at least one push button station located at the traffic light controlled
>> intersection to be crossed by pedestrians, said push button station
>> including a push button head that is depressed by the pedestrians and
>> message generating means adapted to cause said push button head to
>> vibrate to provide a tactile indication to a visually impaired pedestrian
>> when to cross the intersection; and
>>
>> a *control unit* that is *responsive* to the depression of the push button
>> head of said push button station *to transmit* to the push button *both*
>> *power and digital data signals over a single pair of wires* by which to
>> power and control the operation of said message generating means.

('476 Patent at 9:56−10:4 (emphasis added).)  The term "message generating means," as

used in claim 1, means at least a vibration driver for vibrating the pedestrian pushbutton.

(Polara UF No. 38.)


Claim 2 recites the control system described in claim 1 and further provides that

"at least one push button station also includes a microcontroller to receive the power and

---

[3]  The "Polara Exhibits" are those found in Polara's Appendix of Non-Confidential Exhibits in Support
of Polara Engineering, Inc.'s Motion for Summary Judgment of Infringement.  (*See* Dkt. Nos. 89−90.)

digital signals from said control unit, said microcontroller providing output signals to control the operation of said message generating means."  ('476 Patent at 10:5−9.) Claim 3, in turn, is dependent on claim 2, and further requires that "said message generating means of said at least one push button station includes a vibration driver connected to said microcontroller to cause said push button head to vibrate and thereby provide said tactile indication to the visually impaired pedestrian that it is safe to cross the intersection."  (*Id.* 10:10−15.)

Claim 4 recites the control system described in claim 2, "wherein said message generating means of said at least one push button station includes a sound chip in which prerecorded messages are stored and from which an audible indication is provided to the visually impaired pedestrian whether" it is safe to cross the intersection.  (*Id.* 10:16−22.)

## B.    Campbell's Accused AAPS System

Polara accuses Campbell's Advisor Advanced Accessible Pedestrian Station ("AAPS") of infringing the '476 patent.  Campbell's AAPS is a 2-wire accessible pedestrian system that aids the visually impaired to know when to cross an intersection using vibro-tactile messages.  (Polara UF Nos. 7, 8.)

Campbell's AAPS includes two key components that are relevant to the '476 patent.  First, the AAPS includes one or more pushbutton stations, which Campbell calls "Advanced Pedestrian Buttons."  (Polara UF No. 9.)  Campbell's Advanced Push Buttons are similar to typical pushbutton stations, but include a vibrating pushbutton, a speaker, and an LED, which together provide the pedestrian with tactile, voice, and visual indications.  (Polara UF No. 10.)  They also include a counter-balanced electromagnetic motor that, when activated, causes the pushbutton head to vibrate. (Polara UF Nos. 12, 45.)

Appx4

Campbell's AAPS also includes a central computer server stationed in the traffic cabinet called an "Advanced Pedestrian Controller," which transmits both power and data to the pushbuttons over a single pair of wires.  (Polara UF No. 9; Dkt. No. 94-2 [Def.'s Separate Statement of Material Facts & Conclusions of Law in Supp. of Campbell MSJ ("Campbell UF")] Nos. 5, 13.)  Over the same pair of wires it uses to transmit a constant flow of electricity (18 Volts AC), every fourth of a second the Advanced Pedestrian Controller broadcasts Ethernet over Powerline ("EoP") packets of information to all pushbuttons.  (Campbell UF Nos. 5, 6.)  In each broadcast, an identical EoP packet is sent to each pushbutton station with the same information regarding the status of every traffic signal at the intersection.  (Campbell UF Nos. 8, 10.) Each pushbutton station then reads the EoP packet and determines if it is to take any action.  (Campbell UF No. 11.)  The rate and timing of each broadcast does not change when a pushbutton is pressed.  (Campbell UF No. 9.)  When a pedestrian presses an AAPS pushbutton, the Advanced Pedestrian Controller does not change the timing of each broadcast (the broadcasts continue to be sent every quarter second), but it does respond by updating the digital data being sent to all pushbuttons at the intersection, thus causing the pushbutton that was pressed to vibrate.  (*See* Campbell UF No. 9; Dkt. No. 113 [Def.'s Opp'n to Pl.'s MSJ ("Campbell Opp'n")] at 14−15.)

## III.  LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense — or the part of each claim or defense — on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of

Appx5

material fact.  *Celotex*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

Where the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In contrast, where the nonmovant will have the burden of proof on an issue at trial, the moving party may discharge its burden of production by either (1) negating an essential element of the opposing party's claim or defense, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–60 (1970), or (2) showing that there is an absence of evidence to support the nonmoving party's case, *Celotex*, 477 U.S. at 325.  Once this burden is met, the party resisting the motion must set forth, by affidavit or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (1) citing to materials in the record, (2) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (3) showing that the moving party lacks admissible evidence to support its factual position.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  But the opposing party cannot rely on the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]."  *Anderson*, 477 U.S. at 252.

Appx6

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.*; *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c).

## IV.  ANALYSIS

A determination of infringement requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Second, the properly construed claims are compared to the accused device to determine whether there is infringement. *Id.* When performing the first step, the court is to construe the claims of the patent as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Accordingly, the words of the claims are of "primary importance" in the effort to determine precisely what is claimed by the patent. *Id.* "[W]ords of a claim are generally given their ordinary and customary meaning." *Id.* (citation omitted). In construing the patent's claims, the court first considers whether the ordinary meaning of claim language as understood by a person of

1   skill in the art is "readily apparent." *Id.* at 1314. "[C]laim construction in such cases

2   involves little more than the application of the widely accepted meaning of commonly

3   understood words." *Id.*

4

5       If, however, the meaning of a claim term as understood by persons of skill in the

6   art is not immediately apparent, the court looks to "the words of the claims themselves,

7   the remainder of the specification, the prosecution history, and extrinsic evidence

8   concerning relevant scientific principles, the meaning of technical terms, and the state of

9   the art." *Id.* (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381

10  F.3d 1111, 1116 (Fed. Cir. 2004)) (internal quotation marks omitted). In such cases,

11  claim construction begins with the intrinsic evidence associated with the patent,

12  including the claims themselves, the specification, and the prosecution history. *Id.* at

13  1317–19. The specification is the primary basis for construing the claims. *Id.* at 1315

14  ("[T]he specification 'is always highly relevant to the claim construction analysis. . . . It

15  is the single best guide to the meaning of a disputed term." (quoting *Vitronics Corp. v.*

16  *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 2004))). Finally, "extrinsic evidence"

17  such as dictionary definitions and expert reports "may be useful to the court, but it is

18  unlikely to result in a reliable interpretation of patent claim scope unless considered in

19  the context of the intrinsic evidence." *Id.* at 1319. In light of the flaws inherent in

20  extrinsic sources, district courts have discretion whether to admit and use extrinsic

21  evidence. *Id.*

22

23      In its motion for summary judgment, Polara asserts infringement of independent

24  claim 1 and dependent claims 2, 3, and 4 of the '476 patent. The Court addresses each

25  claim in turn, and concludes that Polara is entitled to summary judgment of

26  infringement as to all four claims.

27

28  //

Appx8

## A.      Claim 1

The parties do not dispute that Campbell's AAPS includes at least one pushbutton station located at a traffic light controlled intersection, that the AAPS pushbutton station includes a pushbutton head that may be pressed by a pedestrian, or that the AAPS pushbutton vibrates to give visually impaired pedestrians a tactile indication when it is safe to cross the intersection.  (*See* '476 Patent at 9:59−65; Polara UF No. 8.)  The parties instead primarily dispute whether Campbell's AAPS satisfies the limitations of the final clause of claim 1, which recites:

> a *control unit* that is *responsive* to the depression of the push button head of said push button station *to transmit* to the push button station *both power and digital data signals* over a single pair of wires by which *to power and control* the operation of said message generating means.

('476 Patent at 9:66−10:4 (emphasis added).)  The Court addresses three claim construction issues raised by the parties regarding that final clause and finds that Campbell's AAPS infringes claim 1.

### 1.      "[C]ontrol the operation of [the vibrating pushbutton]"

The parties first dispute the meaning of "control the operation of said message generating means."[4]  (*Id.* at 10:3−4.)  Campbell argues that its Advanced Pedestrian Controller does not "control" the operation of the pushbuttons because the pushbuttons control their own actions.  (Campbell Opp'n at 15.)   The Advanced Pedestrian Controller, Campbell argues, merely broadcasts the current status of all signals and devices to each pushbutton, and "[b]ased on the message sent to all push buttons, all the

---

[4]  The '476 patent describes the "message generating means" as comprising, for example, a vibration driver for vibrating the pedestrian pushbutton.  (Polara UF No. 38; *see, e.g.*, '476 Patent at 10:10−10:15 (claim 3).)  Campbell does not dispute that its AAPS includes such a vibration driver. (*See* Polara UF No. 45.)

Appx9

other buttons ignore . . . that part of the update except the [button] that was pushed[,] which notices that the update indicates that a press occurred and . . . then decides to 'bump.' " (*Id.*)  Campbell also contends emphatically that the Advanced Pedestrian Controller "simply does *not* have a *means* to send an *individual* message to a single [pushbutton]." (*Id.* at 14.)

      But nothing in the patent requires such a restrictive reading.  The patent does not require that the control unit send individualized messages to particular pushbutton stations, nor does it foreclose the possibility that the pushbutton stations process the control unit's signal using their own internal logic and then create an output signal that causes the pushbutton to vibrate.  To the contrary, claim 2 explicitly provides that the control system of claim 1 may encompass a pushbutton station that "includes a microcontroller to receive the power and digital data signals from said control unit" and then "provid[es] output signals to control the operation of" the pushbutton.  ('476 Patent at 10:6−9); *see Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can . . . be valuable sources of enlightenment as to the meaning of a claim term.").  Moreover, Campbell concedes that the Advanced Pedestrian Controller "update[es] the digital data being sent to the [pushbutton] so as to cause the [pushbutton] to vibrate."  (Campbell Opp'n at 14 (internal quotation marks omitted).)  By gathering information from all pushbuttons and broadcasting information that causes a pressed pushbutton to vibrate, Campbell's AAPS satisfies claim 1's "control" limitation.

### 2. "[C}ontrol unit that is responsive to the depression of [a] push button . . . to transmit . . . both power and digital data signals"

      Campbell also argues that its Advanced Pedestrian Controller is not a "control unit that is responsive to the depression of [a] push button . . . to transmit . . . both power and digital data signals." (*See* '476 Patent at 9:66−10:2.)  Campbell contends that the

Advanced Pedestrian Controller transmits power and digital data broadcasts at a constant rate, not in response to the depression of a pushbutton.  (Campbell Opp'n at 16.)  Yet Campbell admits that it is "literally true" that "the [Advanced Pedestrian Controller] *responds* to the pedestrian pressing the [pushbutton] by updating the digital data being sent to the [pushbutton] so as to cause the [pushbutton] to vibrate."  (*Id.* at 14 (emphasis added); *see also id.* at 15−16 ("[T]he [Advanced Pedestrian Controller] does *respond* to the [pressed pushbutton] to update the 'status message' to send to all the [pushbuttons] . . . ." (emphasis added))).  The patent does not require that the control unit respond to a pushed button by sending digital data signals at a different rate.  Rather, it only requires that the control unit respond by "transmit[ting] . . . digital data signals . . . by which to . . . control the operation of" the vibrating pushbutton.  Campbell points to nothing in the intrinsic or extrinsic record to suggest otherwise.

Nor does the patent require, as Campbell suggests, that the control unit respond by altering the amount of power sent to the pushed button.  (*See id.* at 16.)  Read in the context of the patent as a whole, the requirement that the control unit respond by "transmit[ting] . . . both power and digital data signals over a single pair of wires" simply describes the invention's data-over-power system.  Indeed, the invention's use of a data-over-power system is one of the primary advances over prior art described in the patent's discussion of "Background Art."  (*See* '476 Patent at 1:48−2:9 ("[C]ost sensitive cities would be able to avoid . . . having to pull additional wires or even dig trenches . . . if a control system were available that could incorporate the existing underground wire pairs to transmit power and data signals in order to generate the accessible signal functions for both sighted and visually impaired pedestrians.").

Thus, although the '476 patent does require that "both power and digital data signals" be sent "over a single pair of wires" in response to a button press, that does not mean that power and data cannot be sent at other times, even continuously, so that the

1    pushbutton remains powered and functional.  Because the AAPS Advanced Pedestrian

2    Controller responds to a pressed button by sending both power and an updated message

3    to all pushbutton stations, AAPS satisfies claim 1's "responsive" limitation.

4

5         **3.    "[D]igital data signals"**

6

7         Lastly, Campbell argues that the accused AAPS does not transmit "digital data

8    signals" from the Advanced Pedestrian Controller to the pushbutton.  This is so,

9    Campbell contends, because the technology used by Campbell's AAPS to send EoP

10   packets — orthogonal frequency division modulation ("OFDM") — is not described in

11   the '476 patent's specification.  (Campbell Opp'n at 17; Dkt. No. 113-3 [Decl. of

12   Christopher Jones in Supp. of Campbell Opp'n to Polara MSJ ("Jones Opp'n Decl.")]

13   ¶¶ 5−10.)  Campbell points out that the specification instead describes a "series of coded

14   data pulses corresponding to output voltages which lie in the range of voltages between

15   0 and 48 volts DC."  ('476 Patent at 7:20−22.)

16

17        Campbell does not dispute, however, that OFDM is a method of encoding digital

18   data, or that the OFDM technology was known to persons skilled in the art when the

19   '476 patent application was filed.  (*See* Polara UF Nos. 19−20.)  Campbell instead

20   argues that OFDM is not taught in the specification and, therefore, the term "digital data

21   signals" excludes data signals sent using the OFDM technique.[5]  (*See* Jones Opp'n Decl.

22   ¶ 10 (opining that OFDM "would not be obvious to combine with elements taught in the

23

24   _____

     [5]  Campbell argues that were the term "digital data signals" read more broadly, claim 1 would fail for
     lack of enablement under 35 U.S.C. § 112, ¶ 1.  (Campbell Opp'n at 20−21); *see Hybritech Inc. v.*
25   *Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("Enablement is a legal
     determination of whether a patent enables one skilled in the art to make and use the claimed
26   invention.").  But a patent specification need not include information that is well known to persons
     skilled in the art, *see Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1253 (Fed. Cir. 2004), and
27   Campbell does not dispute that the OFDM technique was well known to persons skilled in the art as of
     the '467 patent's effective date.  Campbell thus has not shown clearly or convincingly that the '476
28   patent fails for lack of enablement.

-12-

1  '476 patent because there is no mention of an adverse communication channel that

2  would warrant the significant complexity and cost additions of OFDM").

3

4      Campbell's argument fails because it would improperly confine the claims to the

5  embodiments described in the specification.  The Federal Circuit "ha[s] expressly

6  rejected the contention that if a patent describes only a single embodiment, the claims of

7  the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at

8  1323 (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366

9  (Fed. Cir. 2004)); *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 792 (Fed. Cir.

10  2010) ("A construing court's reliance on the specification must not go so far as to

11  import limitations into claims from examples or embodiments appearing only in a

12  patent's written description unless the specification makes clear that the patentee intends

13  for the claims and the embodiments in the specification to be strictly coextensive.").  Of

14  course, if the specification reveals a special definition given to a claim term by the

15  patentee or an intentional disclaimer of claim scope, such a definition or disclaimer may

16  control.  *See Phillips*, 415 F.3d at 1316.  But Campbell points to no special definition or

17  intentional disclaimer of scope limiting the term "digital data signals" in the '476 patent.

18

19      It is undisputed that the AAPS Advanced Pedestrian Controller sends EoP data

20  packets to pushbuttons using OFDM technology to encode digital data onto electrical

21  waveforms.  Campbell's AAPS therefore satisfies the "digital data signals" limitation.

22  Accordingly, the Court finds that Polara is entitled to summary judgment of

23  infringement on claim 1 of the '476 patent.

24

25      **B.    Claims 2, 3, and 4**

26

27      Polara also asserts infringement of claims 2, 3, and 4 of the '476 patent.  Claim 2

28  depends on claim 1, and further recites "a microcontroller" that "receive[s] the power

-13-

Appx13

1  and digital data signals from [the] control unit" and "provid[es] output signals to control

2  the operation of" the vibrating pushbutton. ('476 Patent at 10:5−9.)  Campbell

3  apparently does not dispute that the AAPS pushbutton includes a microcontroller that

4  receives signals modulated using OFDM from the Advanced Pedestrian Controller and

5  then causes the pushbutton head to vibrate.  (*See* Polara UF Nos. 40, 46.)[6]  Rather,

6  Campbell only argues that the AAPS does not infringe claim 2 because the AAPS

7  pushbuttons do not receive "digital data signals."  Because the Court rejects that

8  argument, as discussed above, the Court finds that Campbell's AAPS infringes claim 2

9  as well.

10

11        Campbell raises no additional argument regarding claim 3, and concedes that

12  AAPS pushbuttons include "a vibration driver comprising a coil motor that uses a

13  magnetic field to rotate and thereby vibrate the button head," as claim 3 requires.  (*See*

14  Polara UF No. 45.)  Accordingly, the Court finds that Campbell's AAPS infringes claim

15  3.

16

17        As to claim 4, Campbell argues that the AAPS pushbuttons do not include a

18  "sound chip," as required by the claim, because "unlike the 'prerecorded clips' used by

19  Polara, Campbell includes 'sound wave files' which can be recorded, re-recorded,

20  altered, expanded, etc., remotely."  (Campbell Opp'n at 19.)  But Campbell does not

21  dispute that the AAPS pushbuttons contain a chip that includes pre-recorded sound wave

22  files.  Neither the format of the recording nor the fact that the recording may be remotely

23  altered or re-recorded makes any difference.

24

25  [6]  Campbell disputes, at least in part, Polara's statement that the AAPS pushbutton "includes a
    microcontroller that receives the digital data signals transmitted to it by the Advanced Pedestrian
26  Controller and then — based on this information — causes the [pushbutton] to generate messages for
    the pedestrian."  (*See* Dkt. No. 113-1 [Campbell Resp. to Polara's Separate Statement] No. 40.)  But
27  Campbell's only stated basis for disputing that statement is that "[t]he [pushbutton] does not receive
    'digital data signals' from the [Advanced Pedestrian Controller] or any messages which cause the
28  [pushbutton] to do anything."  (*See id.*)

Appx14

The Court thus finds that Polara is entitled to summary judgment of infringement on claims 2, 3, and 4 of the '476 patent.

## V.    CONCLUSION

For all the reasons set forth above, the Court finds that Campbell's AAPS infringes claims 1 through 4 of the '476 patent.  The Court therefore GRANTS IN PART Polara's motion for summary judgment of infringement and DENIES Campbell's motion for summary judgment of non-infringement.

DATED:      June 10, 2014

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

Appx15

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10             SOUTHERN DIVISION

11   POLARA ENGINEERING, INC.,        Case No. SA CV 13-00007-DFM

12            Plaintiff,

13        v.                          ORDER RE: POSTTRIAL
                                      MOTIONS
14   CAMPBELL COMPANY,

15            Defendant.

16

17

18        This matter is before the Court on the parties' posttrial motions.

19   Defendant Campbell Company ("Campbell") moves for judgment as a matter

20   of law. Plaintiff Polara Engineering, Inc. ("Polara") moves for a permanent

21   injunction, a judgment of willfulness and an award of treble damages, a finding

22   of exceptional circumstances and a corresponding award of attorney's fees, and

23   an award of supplemental damages, prejudgment interest, and postjudgment

24   interest.

25   ///

26   ///

27   ///

28   ///

# I.

# BACKGROUND

Polara filed this patent-infringement suit against Campbell on January 2, 2013. Dkt. 1. Polara, a manufacturer of accessible pedestrian signal systems and pedestrian push buttons, alleged that Campbell was infringing on Polara's United States Patent No. 7,145,476 (the "'476 Patent"). Id. at 2. The '476 Patent, issued in December 2006, was for a "2-wire push button station control system for a traffic light controlled intersection." Id. at 3. Polara alleged that Campbell, a manufacturer of traffic-industry products, had developed an "Advisor Advanced Accessible Pedestrian Station," or "AAPS," that infringed the '476 Patent. Id.

Polara moved for summary judgment of infringement of Claims 1 through 4 of the '476 Patent. Dkt. 87. Claim 1 recites:

> A control system by which vibro-tactile messages are provided to alert pedestrians when to cross a traffic light controlled intersection, said control system comprising:
>
> > at least one push button station located at the traffic light controlled intersection to be crossed by pedestrians, said push button station including a push button head that is depressed by the pedestrians and message generating means adapted to cause said push button head to vibrate to provide a tactile indication to a visually impaired pedestrian when to cross the intersection; and
> >
> > a control unit that is responsive to the depression of the push button head of said push button station to transmit to the push button station both power and digital data signals over a single pair of wires by which to power and control the operation of said message generating means.

2

Tr. Exh. 9 at 11.[1] Claim 2 recites the control system described in Claim 1 and further provides that "at least one push button station also includes a microcontroller to receive the power and digital data signals from said control unit, said microcontroller providing output signals to control the operation of said message generating means." Id. Claim 3, in turn, is dependent on Claim 2, and further requires that "said message generating means of said at least one push button station includes a vibration driver connected to said microcontroller to cause said push button head to vibrate and thereby provide said tactile indication to the visually impaired pedestrian that it is safe to cross the intersection." Id. Claim 4 recites the control system described in Claim 2, "wherein said message generating means of said at least one push button station includes a sound chip in which prerecorded messages are stored and from which an audible indication is provided to the visually impaired pedestrian whether" it is safe to cross the intersection. Id.

The judge originally assigned to this case—United States District Judge Cormac J. Carney—found that Campbell's AAPS infringed Claims 1 through 4 of the '476 Patent, and that Polara was thus entitled to partial summary judgment on the issue of infringement as to those claims. Dkt. 155. With trial remaining on damages, Polara's willfulness claim, and Campbell's invalidity and unenforceability defenses, the parties consented to this Court's jurisdiction. Dkt. 383; see 28 U.S.C. § 636(c).

A jury trial began on June 21, 2016. See Dkt. 413. After seven days of jury selection, testimony, and argument, the jury returned a special verdict on June 30, 2016. See Dkt. 440. The jury found that Campbell had not shown that Claims 1 through 4 of the '476 Patent were invalid. Id. at 2-3. The jury also

---

[1] "Tr. Exh." refers to the parties' trial exhibits, which are identified in the Amended List of Exhibits and Witnesses. Dkt. 474.

1  found that Polara had not proved that it was entitled to lost profits, but it
2  awarded damages of $412,926 based on a 15 percent royalty rate and total
3  sales of $2,752,842. Id. at 4. The jury found that Campbell had willfully
4  infringed the '476 Patent. Id. Finally, the jury made an advisory finding that
5  Polara had not engaged in inequitable conduct before the Patent and
6  Trademark Office ("PTO") that rendered the '476 Patent unenforceable. Id. at
7  5.

8      These motions followed.

## II.

## DISCUSSION

### A.  Campbell's Motion for Judgment as a Matter of Law

Campbell moves for judgment as a matter of law, arguing that: (1) the
'476 Patent is invalid because it was in public use for more than one year
before a patent application was filed; (2) Claims 1 through 4 were obvious in
light of the prior art; (3) the '476 Patent is invalid because it was described in
publications more than one year before Polara filed the patent application; and
(4) Campbell did not act willfully in infringing the '476 Patent. Dkt. 450 at 1-
56, 66-82.

### 1.  Standard of Review

Federal Rule of Civil Procedure 50 permits a court to grant judgment as
a matter of law "when the evidence permits only one reasonable conclusion
and the conclusion is contrary to that reached by the jury." Ostad v. Or. Health
Scis. Univ., 327 F.3d 876, 881 (9th Cir. 2003). If substantial evidence supports
the jury's verdict, the court should deny a motion for judgment as a matter of
law. Wallace v. City of San Diego, 479 F.3d 616, 624 (9th Cir. 2007) (as
amended); Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361, 1366 (Fed. Cir.
2005). "Substantial evidence is such relevant evidence as reasonable minds
might accept as adequate to support a conclusion even if it is possible to draw

4

two inconsistent conclusions from the evidence." Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir. 1994) (as amended). A court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009) (citation omitted, alteration in original). Neither a "mere scintilla" of evidence nor pure speculation is sufficient to sustain a verdict for the prevailing party. See Lakeside-Scott v. Multnomah Cty., 556 F.3d 797, 802-03 (9th Cir. 2009). And because a post-verdict Rule 50(b) motion is "a renewed motion," it is "limited to the grounds asserted in the pre-deliberation Rule 50(a) motion." Go Daddy, 581 F.3d at 961.

**2.    Waiver**

As an initial matter, Polara argues that "[b]ecause Campbell never raised any arguments regarding patent invalidity in its pre-verdict Rule 50(a) motion, Campbell has waived those arguments." Dkt. 461 at 24. The Court disagrees.

a.    Background

After Campbell rested its case, Polara moved for judgment on Campbell's claim that the '476 Patent was invalid because of Polara's inequitable conduct. 6 Tr. 123-26.[2] Polara also moved for judgment on Campbell's "prior sale or offer for sale" (or "on-sale" bar), "experimental use," "prior use," and anticipation and obviousness defenses. Id. at 127. Before hearing argument from the parties on Polara's motions, the Court stated:

> I think it's perfectly appropriate for me to, even just on the basis of hearing those potential arguments, to tell you that I am not going to -- you've made it at the appropriate time, so you've reserved the ability to argue it after a jury verdict.

---

[2] Citations to "Tr." refer to the trial transcript and are preceded by the volume number and followed by the page number.

Appx20

1   Id. The Court also indicated that it would defer ruling on the experimental use,

2   obviousness, and anticipation issues. Id. The Court did hear argument from

3   Campbell regarding the on-sale bar issue. See id. at 130-33.

4       Campbell subsequently indicated that it wanted to "bring a motion

5   pursuant to Rule 50 concerning the claim of willfulness." Id. at 135. After

6   hearing argument from Polara, id. at 137-39, the Court "den[ied] the Rule 50

7   motion with respect to the willfulness argument," id. at 139. The Court also

8   ruled:

9           I find that there's sufficient evidence of contested issues of

10          fact on experimental use and on the obviousness and anticipation

11          doctrines as related to the [prior art] devices to put those issue[s] to

12          the jury. I deny Rule 50 motions as to those.

13          I am also going to deny the Rule 50 motion as to the

14          inequitable conduct defense. I find that there are issues of fact both

15          with respect to the defendant's conduct as well as the intent to

16          deceive or mislead sufficient to take the issue to the jury. . . .

17  Id. at 139-40. The Court subsequently granted Polara's Rule 50 motion as to

18  the on-sale bar because "no reasonable jury could conclude that the evidence

19  has shown that the claimed invention was subject to a commercial offer for

20  sale on or before that date." 7 Tr. 6. The Court also noted that Campbell was

21  left with two statutory bar arguments: that over a year before the patent

22  application was filed, the claimed invention was (1) described in a publication

23  and (2) used openly and non-experimentally. Id.

24          b.    Relevant Law

25      The same claims or issues on which judgment as a matter of law is

26  sought under Rule 50(b) must have been raised in a pre-verdict motion for

27  judgment under Rule 50(a). See Fed. R. Civ. P. 50(b), Adv. Comm. Notes

28  (1991 Amend.); see also Go Daddy, 581 F.3d at 961 ("Because it is a renewed

6

1 motion, a proper post-verdict Rule 50(b) motion is limited to the grounds
2 asserted in the pre-deliberation Rule 50(a) motion."). The Ninth Circuit has
3 explained that this rule limitation serves two purposes. First, the rule
4 "preserves the sufficiency of the evidence as a question of law, allowing the
5 district court to review its initial denial of judgment as a matter of law instead
6 of forcing it to 'engage in an impermissible reexamination of facts found by the
7 jury.'" Freund v. Nycomed Amersham, 347 F.3d 752, 761 (9th Cir. 2003)
8 (quoting Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1428-29 (9th
9 Cir. 1986)). Second, it ensures that the court and the parties are put on notice
10 of "any alleged deficiencies in the evidence at a time when the opposing party
11 still has an opportunity to correct them." Id.

12         c.    Analysis

13    "Although courts construe strictly the requirement that a motion be
14 made after a case-in-chief, they are generally more liberal about what suffices
15 as a motion for a directed verdict after the close of all the evidence." Reeves v.
16 Teuscher, 881 F.2d 1495, 1498 (9th Cir. 1989). Thus, Rule 50(b) "may be
17 satisfied by an ambiguous or inartfully made motion for a directed verdict or
18 by an objection to an instruction for insufficient evidence to submit an issue to
19 the jury." Id. In Reeves, for example, the Ninth Circuit found that the
20 defendants properly preserved a Rule 50(b) motion where the trial court
21 interrupted their argument and told them to renew their motion after the jury's
22 verdict. Id.

23    Similarly here, the Court elected to "withhold argument" until after
24 Polara had stated the bases for its Rule 50(a) motion, and deferred argument as
25 to the experimental use and the obviousness and anticipation issues until after
26 the jury's verdict. 6 Tr. 127. The Court did hear argument from both parties as
27 to the on-sale bar, see id. at 128, 130-33, but informed Campbell that it did not
28 "have to be heard now" regarding the inequitable-conduct issue and could

brief that issue post-verdict, see id. at 129-30. As such, the Court and the parties understood the bases for any Rule 50(a) motion regarding patent invalidity, and the Court did not hear oral argument from the parties on the issues that it found were properly submitted to the jury. The Court therefore finds that Campbell is not barred from challenging the jury's invalidity findings in a Rule 50(b) motion.

**3.    Public Use**

The jury found that Campbell failed to prove that the '476 Patent is invalid because it was in public use for more than one year before Polara filed the patent application. Campbell moves for judgment as a matter of law on this invalidity theory. Dkt. 450 at 30-46. Because substantial evidence shows that Polara's early use was experimental use necessary to ensure that its invention would work for its intended purpose, Campbell's motion is denied.

a.    Background

Polara entered the accessible pedestrian signal ("APS") system market with an eight-wire system called the Navigator. 2 Tr. 22-27.[3] Because many intersections did not have the wiring necessary to support an eight-wire device, installation was difficult and labor-intensive. Id. at 26-27. Leslie Beckwith, a design engineer for Polara, testified that he and another Polara engineer, Randy Cruz, began discussing a two-wire version of the Navigator in late 2000 or early 2001. 3 Tr. 80-81. John McGaffey, Polara's president and owner, testified that it took Polara "about three years" to develop a two-wire APS system. 2 Tr. 32. They "did considerable testing in the lab," 3 Tr. 80, and in Polara's "parking lot in the back," 2 Tr. 35-36, to make sure the first prototype worked. Because the first device was "a little bit cobbled together," Polara then

---

[3] Confusingly, the parties (and the marketplace) refers to these systems generally as "APS" systems while Campbell's infringing product is branded the "AAPS."

8

designed something "with a little more permanent construction" that could be installed on the street. 3 Tr. 80. McGaffey also testified that the device needed to be "tested on live intersections—and not just one intersection, it need[ed] to be tested on multiple because every intersection . . . has different equipment, different challenges and problems that it has to overcome." 2 Tr. 36.

In January 2002, McGaffey instructed Polara's office manager to send a letter to Mark Miller, the traffic engineer for the City of Fullerton, requesting permission to install a prototype system at the intersection of Gilbert Street and Commonwealth Avenue. Id. at 37-38; 3 Tr. 60-63; Tr. Exh. 193. The letter explained that the identified intersection was close to Polara's plant, which would allow for daily monitoring "during the test phase." Tr. Exh. 193. Polara also represented that it "would take full responsibility for installing, maintaining and deinstalling the equipment." Id.

After the prototype system was installed at the Gilbert and Commonwealth intersection, Polara noticed that "it wasn't functioning correctly," 2 Tr. 41, because the communication between the control unit and push-button station was "not reliable," 3 Tr. 81. Polara used an oscilloscope to measure the data signal and learned that "a lot of electrical noise" was affecting the signal; Polara uninstalled the system that same day. Id. at 82; see 2 Tr. 41-42. Beckwith and Cruz revised the device's transmitting and receiving circuitry to make it "much more resistant to external sources of interference." 3 Tr. 83-84. The process took "a few months" because they conducted "a variety of experiments in the lab" before they were satisfied that the device could "be used on the street." Id. at 84. Polara then installed the revised system at the same intersection. Id. at 84-85; 2 Tr. 42. Polara monitored the device on a daily basis—initially twice a day—to see if "it was performing as it was supposed to." 2 Tr. 42-43; see also 3 Tr. 85-86. At "some point," Polara became satisfied that the device was performing as it should. 2 Tr. 43.

9

1    Polara next installed the same product at the intersection of Nutwood
2    Avenue and State College Boulevard in Fullerton. Id. at 44; 3 Tr. 86-87. Polara
3    selected this intersection because it was larger than the one at Gilbert and
4    Commonwealth and "had a much higher pedestrian traffic flow, which meant
5    the buttons would get pushed on a much higher volume." 2 Tr. 44; see also 3
6    Tr. 87. Right after installation, Polara observed a shortcoming in the way the
7    digital-data signal was being communicated. 3 Tr. 87-88. Polara modified the
8    circuitry inside the prototype to adjust the sensitivity of the receiving circuit.
9    Id. at 88-89. Polara was able to make this modification without uninstalling the
10   system, id. at 89, and McGaffey characterized it as a "minor adjustment," 2
11   Tr. 45. Polara's employees visited the intersection several times to test the
12   system's performance, sometimes using an oscilloscope or other device. 3 Tr.
13   89-90. The prototype remained at Nutwood and State College from fall of 2002
14   to fall of 2003, and Polara "continued to monitor it and consider it a test
15   intersection." 5 Tr. 181-82.

16   Polara also "felt that it was imperative" to test the device in a "wet
17   environment" because "water can cause all kinds of problems with electronic
18   equipment." 2 Tr. 46. The City of Burnaby, Canada, which "got a lot of rain"
19   and snow, was "willing to test a system." Id. at 46-47. McGaffey testified that
20   the weather was "a very, very significant factor" in choosing to test the device
21   in Canada. Id. at 47. Likewise, Beckwith testified that testing in a wet and cold
22   environment "was very important." 3 Tr. 91. The City of Burnaby arranged for
23   Cobra Electric to install and monitor the test system. 2 Tr. 47. Because Polara
24   did not have control over all of the equipment, it had both entities sign a
25   confidentiality agreement. Id. at 47-49; Tr. Exh. 205.

26   After Polara became satisfied that the two-wire APS system was working
27   "even in the harsher conditions of Canada," it decided to announce the release
28   of the product at an industry conference in August 2003. 2 Tr. 49. Polara

1   began selling its two-wire Navigator in late September 2003. Id. at 49-51; see

2   Tr. Exh. 203.

3            b.      Relevant Law

4        Under 35 U.S.C. § 102(b), a patent is invalid if "the invention was . . . in

5   public use or on sale in this country [] more than one year prior to the date of

6   the application for patent in the United States." 35 U.S.C. § 102(b).[4] The

7   public use bar applies if the invention is "ready for patenting" and in "public

8   use." Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1379 (Fed. Cir.

9   2005). Evidence of experimental use, even if public, may mean that the bar

10  does not apply. EZ Dock v. Schafer Sys., Inc., 276 F.3d 1347, 1351 (Fed. Cir.

11  2002); see also Pfaff v. Wells Electronics, Inc., 525 U.S. 55, 64 (1998) ("[A]n

12  inventor who seeks to perfect his discovery may conduct extensive testing

13  without losing his right to obtain a patent for his invention—even if such

14  testing occurs in the public eye. The law has long recognized the distinction

15  between inventions put to experimental use and products sold

16  commercially.").

17       A use is experimental if it is designed to "(1) test claimed features of the

18  invention or (2) to determine whether an invention will work well for its

19  intended purpose." Clock Spring, L.P. v. Wrapmaster, Inc., 560 F.3d 1317,

20  1327 (Fed. Cir. 2009). The Federal Circuit has outlined certain objective

21  factors that may be instructive when determining experimental use, including:

22  (1) the need for public testing; (2) the inventor's amount of control over the

23  _____

24       [4] Section 102(b) was amended by the Leahy-Smith America Invents Act

25  ("AIA"), Pub. L. No. 112-29, § 3(b)(1), 125 Stat. 284, 285-86 (2011). Because
    the application for the '476 Patent was filed on August 5, 2004, the pre-AIA
    version of the statute applies in this case. See Merck & Cie v. Watson Labs.,

26  Inc., 822 F.3d 1347, 1348 n.1 (Fed. Cir. 2016) (citing In re Giannelli, 739 F.3d

27  1375, 1376 n.1 (Fed. Cir. 2014), cert. denied, No. 16-493, 2017 WL 69719

28  (U.S. Jan. 9, 2017)).

Appx26

1  experiment; (3) the nature of the invention; (4) the length of the test period; (5)

2  whether payment was made; (6) whether there was a secrecy obligation; (7)

3  whether records of the experiment were kept; (8) who conducted the

4  experiment; (9) the degree of commercial exploitation during testing; (10)

5  whether the invention reasonably required evaluation under actual conditions

6  of use; (11) whether testing was systematically performed; (12) whether the

7  inventor continually monitored the invention during testing; and (13) the

8  nature of contacts made with potential customers. Id. at 1327.

9         c.   Analysis

10        Polara filed its initial application on August 5, 2004. 3 Tr. 12. The Court

11  therefore looks at public use of the '476 Patent before August 5, 2003.

12  According to Campbell, the two-wire device embodying the '476 Patent was in

13  public use as of early 2002, when it was installed at the intersection of Gilbert

14  and Commonwealth. Campbell reasons that by that time, the invention had

15  been reduced to practice because a prototype had operated successfully in

16  Polara's parking lot. See Dkt. 450 at 32-34; Dkt. 481 at 5-9.

17        Campbell does not deserve judgment as a matter of law on the public-use

18  bar. At Campbell's request, see 6 Tr. 7, the jury was instructed on the 13

19  factors identified by the Federal Circuit in Clock Spring, see 7 Tr. 70. Polara

20  produced substantial evidence to support a jury finding in its favor on these

21  factors.

22        The jury heard testimony on the nature of the invention and the need for

23  public testing and evaluation under actual conditions of use. Even though the

24  prototype worked in Polara's parking lot, Polara needed to test the device on

25  live intersections because it was "a life safety device," and "the last thing"

26  Polara wanted was "to put a device on an intersection that's not been

27  thoroughly vetted and potentially have a blind person get the wrong message

28  and walk out in front of the cars and get hit." 2 Tr. 36. The jury also heard that

12

Appx27

an APS system must be capable of enduring different weather conditions, volumes of pedestrian traffic, and electrical-noise interference. See 2 Tr. 43-45; 3 Tr. 91. Polara introduced testimony that most intersections have underground wiring. See 2 Tr. 28-30, 207. The '476 Patent specification expressly contemplates use at actual "traffic light controlled intersection[s]" and the use of "existing pairs of underground wires over which power and data signals are transmitted." Tr. Exh. 9 at 1, 7. The summary states that the "pairs of wires . . . are, in the preferred embodiment, the existing underground wires that were previously installed for the purpose of connecting the . . . push buttons to a traffic light control cabinet." Id. at 7.

Polara presented evidence on other Clock Spring factors. Fullerton did not pay for the installations at its intersections; indeed, Polara removed the device at the end of the test period. See 2 Tr. 39; 5 Tr. 181-82; see also Tr. Exh. 193. Polara retained control over the device; Fullerton merely opened the traffic cabinet so that Polara could install it. 2 Tr. 49. Polara engaged in little if any commercial exploitation of its new two-wire device during the testing period, instead waiting until the completion of testing in Canada to unveil the device at an August 2003 trade show. 2 Tr. 49, 95.[5]

Campbell points out that Polara produced no records reflecting its testing, did not have confidentiality agreements with Fullerton employees, and made no modifications to the device after the early stages of testing at the first Fullerton intersection. While this evidence may have been inconsistent with experimental use, it was the jury's job to weigh the factors and make a determination. Polara presented substantial evidence of experimental use, and the Court cannot second-guess the jury's determination under Rule 50.

---

[5] Because the public-use bar is expressly limited by statute to use in this country, the Canada testing itself was not relevant to the jury's determination.

13

Campbell also contends that Polara's testing was for commercial development, not experimental use, pointing to Polara's testing of how the device operated through underground wires, under harsh weather conditions, in large or busy intersections, within range of other electrical devices, and in areas where other conduits are run. Dkt. 481 at 13. The Court disagrees.

Polara's testing the durability of the digital-data signal related to the invention's claimed features. "Experimentation evidence includes 'tests needed to convince [the inventor] that the invention is capable of performing its intended purpose in its intended environment.'" EZ Dock, 276 F.3d at 1352 (alteration in original) (quoting Gould Inc. v. United States, 579 F.2d 571, 583 (Ct. Cl. 1978)); see also Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 551 (Fed. Cir. 1990) ("When durability in an outdoor environment is inherent to the purpose of an invention, then further testing to determine the invention's ability to serve that purpose will not subject the invention to a [public] bar."). In EZ Dock, for example, two inventors designed a floating dock made of polyethylene and installed one for a customer in a location that experienced "heavier boat traffic and more turbulent water flow." 276 F.3d at 1349. One of the inventors testified that the purpose of the sale was to see how the dock would hold up under more turbulent water conditions. Id. at 1353. The Federal Circuit held that a reasonable jury could find that the sale of the dock was for experimental rather than commercial development because "floating docks, by their nature, must endure all kinds of water conditions, including choppy water created by weather and boating." Id. Here, the evidence supported the jury's finding that an APS system must work in a variety of conditions, such as inclement weather, various pedestrian volumes, and environments with different levels of electrical noise.

In sum, substantial evidence supports the jury's rejection of Campbell's public-use defense because Polara showed that installing the device in

14

Appx29

1  Fullerton was an experimental use. Campbell's motion for judgment as a

2  matter of law on public use is therefore denied.

3      **4.    Obviousness**

4      The jury found that Campbell failed to prove that Claims 1 through 4

5  were either anticipated or obvious. Campbell now renews its motion for

6  judgment as a matter of law that Claims 1 through 4 were obvious in light of

7  the prior art, including United States Patent No. 4,851,836 ("Wilkinson").

8  Dkt. 450 at 54-60. Because the jury relied on substantial evidence to reach its

9  conclusion on the factual issues underlying obviousness, and because the jury's

10  ultimate conclusion was correct as a matter of law, the Court denies

11  Campbell's motion.

12      a.    Relevant Law

13      A patent is obvious and therefore invalid "if the differences between the

14  subject matter sought to be patented and the prior art are such that the subject

15  matter as a whole would have been obvious at the time the invention was

16  made to a person having ordinary skill in the art to which said subject matter

17  pertains." 35 U.S.C. § 103.

18      Obviousness is a question of law based on underlying factual findings.

19  Kinetic Concepts, Inc. v. Smith & Nephew, Inc., 688 F.3d 1342, 1356-57 (Fed.

20  Cir. 2012). The Court must presume that the jury resolved the underlying

21  factual disputes in Polara's favor and leave those presumed findings

22  undisturbed if they are supported by substantial evidence. Id. The Court then

23  examines the jury's ultimate legal conclusion de novo to see whether it is

24  correct in light of the jury's presumed factual findings. Id. at 1357.

25      The underlying factual findings are: (1) the scope and content of the

26  prior art; (2) the differences between the claims and the prior art; (3) the level

27  of ordinary skill in the art; and (4) any relevant secondary considerations, such

28  as commercial success, long felt but unsolved needs, and failure of others. KSR

15

Appx30

1   Int'l Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007). The Court must consider

2   all four of these factors before reaching a conclusion. Kinetic, 688 F.3d at

3   1360. At all times, the burden is on Campbell to establish by clear and

4   convincing evidence that the patent is obvious. Id.

5              b.    Background

6          Neither party requested that the jury answer any special interrogatories.

7   The obviousness portion of the verdict form asked whether Campbell had

8   proven, by clear and convincing evidence, that any of Claims 1 through 4 were

9   invalid due to obviousness. See Dkt. 440 at 2. As to each claim, the jury

10  answered no. Id.

11         At trial, the dispositive issue regarding invalidity was whether an

12  alternating power signal like the signal disclosed in Wilkinson was a digital-

13  data signal. Like the '476 Patent, Wilkinson disclosed a two-wire device. Tr.

14  Exh. 106 at 4 ("[O]nly two wires are needed to power and control the

15  system."). Wilkinson used an alternating power signal in which the power-

16  supply unit provided a half-wave voltage signal during the DON'T WALK

17  mode and a full-wave voltage signal during the WALK mode. Id. Testimony

18  established that two other pedestrian crosswalk devices, the Campbell

19  Enlightened and Tassimco devices, operated similarly. 6 Tr. 36-41. Campbell's

20  expert Dr. Christopher Jones testified that the full-wave/half-wave signal

21  identified in Wilkinson and these other devices was a digital-data signal. Id.

22         Polara introduced evidence showing that Wilkinson, Campbell

23  Enlightened, and Tassimco did not send digital data. Beckwith, the inventor of

24  the '476 Patent, testified that these devices did not transmit digital data over

25  power like the Polara Navigator two-wire device. 3 Tr. 93-96. McGaffey

26  testified that these devices could turn a light on or off only by manipulating

27  voltage. 3 Tr. 20-21. They could not accomplish the other functions enabled by

28  the '476 Patent. Id. at 23-25; see 2 Tr. 64-68.

1    Polara's expert Dr. Ian Harris distinguished Wilkinson and, by

2    extension, the Campbell Enlightened and Tassimco devices. Dr. Harris

3    testified that the Campbell Enlightened sends only power and no data. 6 Tr.

4    81-82 ("The Enlightened doesn't send digital data signals by any normal

5    conventional understanding of digital data signals."). He noted that the

6    Enlightened device did not have a microcontroller to interpret a digital-data

7    signal. Id. at 82-83. He similarly observed that the Tassimco device and the

8    device described in Wilkinson transmitted only power. Id. at 87-88 ("Q. So in

9    all three—the Wilkinson, Enlightened, and Tassimco—all that's being sent is

10    power? A. Yes.").

11    On cross-examination, Dr. Harris maintained that "send[ing] digital

12    signals and power together over two wires was not obvious at that time." Id. at

13    118. He continued to distinguish Wilkinson, noting that Wilkinson did not

14    disclose encoding a digital signal on top of the power supply. Id. ("Wilkinson

15    sent power or not. It didn't send digital data."). Dr. Harris also rejected Dr.

16    Jones's contention that Wilkinson's manipulation of the power signal

17    constituted data. Id. ("Nobody would call that digital data. That's power.").

18    c.    Analysis

19    The jury's finding of nonobviousness indicates that it credited Polara's

20    contention that the differences between the prior art asserted by Campbell and

21    the '476 Patent were significant, and that the prior art did not disclose various

22    elements of Claims 1 through 4. In light of the jury's validity finding, the Court

23    must infer that the jury found Dr. Harris to be credible and persuasive when

24    testifying that Wilkinson's power signal was not digital data. "[W]hether the

25    prior art discloses the limitations of a particular claim is a question of fact to be

26    determined by the jury." Kinetic, 688 F.3d at 1363. Polara presented ample

27    evidence that Wilkinson and the other prior art did not disclose the digital-

28    data-over-power limitation of Claims 1 through 4. The Court must defer to the

17

Appx32

1  jury's factual finding. Id. at 1356-57.

2      Campbell argues that a person of ordinary skill in the art would have

3  combined Wilkinson's use of two wires with the use of digital data over power

4  and thus that Claims 1 through 4 are an obvious combination of familiar

5  elements. But Campbell offered no evidence at trial to support this argument.

6  Nor did it define "a person of ordinary skill in the art." It did not ask its expert,

7  Dr. Jones, whether such a person would have been motivated to combine

8  Wilkinson with digital data over power to achieve the advancement offered by

9  the Navigator two-wire device. "[P]ossibility and ease do not automatically

10  translate to motivation." Golden Bridge Tech., Inc. v. Apple, Inc., No. 12-

11  04882, 2015 WL 2064525, at *9 (N.D. Cal. May 1, 2015). And it offered no

12  evidence to rebut or contradict Dr. Harris's testimony that "[t]o encode the

13  digital signal on top of the power was a complicated thing." 6 Tr. 118.

14      The Court understands that the idea of transmitting digital data over a

15  power line was not new at the time of the '476 Patent. But "a patent composed

16  of several elements is not proved obvious merely by demonstrating that each of

17  its elements was, independently, known in the prior art." KSR, 550 U.S. at

18  418. "[I]nventions in most, if not all, instances rely upon building blocks long

19  since uncovered, and claimed discoveries almost of necessity will be

20  combinations of what, in some sense, is already known." Id. at 418-19. Put

21  differently, "[a]n invention may be a combination of old elements disclosed in

22  multiple prior art references." Plantronics, Inc. v. Aliph, Inc., 724 F.3d 1343,

23  1354 (Fed. Cir. 2015) (citing Cross Med. Prods. Inc. v. Medtronic Sofamor

24  Danek, Inc., 424 F.3d 1293, 1321 (Fed. Cir. 2005)). Because the prior-art

25  references did not disclose using digital data over power to transmit digital

26  data from the control unit to the various message generating means, the '476

27  Patent did more than just combine known elements.

28      Finally, the jury was instructed to consider secondary considerations

18

Appx33

1    indicating nonobviousness, including whether the products covered by the
2    invention were commercially successful due to the claimed invention's merits,
3    whether a long-felt but unsolved need was resolved by the claimed invention,
4    and whether others copied the claimed invention. 7 Tr. 74-75.

5        Substantial evidence supports the jury's finding in Polara's favor on
6    these issues. Polara introduced evidence that its two-wire Navigator device
7    resolved a long-felt but unsolved need for a two-wire device with the features
8    of its eight-wire Navigator system such as a locate tone, audible messages, and
9    a vibrating button. 2 Tr. 22-27. Many of Polara's potential customers resisted
10    installing an eight-wire device because their existing intersections had only two
11    wires, meaning that wiring had to be added at considerable expense. Id. at 26-
12    29. Polara worked for almost three years to develop a device that would use
13    the two existing wires and not require additional wiring. Id. at 28, 32.

14        Polara also introduced evidence showing that its two-wire Navigator
15    device enjoyed substantial commercial success because the claimed invention,
16    i.e., the use of digital data over power, enabled them to offer the functionality
17    of an eight-wire system with only two wires. Polara's customers were "very
18    happy to see" the two-wire device and "preferred it over the eight-wire." Id. at
19    52. Finally, Polara introduced evidence suggesting that Campbell introduced
20    its infringing two-wire accessible pedestrian system to compete with Polara's
21    Navigator two-wire device. Id. at 70-71; 3 Tr. 28-29, 118, 120-22.

22        This motion is not a vehicle for the Court to second-guess the jury's
23    assessment of the evidence. The jury's finding of nonobviousness was
24    supported by substantial evidence and the jury did not misapply the relevant
25    law to the facts. Therefore, Campbell has not carried its burden of overcoming
26    the presumption of validity, and its motion for judgment as a matter of law on
27    obviousness must be denied.

28    ///

19

Appx34

1  **5.    Prior Publication**

2      The jury found that Campbell failed to prove that the '476 Patent is

3  invalid because it was described in three publications more than one year

4  before the patent application was filed. Campbell asks the Court to overturn

5  the jury's verdict. Dkt. 450 at 54-57. The Court declines to do so because the

6  evidence showed that the three publications did not disclose each and every

7  element of the '476 Patent.

8      a.    Background

9      At trial, Campbell introduced a March 2003 survey conducted by the

10 United States Access Board. 5 Tr. 150-51; Tr. Exh. 331. The survey included

11 Polara's original eight-wire Navigator and stated that the

12      [m]anufacturer is developing a model that operates with only two

13      wires to the pushbutton and is programmable after installation by a

14      traffic engineer using a handheld PDA type device. The new

15      model will have the capability to alternate signal sounds, to

16      countdown pedestrian clearance interval and present a signal at

17      the far end of the crosswalk only. It is expected to be available by

18      fall 2003.

19 Tr. Exh. 331 at CAMP024409-10; see 5 Tr. 150-52. An April 2003 report

20 includes an identical entry. 2 Tr. 196-98; Tr. Exh. 311 at 1, 29-31. McGaffey

21 testified that he had provided this entry's information and had been talking to

22 authors of various industry publications about Polara's development of a two-

23 wire APS system. See 2 Tr. 197-99.

24      Campbell also introduced a May 2003 report containing an entry on the

25 eight-wire Navigator. Id. at 200-03; Tr. Exh. 312 at 1, 233-34. The

26 "comments" section stated:

27      Manufacturer is developing a model that operates with only two

28      wires from the intersection traffic control cabinet to the pushbutton

20

| 1 | and is programmable after installation by an engineer using a |
| 2 | handheld PDA type device. The new model will have the |
| 3 | capability to synchronize sounds, alternate sounds, mute all |
| 4 | sounds except the activated crosswalks, to verbally countdown |
| 5 | pedestrian clearance interval or present a signal at the far end of |
| 6 | the crosswalk only. |

7   Tr. Exh. 312 at 234.

8          b.    Relevant Law

9   A patent is invalidated as anticipated if "the invention was patented or

10  described in a printed publication" more than one year before the patent

11  application was filed. 35 U.S.C. § 102(b). To be anticipatory, the prior art

12  reference must "explicitly or inherently" disclose each and every element of the

13  claimed invention. In re Gleave, 560 F.3d 1331, 1334 (Fed. Cir. 2009). An

14  anticipatory prior art reference must also enable "one of skill in the art to

15  practice an embodiment of the claimed invention without undue

16  experimentation." Am. Calcar, Inc. v. Am. Honda Motor Co., 651 F.3d 1318,

17  1341 (Fed. Cir. 2011); see also In re Donohue, 766 F.2d 531, 533 (Fed. Cir.

18  1985) ("Such possession is effected if one of ordinary skill in the art could have

19  combined the publication's description of the invention with his own

20  knowledge to make the claimed invention."). Finally, the party asserting

21  invalidity must prove anticipation by clear and convincing evidence. Orion IP,

22  LLC v. Hyundai Motor Am., 605 F.3d 967, 975 (Fed. Cir. 2010).

23         c.    Analysis

24  The March and April 2003 publications stated that Polara "is developing

25  a model that operates with only two wires to the pushbutton and is

26  programmable after installation by a traffic engineer using a handheld PDA

27  type device." Tr. Exh. 331 at CAMP024409-10; Tr. Exh. 311 at 31. Similarly,

28  the May 2003 publication stated that Polara "is developing a model that

Appx36

1    operates with only two wires from the intersection traffic control cabinet to the
2    pushbutton and is programmable after installation by an engineer using a
3    handheld PDA type device." Tr. Exh. 312 at 234. These publications also
4    contained pictures and diagrams of, and specifications and installation
5    instructions for, Polara's original eight-wire Navigator. Id. at 233-34; Tr. Exh.
6    311 at 29-31; Tr. Exh. 331 at CAMP024408-10.

7        Campbell argues that the original Navigator and the invention claimed
8    in the '476 Patent are virtually identical with the only "alleged innovation"
9    being "communication between a control unit and pushbutton over a single
10   pair of wires." See Dkt. 450 at 54. According to Campbell, the information on
11   the Navigator coupled with the statements about the two-wire model in
12   development discloses every element of Claims 1 through 4. See id. at 54-57.
13   Campbell does not dispute that the three publications at issue do not disclose
14   transmitting both power and digital-data signals over two wires. Instead,
15   Campbell argues that this limitation is inherent in each publication, because
16   "communication of digital signals over a single pair of wires was 'obvious' to
17   one skilled in the art." Id. at 57.

18       This argument fails. As previously discussed, Polara presented
19   substantial evidence that using digital data over power to transmit digital data
20   from the control unit to the push buttons was nonobvious. As such, substantial
21   evidence supports a finding that the March, April, and May 2003 publications
22   did not disclose all the limitations of Claims 1 through 4. See RCA Corp. v.
23   Applied Digital Data Sys., Inc., 730 F.2d 1440, 1446 (Fed. Cir. 1984) (holding
24   that dependent claim "cannot be anticipated" where the independent claim "is
25   not anticipated").

26       The jury's obviousness verdict also supports a finding that the
27   publications were not enabling. Campbell offered little evidence that would
28   demonstrate how each of the three industry publications enabled one of

22

Appx37

1   ordinary skill in the art to practice the claimed invention. Campbell questioned

2   McGaffey about whether "people with ordinary skill in the art" reading the

3   May 2003 entry on the Navigator would understand that the two-wire device

4   would have a push button station, control system, and control unit. See 3 Tr.

5   30, 33-34. However, other than the examples of "Mr. Beckwith or these traffic

6   engineers, somebody who knew what these devices were about, somebody

7   who would actually read those documents," id. at 33-34, Campbell did not

8   seek to define what constitutes a person of ordinary skill in the art. Nor did

9   Campbell discuss the March, April, and May 2003 publications with Dr. Jones

10  or Dr. Harris.

11      "Typically, testimony concerning anticipation must be testimony from

12  one skilled in the art and must identify each claim element, state the witnesses'

13  interpretation of the claim element, and explain in detail how each claim

14  element is disclosed in the prior art reference." Koito Mfg. Co. v. Turn-Key-

15  Tech, LLC, 381 F.3d 1142, 1151-52 (Fed. Cir. 2004) (quoting Schumer v. Lab.

16  Computer Sys., Inc., 308 F.3d 1304, 1315 (Fed. Cir. 2002)). Dr. Jones's

17  general testimony regarding other prior art was far from substantial evidence of

18  how the 2003 publications disclosed each claim. See Schumer, 308 F.3d at

19  1316 (finding that declaration setting forth purported programmer of software

20  driver's "understanding of the operation and steps performed by the [] driver"

21  and description of "what he considered to be known to one of ordinary skill

22  prior to [patentee's] invention" was not clear and convincing evidence that

23  driver disclosed "each and every limitation" of claim). The jury therefore had

24  substantial evidence from which to conclude that Campbell had not met its

25  burden of showing, by clear and convincing evidence, that the 2003

26  publications anticipated the '476 Patent. Accordingly, the motion for judgment

27  as a matter of law as to prior publication is denied.

28  ///

23

### 6.  Willfulness

A week before trial began, the Supreme Court decided Halo Electronics, Inc. v. Pulse Electronics, Inc., --- U.S. ---, 136 S. Ct. 1923 (2016), and changed the framework for awarding enhanced damages. Before Halo, a patentee seeking enhanced damages first needed to show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions infringed a valid patent. Id. at 1930 (citing In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (2007) (en banc)). This objective prong tended not to be met where an accused infringer had a reasonable defense to infringement. See Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc., 682 F.3d 1003, 1005-06 (Fed. Cir. 2012). Second, the patentee had to show that the risk of infringement was either known or so obvious that it should have been known to the accused infringer. Seagate, 497 F.3d at 1371.

Halo criticized the objective recklessness requirement, reasoning that it "excludes from discretionary punishment many of the most culpable offenders," and faulted the requirement for "making dispositive the ability of the infringer to muster a reasonable (even though unsuccessful) defense at the infringement trial." 136 S. Ct. at 1932, 1932-33. Halo explained that an infringer's subjective bad faith alone could support an enhanced damages award. Id. at 1933. Moreover, Halo made clear that it is the infringer's state of mind at the time of the challenged conduct that matters, without regard to any later reasonable defense at trial. Id.

In this case, the jury was instructed that it must find by a preponderance of the evidence that Campbell's infringement of the '476 Patent was egregious measured against Campbell's knowledge at the time of the infringement. 7 Tr. 93. The jury was also told that "egregious conduct" could be described as "willful, wanton, malicious, bad faith, deliberate, consciously wrongful, flagrant, or characteristic of a pirate." Id. The jury was then instructed that it

24

1    must consider the totality of the circumstances when determining whether
2    Campbell acted egregiously, including whether Campbell intentionally copied
3    Polara's technology covered by the '476 Patent, whether Campbell made a
4    good-faith effort to avoid infringing the patent, whether Campbell reasonably
5    believed it had a defense to infringement at the time it engaged in the
6    infringing conduct, or whether Campbell relied on a legal opinion that was
7    well supported and believable. Id. at 94-95.

8        Campbell's motion for judgment as a matter of law raises two primary
9    arguments with respect to the jury's willfulness finding. First, Campbell argues
10   that the jury's verdict was tainted by the Court's instructions and counsel's
11   remarks about Judge Carney's infringement ruling. Dkt. 450 at 66-68. Second,
12   Campbell argues that the evidence does not support the jury's finding of
13   willfulness. Id. at 68-80. Neither argument is persuasive.

14       a.    The Court's Instructions and Polara's Arguments
15       In its initial instructions, the Court told the jury about Judge Carney's
16   infringement finding but warned the jurors that Judge Carney's infringement
17   determination should have "absolutely no impact" on its deliberations:

18       In proceedings before trial it was determined that certain
19       pedestrian crosswalk signal systems products made and distributed
20       by Campbell and known as the Campbell AAPS products
21       infringed the '476 patent. It was not determined, however, whether
22       the '476 patent is valid or whether it is enforceable or whether any
23       infringement by Campbell was willful or what damages, if any,
24       Polara is entitled to.

25       All of these will be questions for you to decide, and the
26       determination that the Campbell AAPS products infringed the
27       '476 patent should have absolutely no impact on how you decide
28       the questions that you are asked to decide; nor does my

25

Appx40

1     determination on any question presented to me mean that I have

2     any opinion on any of the questions that are for you to decide.

3 1 Tr. 10-11. The Court reiterated these instructions during final instructions:

4            In proceedings before trial it was determined that certain

5     pedestrian crosswalk signal systems products made and distributed

6     by Campbell infringed claims 1, 2, 3, and 4 of the '476 patent. It

7     was not determined, however, whether the '476 patent is valid or

8     whether it is enforceable or whether any infringement by Campbell

9     was willful or what damages, if any, Polara is entitled to. All of

10     these questions are questions for you to decide, and the prior

11     determination must not have any impact on how you decide the

12     questions you are asked to decide.

13 7 Tr. 52-53. Later in its final instructions, the Court clarified that Campbell's

14 infringement could be considered as part of its discussion on damages and

15 willfulness. Id. at 57-58.

16     This clarification was discussed shortly before the final instructions were

17 given. Polara's counsel argued that the instructions were unclear about

18 whether the jury could consider, as part of its willfulness determination,

19 Campbell's continued sales of its AAPS device after Judge Carney's

20 infringement ruling. Id. at 18-20. The Court agreed, then discussed with

21 counsel how to modify the language to address Polara's concern yet make

22 clear that the jury could not consider the infringement ruling for purposes of its

23 other determinations. Id. at 20. At the conclusion of this colloquy, Campbell

24 did not object to the Court's proposed language. Id.[6]

25 _____

26     [6] The full discussion follows:

27            THE COURT: All right. I'm inclined to agree

28     [with Polara]. I'm going to stop the sentence: All of

26

Appx41

1    Judge Carney's finding that Campbell infringed the '476 Patent was
2   submitted to the jury as a stipulated fact. 3 Tr. 12. The Court told the jury that
3   "the Court has determined that Campbell's accused product, the AAPS,
4   directly infringes claims 1 through 4 of U.S. patent number 7,145,476. That's
5   the Beckwith '476 patent." Id. Later, Polara's counsel asked Philip Tate,

6          these questions are for you to decide, period.

7          MR. TATE: Your Honor, for the record, if I
8   may.

9          THE COURT: Yes, you may.

10         MR. TATE: It's certainly a proper instruction
11  with regard to the [inequitable conduct defense], and it
12  is an improper [sic] instruction with regard to validity.
    So—
13
14         THE COURT: You want me to give—you want
15  me to phrase it that way: The determination that
    Campbell's products infringed the '476 patent should
16  have no impact on how you decide the questions of
17  invalidity and unenforceability?

18         MR. TATE: Yes.

19         THE COURT: I can do that.

20         MR. DILGER: I think it then would need to
21  read: But may be considered as part of your decision
    on willfulness.
22
23         THE COURT: And damages, I think.

24         MR. DILGER: And damages, yes.

25         THE COURT: Mr. Tate, any comment on that?

26         MR. TATE: No, Your Honor.

27
28  7 Tr. 20.

27

Campbell's owner and president, about Judge Carney's infringement ruling:

> Q. Now, you did get at least one other opinion on your device, however; didn't you?
>
> A. I personally do not recall getting an additional opinion.
>
> Q. You got one in this litigation.
>
> A. Yes.
>
> Q. A federal judge in this building said that your device infringes.

Id. at 166. The Court sustained Campbell's objection to this question and refused Polara's request for a sidebar. Id. at 167. Polara then asked Tate whether he "continue[d] to sell [Campbell's AAPS] device to this day." Id. Tate answered, "I do." Id.

Later, in closing argument, Polara told the jury it should consider Campbell's conduct after Judge Carney's infringement ruling as evidence of Campbell's willfulness:

> [W]e know exactly how Campbell responds when they do in fact know that they have an infringing device. How do we know that? Because they did get another opinion. They got an opinion from a federal judge in this building two years ago.
>
> What did he tell them? He told them: Campbell, your product infringes the '476 patent. That's what he said. What did Campbell do? What did they do? They did what they had been doing for the previous four years. They continued to make and they continued to sell the infringing product.
>
> If that's not recklessness, what is? At that point they didn't even—it wasn't even a mystery. They were told it infringes, and they said: We don't care. We're barrelling forward. And that's what they've done.

28

1       Ladies and gentlemen, that is willfulness, about as good as it

2       gets. So we have infringement of a valid patent, and that

3       infringement is willful.

4  7 Tr. 124.

5       Campbell's argument that the Court's instructions tainted the jury is

6  misplaced. Campbell chose to continue sales of its two-wire device after Judge

7  Carney's ruling. This was among the "totality of the circumstances" that was

8  appropriately considered by the jury to assess the egregiousness of Campbell's

9  conduct. See Avocent Huntsville Corp. v. ClearCube Tech., Inc., No. 03-

10  02875, 2006 WL 2109503, at *27 (N.D. Ala. July 28, 2006) (finding that

11  defendant's continued sale of accused products after court granted plaintiff's

12  motion for partial summary judgment on infringement "may fall under the

13  rubric of the 'totality of the circumstances' test, tending to show [defendant's]

14  infringement was (and continues to be) willful"); see also Applied Med.

15  Resources Corp. v. U.S. Surgical Corp., 353 F. Supp. 2d 1075, 1079 (C.D. Cal.

16  2004) (finding that jury drew a reasonable inference of willful behavior from

17  infringer's continued sale of infringing device after summary judgment ruling

18  of infringement).

19       Campbell also points to its invalidity and unenforceability defenses,

20  arguing that those defenses gave it "reasonable grounds" to continue selling a

21  two-wire device. Dkt. 450 at 67. But the Court's instructions enabled Campbell

22  to continue to argue these defenses to the jury, both before and after Judge

23  Carney's infringement ruling. See 7 Tr. 94 (instructing jury that it should

24  consider "whether Campbell reasonably believed that it had a substantial

25  defense to infringement and reasonably believed that the defense would be

26  successful if litigated" when determining whether Campbell acted egregiously).

27  The jury simply rejected these defenses.

28       Nor is the Court persuaded that Polara's questioning of Tate and

Appx44

1  argument about Campbell's continued sales after Judge Carney's infringement
2  ruling was "improper and prejudicial." As the excerpt above reflects, the Court
3  sustained an objection to Polara's questioning about Campbell's continued sale
4  of an infringing product and allowed Polara to elicit only that Campbell's sales
5  of an infringing product continued after Judge Carney's summary judgment
6  ruling. And Polara's closing argument was just that—argument based on facts
7  the jury heard during trial, facts that included Judge Carney's infringement
8  ruling and Campbell's decision to continue selling its product after that ruling.

9       Moreover, nothing prevented Campbell from vigorously and steadfastly
10 maintaining that it reasonably believed that it had a defense to Polara's charges
11 of infringement. As Polara points out, Campbell did just that, arguing that
12 Tate believed that Campbell's products did not infringe and that the '476
13 Patent was invalid. See 7 Tr. 166-67.

14      Campbell also argues that the special verdict form should have required
15 the jury to consider its willfulness throughout the period of alleged
16 infringement. Dkt. 450 at 67. Campbell's revised special verdict form
17 contained an interrogatory that would have asked the jury to specify the time
18 period during which Campbell's infringement was egregious. See Dkt. 414 at
19 9. On the morning of final argument and jury instructions, the Court provided
20 counsel with a draft special verdict form for their review and comment. 7 Tr. 5
21 ("I will hand out for you a draft special verdict form. You may take a quick
22 look at it. If you have any concerns about it, I want to hear those."). A short
23 while later, each side raised their respective concerns about the Court's verdict
24 form. Id. at 38-43. Campbell did not raise any concerns about the omission of
25 its proposed interrogatory about the time period. By failing to raise its concerns
26 and explain to the Court why omitting an interrogatory about the specific time
27 period would lead to legal error, Campbell has waived its objection. See
28 United States v. Parsons Corp., 1 F.3d 944, 945 (9th Cir. 1993) (holding that

30

1    counsel waived objection to verdict form because although it was clear that

2    counsel preferred a different form, counsel "did not tell the court that it would

3    be committing an error of law or an abuse of discretion if it did not adopt

4    [counsel's] approach").[7]

5        Moreover, any contention that evidence of Campbell's willfulness was

6    limited to after Campbell received Judge Carney's infringement ruling is

7    misplaced. As detailed below, the jury heard evidence that Campbell's

8    egregious conduct began much earlier, when it decided to go ahead with a two-

9    wire AAPS despite knowledge of the '476 Patent. It is simply not the case that

10   evidence of Campbell's willfulness was limited to its decision to continue sales

11   of its infringing product after Judge Carney's ruling. As a result, any error in

12   omitting Campbell's proposed interrogatory was harmless.

13                b.    The Jury's Finding of Willfulness

14       As an initial matter, the parties dispute whether the jury's finding is

15   dispositive of the issue of willfulness. Campbell argues that the jury's finding is

16   only advisory. Dkt. 450 at 68 ("[T]he Jury's tainted rendering is advisory only

17   and, of course, the Court now reviews the evidence."). Polara argues that the

18   jury's willfulness finding is not advisory but may only be overturned if the

19   evidence, construed in the light most favorable to Polara, permits only a

20   conclusion contrary to the jury's verdict. Dkt. 461 at 8.

21   ――――――――――
22           [7] Ninth Circuit law applies to this issue. See Bose Corp. v. JBL, Inc., 274
     F.3d 1354, 1360 (Fed. Cir. 2001) ("We apply regional circuit law to procedural
23   questions that are not themselves substantive patent law issues so long as they
     do not: (1) pertain to patent law; (2) bear an essential relationship to matters
24   committed to our exclusive control by statute; or (3) clearly implicate the
     jurisprudential responsibilities of this court in a field within its exclusive
25   jurisdiction." (citations omitted)); see also Lazare Kaplan Int'l, Inc. v.
26   Photoscribe Techs., Inc., 628 F.3d 1359, 1372 (Fed. Cir. 2010) (applying
     Second Circuit law to determine whether a litigant objected to jury instruction
27   in manner set forth in Fed. R. Civ. P. 51).

28

                                      31

Polara is correct. After <u>Halo</u>, the Federal Circuit has reiterated that "the factual components of the willfulness question should be resolved by the jury." <u>WBIP, LLC v. Kohler Co.</u>, 829 F.3d 1317, 1341 (Fed. Cir. 2016); <u>see</u> <u>Greatbatch Ltd. v. AVX Corp.</u>, No. 13-723, 2016 WL 7217625, at *2 (D. Del. Dec. 13, 2016). The jury's finding that Campbell was subjectively willful establishes the predicate of willful misconduct; thus the inquiry moves to the stage at which the district court exercises its discretion. <u>See</u> <u>Innovention Toys, LLC v. MGA Entm't, Inc.</u>, --- F. App'x ---, 2016 WL 4151240, at *2 (Fed. Cir. Aug. 5, 2016); <u>see also</u> <u>Dominion Res. Inc. v. Alstom Grid, Inc.</u>, No. 15-224, 2016 WL 5674713, at *19 (E.D. Pa. Oct. 3, 2016).

Considering the totality of the circumstances, the jury had substantial evidence on which to conclude that Campbell's conduct was willful by a preponderance of the evidence. Tate testified that Campbell developed its AAPS in response to Polara's two-wire system. 3 Tr. 121. He acknowledged that Campbell did not have the technology to compete with Polara's two-wire Navigator when it was introduced. <u>Id.</u> at 123. He also stated that Campbell "needed" a product that would compete with Polara's two-wire Navigator. <u>Id.</u> at 121. The jury could have relied on those statements to conclude that Campbell intentionally copied Polara's two-wire device.

Tate also provided evidence from which the jury could have concluded that Campbell was aware of a significant risk that Campbell's AAPS would infringe the '476 Patent. Tate testified that he discussed the '476 Patent with Dr. Richard Wall of the University of Idaho and that they considered using a three-wire device because it would be "cleaner." <u>Id.</u> at 142-43. In an email exchange, Dr. Wall told Tate that there were similarities between Campbell's proposed AAPS and the '476 Patent. <u>Id.</u> at 140-41; Tr. Exh. 10. Dr. Wall shared with Tate the advice of Mike Jones, a University of Idaho patent lawyer; Tate also testified that he spoke directly with Jones. 3 Tr. 144, 151.

32

Appx47

1   Tate admitted that Jones did not give Campbell's proposed AAPS a "clean bill

2   of health" in May 2008. Id. at 146. To the contrary, Jones identified "potential

3   problems" and "uncertainty." Id. at 146-47; see Tr. Exh. 316 at 2.

4        Tate also received an opinion from Bob Shaver, an intellectual property

5   attorney. 3 Tr. 131. Shaver shared with Tate an analysis of prior art prepared

6   by Joe Lindsey, who apparently worked with Shaver. Id. at 155-56; Tr. Exh.

7   317. Tate admitted that this was the only written communication he received

8   from any lawyer about the '476 Patent. 3 Tr. 155-56. Lindsey's analysis began

9   with the following preamble:

10          All but one claim in the ['476] patent limit to the 2-wire

11          configuration as previously discussed. Claim 11 does not have this

12          limitation.

13          Not including claim 11, as long as the system does not

14          contain 2-wire outputs ports interfacing with the push button

15          stations, any system you make is not covered by this patent.

16   Tr. Exh. 317 at 1. Lindsey proceeded to discuss Claim 11 at some length and

17   ultimately asked Tate for more information about the prior art as it existed in

18   2004 before concluding, "[w]e will need to establish this to provide a viable

19   argument to the validity of claim 11 of this patent." Id. at 2.

20       One fair reading of Lindsey's analysis—the one urged by Polara—is that

21   he assumed that Campbell did not intend to adopt a two-wire device. See 3 Tr.

22   157; 7 Tr. 121-22. The Court must assume that the jury adopted this view of

23   Lindsey's analysis; if it did so, then Lindsey's analysis offers little support for

24   an argument that Campbell acted in good faith or had a reasonable belief that

25   Polara's '476 Patent would be invalidated.

26       Polara argues that the opinions Campbell received were incompetent

27   because they neither considered the AAPS nor contained a detailed analysis of

28   validity or infringement. Dkt. 461 at 11. To the contrary, according to Polara,

1    the evidence suggests that Campbell was repeatedly warned that it should

2    avoid its two-wire design. Id. The Court agrees.

3         The jury could have also concluded that there was sparse evidence

4    showing that Campbell took any remedial action. It appears from the

5    testimony and exhibits that Campbell rejected Dr. Wall's suggestion to design

6    around the '476 Patent by using a three-wire design for reasons never

7    articulated at trial. The jury could have easily concluded that Campbell's

8    decision emanated from the fact that its customers, like Polara's, wanted a

9    product that could be installed using intersections' existing two-wire

10   infrastructure. Likewise, as noted above, the jury heard that Campbell

11   continued to sell an infringing product even after Judge Carney's infringement

12   ruling.

13        In sum, substantial evidence adequately supports the jury's finding that

14   Campbell acted willfully when it decided to go ahead with its two-wire device

15   despite knowledge of the '476 Patent. Taken together, the evidence of its

16   knowledge of the '476 Patent, the evidence indicating that its lawyers had

17   concerns about the '476 Patent, the inadequacy of evidence demonstrating that

18   Campbell reasonably believed the '476 Patent was invalid, and Campbell's

19   failure to take remedial measures supported the jury's conclusion that the

20   totality of the circumstances demonstrated egregious conduct. Campbell's

21   motion for judgment as a matter of law on this finding is denied.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

**B.    Campbell's Inequitable Conduct Defense**[8]

Campbell's inequitable conduct defense is based on Polara's alleged failure to disclose material prior art references to the PTO—namely, Wilkinson, the Campbell Enlightened device, and the Tassimco device. Dkt. 450 at 57-66.[9] Specifically, Campbell argues that those references would have shown the PTO that transmitting power and data signals over a single pair of wires was obvious. Id. at 61-64. Polara counters that the Tassimco and Enlightened devices were "indistinguishable" from Wilkinson, which was directly considered by the patent examiner. Dkt 461 at 52-54. Polara also contends that the jury's rejection of Campbell's invalidity defenses "undermines significantly Campbell's arguments regarding materiality." Id. at 54. Finally, Polara asserts that Campbell has failed to present clear and convincing evidence of intent to deceive the PTO. Id. at 56-57.

_____

[8] Campbell argues in its motion for judgment as a matter of law that Polara's inequitable conduct makes the '476 Patent unenforceable. See Dkt. 450 at 57-66. Because the jury's finding of no inequitable conduct was advisory, see 6 Tr. 134, the Court construes Campbell's argument as a request for entry of judgment on inequitable conduct.

[9] The Court rejects Campbell's attempt to broaden its inequitable conduct defense to include an allegation that Polara failed to disclose its alleged public use of the claimed invention to the patent examiner. As Polara correctly points out, such an allegation is not part of Campbell's inequitable conduct defense. See Dkt. 199 at 8-14. In any event, as discussed in Section II.A.3, the jury found that Polara's installation of the prototype system in Fullerton was not a public use as contemplated by 35 U.S.C. § 102(b), and the Court, having considered the record, agrees with the jury's finding. See Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1362 (Fed. Cir. 2010) (affirming district court's finding that patentee was not required to disclose inventor's confidential testing of custom software embodying claimed invention because reasonable examiner "would not have regarded such experimental use as material").

1      **1.    Legal Standard**

2          Federal Rule of Civil Procedure 52(a) requires district courts to make

3   findings of fact in any action "tried on the facts without a jury or with an

4   advisory jury." Fed. R. Civ. P. 52(a)(1). The court must also "find the facts

5   specially and state its conclusions of law separately." Id. The district court's

6   findings must "be explicit enough to give the appellate court a clear

7   understanding of the basis of the trial court's decision, and to enable it to

8   determine the ground on which the trial court reached its decision." Zivkovic

9   v. S. California Edison Co., 302 F.3d 1080, 1090 (9th Cir. 2002) (quoting

10  Alpha Distrib. Co. of California v. Jack Daniel Distillery, 454 F.2d 442, 453

11  (9th Cir. 1972)). However, the court "is not required to base its findings on

12  each and every fact presented at trial." Simeonoff v. Hiner, 249 F.3d 883, 891

13  (9th Cir. 2001). Finally, the court must resolve conflicting testimony on

14  relevant issues. Zivkovic, 302 F.3d at 1090.

15     **2.    Findings of Fact**

16         The Court, having heard live testimony and duly considered the

17  evidence presented at trial, the parties' briefing and the contentions and

18  arguments of counsel, makes the following findings of fact.[10]

19             a.    Background on Prior Art

20         On February 29, 2000, Polara's Arizona distributor, Phoenix Highway,

21  faxed Polara a specification sheet for Campbell's Enlightened device and asked

22  if Polara made a similar product. 2 Tr. 155-59, 172-73; Tr. Exh. 184-A.

23  McGaffey kept the document in a file in his desk, which contained brochures

24  and other information from trade shows about competitor's products. 2 Tr. 68-

25  69, 153-54; Tr. Exh. 184. The specification sheet states that the wiring

26         [10] Any finding of fact that constitutes a conclusion of law is hereby

27  adopted as a conclusion of law, and any conclusion of law that constitutes a
    finding of fact is hereby adopted as a finding of fact.

28

1  schematic for the Enlightened device "is to be used in conjunction with the

2  Tassimco PIU 500 unit." Tr. Exh. 184-A at 2; 2 Tr. 159.

3      McGaffey testified that he first learned of the Tassimco PIU500 when

4  Tassimco approached Polara about making its Bulldog button compatible with

5  the PIU500. 2 Tr. 159, 177-78. McGaffey could not recall whether this

6  occurred before or after he received the fax from Phoenix Highway. Id. at 159-

7  60.

8      On March 7, 2000, McGaffey called Tassimco's Conrad Di Pietro to ask

9  to look at Tassimco's interface module for illuminated push buttons. 2 Tr. 174-

10  76. On March 8, 2000, Di Pietro sent McGaffey a fax attaching a product

11  description and schematic of the light kit for the push button. Id.; Tr. Exh. 186.

12  McGaffey gave this information to his engineers. 2 Tr. 177. McGaffey testified

13  that Van Cruz "had already been thinking about or started to sketch out the

14  Navigator [two]-wire device" in early 2000—before McGaffey contacted Di

15  Pietro about the PIU500. Id. at 194.

16      In 2002, Polara received U.S. Patent No. 6,340,936 (the "'936 Patent")

17  for its eight-wire Navigator. Id. at 144-46; Tr. Exh. 105. Wilkinson appears on

18  the face of the '936 Patent. 2 Tr. 146-147; Tr. Exh. 105 at 1. McGaffey testified

19  that it was "certainly possible" that he reviewed Wilkinson around the time the

20  '936 Patent was issued. 2 Tr. 147. He testified that it was his regular practice to

21  provide copies of the cited references to the inventors and ask them to review

22  the references but he could not remember if he had done so. Id. at 149-50.

23  Beckwith testified that he "probably" reviewed Wilkinson after the '936 Patent

24  was issued. 3 Tr. 100-01.

25          b.    Patent Prosecution – Amendments

26      Moreland Fischer was Polara's attorney who prosecuted the application

27  that resulted in the issuance of the '476 Patent. See 2 Tr. 54-55; Tr. Exh. 109 at

28  32-33. McGaffey testified that he and Beckwith first met with Fischer in early

1    2003. 2 Tr. 203-04. McGaffey estimated that he met with Fischer around 3 or 4

2    times. Id. Fischer reported directly to McGaffey for "all important decisions"

3    regarding the patent application. 2 Tr. 204. Fischer testified that he has "an

4    ongoing duty from the time the application is filed, throughout the end of the

5    prosecution, to cite any relevant prior art that comes to [his] attention to the

6    Patent Office for its consideration." 4 Tr. 37. He also testified that it is his

7    standard practice to tell clients to tell him "everything [they] know that's

8    relevant to the claimed invention." Id. at 38.

9        Fischer testified that the patent statutes and rules do not require

10   inventors to complete a patent search. 4 Tr. 91. McGaffey testified that, based

11   on Fischer's advice, he believed it was reasonable to forgo spending the $5,000

12   it would cost for a patent search. 2 Tr. 205.

13       The application for the '476 Patent was filed on August 5, 2004. 3 Tr. 12;

14   Tr. Exh. 109. Fischer testified that he did not file an information disclosure

15   statement to notify the PTO of prior art while prosecuting the '476 Patent. 4

16   Tr. 36-37.

17       On May 30, 2006, the patent examiner rejected Claims 1, 2, 4, and 5. Tr.

18   Exh. 112 at 1. Among other things, the examiner found that, in light of United

19   States Patent No. 5,241,307 ("Bidault") and No. 3,886,496 ("Spilo"), "[i]t

20   would have been obvious to one of ordinary skill in the art, at the time the

21   invention was made to disclose digital data signals control operation of a

22   message generating means so that a single device . . . processes large amounts

23   of data quickly and efficiently . . . as opposed to an analog controller." Tr.

24   Exh. 112 at 2-3. The patent examiner also identified Wilkinson as "prior art

25   made of record and not relied upon [that] is considered pertinent to applicant's

26   disclosure." Id. at 5.

27       On August 14, 2006, Fischer sent some remarks and an amendment to

28   the USPTO. 4 Tr. 43-46, 53-56; Tr. Exh. 113. Fischer amended Claim 1, as

38

1  follows:

2       A control system by which ~~accessible signal~~ <u>vibro-tactile messages</u>

3       are provided to ~~pedestrians regarding the status of vehicular traffic~~

4       ~~at~~ <u>alert pedestrians when to cross</u> a traffic light controlled

5       intersection, said control system comprising:

6            at least one push button station located at the traffic light

7            controlled intersection to be crossed by pedestrians, said

8            push button station including a push button head that is

9            depressed by the pedestrians and message generating means

10           ~~by which to provide at least one accessible message to advise~~

11           <u>adapted to cause said push button head to vibrate to provide</u>

12           <u>a tactile indication to</u> a visually impaired pedestrian when

13           ~~vehicular traffic through the intersection has been halted;~~

14           ~~and~~ <u>to cross the intersection; and</u>

15           a control unit that is responsive to the depression of the push

16           button head of said push button station to transmit to the

17           push button station both power and digital data signals over

18           a single ~~line~~ <u>pair of wires</u> by which to power and control the

19           operation of said message generating means.

20  4 Tr. 57-58; Tr. Exh. 113 at 4. Fischer testified that he added "detail to narrow

21  the scope" of Claim 1 "in an effort to call out the inventive concept which was

22  different than the prior art that the Patent Office had cited against the claim." 4

23  Tr. 100-01. Fischer also added a new independent claim, Claim 21, which

24  "restate[s] the invention in different terms." <u>Id.</u> at 60-61.[11]

25  _____

26       [11] Claim 21 recites:

27       A control system by which messages are provided to alert

28       pedestrians when to cross a traffic light controlled intersection,

39

Appx54

1    The '476 Patent was issued on December 5, 2006. 3 Tr. 12; Tr. Exh. 9.

2    Polara owns the '476 Patent by assignment executed in July 2004. 3 Tr. 12; Tr.

3    Exh. 145-B.

4        c.    The Parties' Understanding of the Prior Art

5    McGaffey testified that he understood that two-wire devices existed

6    before Polara's two-wire Navigator. 3 Tr. 23. He also understood Campbell's

7    Enlightened device to be a "simple button that would turn a light on through

8    the manipulation of voltage" like an elevator button. Id. at 20-21. It was not

9    his understanding that the two-wire Navigator was the first product to

10   accomplish one function with two wires. Id. at 23-24. McGaffey testified that

11   he was not trying to hide from the patent examiner that Campbell and

12   Tassimco had products that accomplished one function with two wires. Id. at.

13   24. Rather, he believed Polara's device was different because it "utiliz[ed]

14   digital data over power to accomplish the functions, the four established

15   functions, plus the many more that would be capable through that kind of

16

_____

17       said control system comprising:

18       at least one push button station located at the traffic light
19       controlled intersection to be crossed by pedestrians, said push
         button station including a push button head that is depressed by
20       the pedestrians and a message generator by which to provide at
21       least one message to advise the pedestrians when to cross the
22       intersection; and

23       a control unit responsive to the depression of the push button head
24       of said push button station to transmit to the push button station
         power and digital data signals over a single pair of wires by which
25       to power and control the operation of said message generator, one
26       of said pair of wires carrying both of said power and digital data
         signals and the second of said pair of wires connected to ground.

27
28   Tr. Exh. 113 at 10.

40

1    technology." Id. at 23. When McGaffey was asked for his understanding of

2    what he believed was different about Polara's two-wire APS device at the time

3    the patent application was filed, he responded, "That it was able to accomplish

4    through digital data over power what none of the other devices out there at the

5    time could do." Id. at 25.

6        Beckwith testified that the central control unit and push button station in

7    Polara's two-wire APS system both include microprocessors that communicate

8    with each other over two wires using digital-data signals. 3 Tr. 93-94. He

9    testified that he was not aware of any product that operated in that fashion at

10   the time the application for the '476 Patent was filed and prosecuted. Id. at 94.

11   Beckwith also testified that the Tassimco and Enlightened devices do not

12   operate using digital-data-over-power signals between two microprocessors. Id.

13   at 95. Beckwith testified that Wilkinson did not transmit digital data, "[n]ot in

14   the normal meaning of the word digital." Id. at 101-03.

15       At trial, Campbell's expert, Dr. Jones, testified that Claim 1 of the '476

16   Patent was anticipated by Wilkinson. 6 Tr. 46. Dr. Jones also testified that

17   Claim 21 of the '476 Patent was anticipated by Wilkinson, the Campbell

18   Enlightened device, and the Tassimco device. Id. at 46-47.

19       **3.    Conclusions of Law**

20       "Inequitable conduct is an equitable defense to patent infringement that,

21   if proved, bars enforcement of a patent." Therasense, Inc. v. Becton, Dickinson

22   & Co., 649 F.3d 1276, 1285 (Fed. Cir. 2011). "It is only applied where the

23   patentee has unfairly obtained an unwarranted patent through misconduct."

24   Ohio Willow Wood Co. v. Alps S., LLC, 735 F.3d 1333, 1344 (Fed. Cir.

25   2013). To prove inequitable conduct, the defendant "must show by clear and

26   convincing evidence that the patent applicant (1) misrepresented or omitted

27   information material to patentability, and (2) did so with specific intent to

28   mislead or deceive the PTO." Id. (quoting In re Rosuvastatin Calcium Patent

41

Appx56

1  Litig., 703 F.3d 511, 519 (Fed. Cir. 2012)).

2      In Therasense, the Federal Circuit established a heightened standard for

3  proving inequitable conduct at the merits stage. In cases involving

4  nondisclosure of information, "the accused infringer must prove by clear and

5  convincing evidence that the applicant knew of the reference, knew that it was

6  material, and made a deliberate decision to withhold it." Therasense, 649 F.3d

7  at 1290. Thus, the defendant must show "but-for materiality" and that the

8  intent to deceive is "the single most reasonable inference able to be drawn from

9  the evidence." Id. at 1290-91. Prior art is but-for material if the PTO would not

10 have allowed a claim had it been aware of the undisclosed reference. Id. at

11 1291. Because the court must look to the standard used by the PTO to allow

12 claims during examination, "the court should apply the preponderance of the

13 evidence standard and give claims their broadest reasonable construction." Id.

14 at 1291-92.[12]

15     Materiality. As a matter of law, a patentee does not commit inequitable

16 conduct by withholding a reference if the patent examiner in fact considered

17 the reference. Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d

18 1565, 1582 (Fed. Cir. 1991), overruled on other grounds by Abbott Labs. v.

19 Sandoz, Inc., 566 F.3d 1282 (Fed. Cir. 2009). In other words, if the examiner

20 actually considers a reference it is irrelevant whether the patentee disclosed the

21

22     [12] District courts and the PTO use different evidentiary standards and
   rules for claim construction. Therefore, "even if a district court does not
23 invalidate a claim based on a deliberately withheld reference, the reference
   may be material if it would have blocked patent issuance under the PTO's
24 different evidentiary standards." Therasense, 649 F.3d at 1292. As such, the
25 jury's verdict finding that Claims 1 through 4 of the '476 Patent were not
   obvious does not weigh on the determination of materiality for inequitable
26 conduct. See Am. Calcar, Inc. v. Am. Honda Motor Co., 768 F.3d 1185, 1189
27 (Fed. Cir. 2014).

28

Appx57

reference or the examiner discovered the reference on her own. Id.; see also 37
C.F.R. § 1.56(a) ("The duty to disclose all information known to be material to
patentability is deemed to be satisfied if all information known to be material
to patentability of any claim issued in a patent was cited by the Office or
submitted to the Office . . . ."). Here, it is evident from the face of the '476
Patent that Wilkinson was before the patent examiner during prosecution of
the patent. See Exh. 9 at 1. In fact, Judge Carney long ago determined that
Wilkinson could not form the basis of an inequitable conduct defense. See Dkt.
34 at 5. When dismissing Campbell's original equitable conduct defense, Judge
Carney held that "[a]ny allegation that Polara withheld [Wilkinson] from the
PTO therefore cannot be the basis for an inequitable conduct defense." Id.
(citing Scripps Clinic, 927 F.2d at 1582; 37 C.F.R. § 1.56(a)).

Additionally, a reference is not but-for material if it is cumulative of or
less relevant than information already before the PTO. Larson Mfg. Co. of S.
Dakota v. Aluminart Prod. Ltd., 559 F.3d 1317, 1327 (Fed. Cir. 2009). A
reference is cumulative if it "teaches no more than what a reasonable examiner
would consider to be taught by the prior art already before the PTO." Regents
of the Univ. of California v. Eli Lilly & Co., 119 F.3d 1559, 1574-75 (Fed. Cir.
1997); see also Molins PLC v. Textron, Inc., 48 F.3d 1172, 1185 (Fed. Cir.
1995) (because withheld reference was "no more pertinent to" patent
application "than was claim 26 of the Lemelson '770 patent, which was
already of record," court's finding that withheld reference was material "was
clearly erroneous").

Here, by Campbell's own admission, Wilkinson is a better and more
relevant reference than the Tassimco or Enlightened devices. Campbell has not
identified any evidence presented at trial showing that either of those devices
discloses a particularly important limitation not elsewhere disclosed or "a more
complete combination of relevant features." Indeed, Campbell's expert, Dr.

43

1  Jones, testified that Wilkinson and the Tassimco and Enlightened devices

2  anticipated Claim 21, but only Wilkinson anticipated Claim 1. See 6 Tr. 46-47;

3  see also Dkt. 450 at 61 ("As Wilkinson demonstrated, such systems could, of

4  course, control . . . not just sounds and a pilot light but a vibrating pushbutton

5  – an APS feature, as well."). Thus, even if the patent examiner had possessed

6  the Tassimco and Enlightened devices and gave the '476 Patent claims the

7  broadest reasonable construction, it is unlikely that the examiner would have

8  rejected the claims based on these references.

9       *Intent to deceive.* To prove intent based on nondisclosure to the PTO, the

10  accused infringer must show by clear and convincing evidence that "the

11  applicant made a deliberate decision to withhold a known material reference."

12  Therasense, 649 F.3d at 1290 (quoting Molins, 48 F.3d at 1181). It is not

13  enough to show that a misrepresentation or omission amounted to negligence

14  or gross negligence under a "should have known" standard. Id. If there is no

15  direct evidence of deceptive intent, "a district court may infer intent from

16  indirect and circumstantial evidence." Id. "However, to meet the clear and

17  convincing evidence standard, the specific intent to deceive must be 'the single

18  most reasonable inference able to be drawn from the evidence.'" Id. (quoting

19  Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir.

20  2008)). Accordingly, "when there are multiple reasonable inferences that may

21  be drawn, intent to deceive cannot be found." Id. at 1290-91 (Fed. Cir. 2011)

22  (citing Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V., 528 F.3d 1365,

23  1376 (Fed. Cir. 2008)).

24       Here, the only evidence of deceptive intent Campbell identifies is the fact

25  of nondisclosure, which does not satisfy the intent to deceive element of

26  inequitable conduct. See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling

27  Co., 439 F.3d 1335, 1341 (Fed. Cir. 2006). Moreover, Polara presented

28  evidence that McGaffey and Beckwith did not have the requisite intent because

44

1  they did not consider Wilkinson, the Tassimco PIU500, and Campbell

2  Enlightened device to be material. See Therasense, 649 F.3d at 1290

3  (explaining that "accused infringer must prove by clear and convincing

4  evidence that the applicant knew . . . that [the reference] was material").

5  McGaffey testified that he was not trying to hide from the patent examiner that

6  Campbell and Tassimco had products that accomplished one function with

7  two wires. 3 Tr. 24. Rather, he believed Polara's device was different because it

8  "utiliz[ed] digital data over power to accomplish the functions, the four

9  established functions, plus the many more that would be capable through that

10  kind of technology." Id. at 23. When asked what he believed was different

11  about Polara's two-wire APS system at the time the patent application was

12  filed, McGaffey responded "[t]hat it was able to accomplish through digital

13  data over power what none of the other devices out there at the time could

14  do." Id. at 25. Similarly, Beckwith testified that at the time the patent

15  application was filed and prosecuted, he was not aware of any other product

16  that operated using digital-data-over-power signals over two wires. Id. at 94-95.

17  Beckwith also testified that Wilkinson did not transmit digital data "in the

18  normal meaning of the word digital." Id. at 101-03. Based on the jury's verdict

19  on obviousness and advisory verdict on inequitable conduct, the jury

20  apparently found McGaffey's and Beckwith's testimony credible. The Court

21  agrees with the jury's credibility finding. The Court also finds that McGaffey's

22  decision not to do a patent search—which presumably would have uncovered

23  Wilkinson—was reasonable based on Fischer's advice. Under the

24  circumstances, intent to deceive is not the most reasonable inference to be

25  drawn from the evidentiary record. See Therasense, 649 F.3d at 1290.

26      Based on the record, the Court is not persuaded that it should disturb the

27  jury's advisory verdict that Campbell has not presented clear and convincing

28  evidence that the '476 Patent is unenforceable due to inequitable conduct.

**C.   Polara's Motion for a Permanent Injunction**

Polara moves for a permanent injunction against Campbell's continued sales of infringing products. Dkt. 453.

**1.   Legal Standard**

There is no presumption in favor of an injunction in patent infringement cases. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Instead, a plaintiff must show that the traditional equitable factors support a permanent injunction: (1) the plaintiff has suffered irreparable harm; (2) "remedies available at law are inadequate to compensate for that injury"; (3) "considering the balance of hardships between  the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be 'disserved' by a permanent injunction." i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 861 (Fed. Cir. 2010) (citing eBay, 547 U.S. at 391); see also Sealant Systems Int'l, Inc. v. TEK Global S.R.L., No. 11-774, 2014 WL 1008183, at *5 (N.D. Cal. Mar. 7, 2014).

**2.   Polara's Entitlement to an Injunction**

a.   Irreparable Harm

To establish irreparable harm, a patentee must show a causal nexus between the alleged harm and the infringement. "This just means that there must be proof that the infringement causes the harm." Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 639 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 2522 (2016). Polara argues that evidence that the infringing two-wire design drives demand for the accused AAPS product establishes this causal nexus. Dkt. 453-1 at 6-7. The Court agrees. As noted above, the evidence showed that Campbell developed its two-wire AAPS to compete with Polara's two-wire Navigator. The evidence at trial also showed that developing a two-wire APS system offered marked advantages, because many existing intersections had only two wires. As Polara points out, a 2014 user's manual for Campbell's

1  AAPS "touts the infringing features as an advantage of the product." Dkt. 453-

2  1 at 7 (citing Dkt. 453-11 at 6-8). A causal nexus has been established.

3      Moreover, the evidence showed that Polara and Campbell are direct

4  competitors in the marketplace of APS system suppliers. 2 Tr. 71-72. It also

5  appears that Polara and Campbell are the only two companies who supply

6  two-wire APS systems. See 2 Tr. 71-75. This evidence strongly favors an

7  injunction. See Douglas Dynamics, LLC v. Buyers Prod. Co., 717 F.3d 1336,

8  1345 (Fed. Cir. 2013) ("Where two companies are in competition against one

9  another, the patentee suffers the harm—often irreparable—of being forced to

10  compete against products that incorporate and infringe its own patented

11  inventions.").

12      Additionally, the evidence showed that Polara is not willing to license

13  the '476 Patent. See 2 Tr. 83-88. Polara's unwillingness weighs in favor of

14  finding irreparable injury. See Presidio Components, Inc. v. Am. Tech.

15  Ceramics Corp., 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("The district court

16  correctly found [patentee's] unwillingness to license favored finding irreparable

17  injury.").

18      Campbell argues that Polara has not shown any lost sales due to its

19  infringement. See Dkt. 463 at 12. But the evidence showed that Polara and

20  Campbell are the only two suppliers of two-wire APS systems in the

21  marketplace. See 2 Tr. 70-72. Polara also presented evidence that Campbell

22  had sold two-wire devices to former Polara customers in Nevada and

23  California. See id. at 74-77. This testimony, together with the undisputed

24  evidence that Polara and Campbell were direct competitors, established that

25  Polara has suffered irreparable harm from lost business opportunities due to

26  Campbell's infringement.

27      Campbell also argues that Polara's failure to seek preliminary injunctive

28  relief demonstrates that it is not being irreparably harmed. Dkt. 463 at 13-14.

47

Appx62

1    But a period of delay is only one circumstance that a district court may

2    consider when evaluating irreparable harm. See Hybritech Inc. v. Abbott

3    Labs., 849 F.2d 1446, 1457 (Fed. Cir. 1988); see also Apple, Inc. v. Samsung

4    Elecs. Co., 678 F.3d 1314, 1325 (Fed. Cir. 2012). And "a showing of delay

5    does not preclude, as a matter of law, a determination of irreparable harm."

6    Hybritech, 849 F.2d at 1457.

7        In sum, considering the substantial evidence of direct competition in the

8    same market and the causal nexus between the infringement and the harm, the

9    Court finds that Polara has shown that it has suffered irreparable injury.

10            b.    Adequacy of Legal Remedies

11        Where there is no reason to believe that infringement or irreparable

12    harm arising therefrom will cease absent an injunction, money damages are

13    inadequate. See Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1155

14    (Fed. Cir. 2011). Here, there is no reason to believe that Campbell will

15    discontinue offering an infringing two-wire device absent an injunction. An

16    award of money damages for Campbell's past infringement does not mean that

17    money damages are an adequate remedy for future infringement. See Kanga

18    Care LLC v. GoGreen Enters. LLC, No. 13-2770, 2014 WL 5889815, at *3

19    (D. Colo. Nov. 12, 2014) (holding that "any sales" of infringing product

20    "cause[s] damage to plaintiff's interests that cannot be adequately remedied by

21    a monetary award"); Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.,

22    397 F. Supp. 2d 537, 546 (D. Del. 2005) (noting that "while a monetary award

23    is often an adequate remedy for past infringement, it does not follow that

24    money relief is a sufficient remedy against future infringement"). Because

25    money damages are inadequate, this factor weighs in favor of issuing an

26    injunction.

27    ///

28    ///

1        c.    Balance of Hardships

2        Absent an injunction, Polara faces substantial hardship because it must

3    compete with its own patented invention. See Robert Bosch, 659 F.3d at 1156

4    (holding that requiring patentee "to compete against its own patented

5    invention," places "substantial hardship" on patentee and therefore "favors

6    entry of an injunction"). In response, Campbell argues that it will lose its

7    "toehold" in the marketplace if an injunction is issued, giving Polara the

8    opportunity to "force [it] out of the marketplace entirely." Dkt. 463 at 20. But

9    the fact that Campbell might lose market share or suffer other harm if it cannot

10    sell an infringing product is not a basis for denying Polara injunctive relief.

11    Any hardship faced by Campbell is the result of its own actions and its

12    decision to enter the relevant market with an infringing device. See Coloplast

13    A/S v. Generic Med. Devices, Inc., No. 10-227, 2012 WL 3262756, at *2

14    (W.D. Wash. Aug. 9, 2012) (finding that balance of hardships favored entry of

15    injunction where defendant's hardship was "result of its calculated business

16    risk to enter the relevant market with its devices"); see also Windsurfing Int'l,

17    Inc. v. AMF, Inc., 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects

18    to build a business on a product found to infringe cannot be heard to complain

19    if an injunction against continuing infringement destroys the business so

20    elected."). Moreover, Campbell itself asserts that it is developing "next

21    generation" products that are not infringing. Dkt. 463 at 20. Any non-

22    infringing products will not be affected by the Court's injunction, diminishing

23    the force of this argument.

24        d.    Public Interest

25        Finally, the public interest also weighs in favor of granting a permanent

26    injunction. The public has a strong interest in maintaining the integrity of the

27    patent system by enforcing a patent owner's right to exclude. See Broadcom

28    Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008) (acknowledging

49

Appx64

district court's conclusion that "it is generally in the public interest to uphold patent rights"); Smith & Nephew, Inc. v. Synthes, 466 F. Supp. 2d 978, 985 (W.D. Tenn. 2006) ("As a general matter, the public maintains an interest in protecting the rights of patent holders, and injunctions serve that interest."). Without an injunction, there is every reason to believe that Campbell will continue violating Polara's right to exclude, undermining the policies that underlie the patent laws.

### 3.    Scope of the Injunction

Having determined that entry of a permanent injunction is supported by the four eBay factors, the Court turns to the appropriate scope of the injunction. The Court possesses "inherent discretion to fashion equitable relief." Robert Bosch, 659 F.3d at 1149.

Polara seeks entry of the following injunction:

IT IS FURTHER ORDERED that Campbell and its subsidiaries and affiliated companies (collectively "the Campbell [E]ntities"), as well as the Campbell [Entities'] successors, assigns, officers, directors, distributors, agents, servants, employees, representatives and attorneys, and those persons in active concert or participation with them who receive notice of the order are hereby immediately and permanently restrained and enjoined, pursuant to 35 U.S.C. § 283 and Fed. R. Civ. P. 65(d), from making, using, offering for sale or selling in the United States, or importing into the United States, or causing to be made, used, offered for sale, or sold in the United States, or imported into the United States, any [Campbell Advisor Advanced Pedestrian Station ("Infringing Product")] or any products not more than colorably different therefrom.

IT IS FURTHER ORDERED that [the Campbell Entities]

50

1    as well as the Campbell [Entities'] successors, assigns, officers,
2    directors, distributors, agents, servants, employees, representatives
3    and attorneys, and those persons in active concert or participation
4    with them who receive notice of the order are hereby immediately
5    and permanently restrained and enjoined, pursuant to 35 U.S.C. §
6    283 and Fed. R. Civ. P. 65(d), from maintaining, servicing,
7    repairing or otherwise providing technical support for any
8    Infringing Product sold prior to January 3, 2013.

9         IT IS FURTHER ORDERED that within 14 days of
10   issuance of this order, the Campbell Entities shall provide written
11   notice of this judgment and order, and the injunction ordered
12   herein, to: their officers, directors, distributors, customers, agents,
13   servants, representatives, attorneys, employees, subsidiaries and
14   affiliates, and those persons in active concert or participation with
15   them, as well as any entity to which Campbell has previously
16   directly or indirectly sold or offered for sale an Infringing Product.
17   The Campbell entities shall take whatever means are necessary or
18   appropriate to ensure that this order is properly complied with.

19        IT IS FURTHER ORDERED that within 14 days of
20   issuance of this order, the Campbell Entities shall provide written
21   notice of this judgment and order, and the injunction ordered
22   herein, to each purchaser, user, or customer to which Campbell
23   has previously directly or indirectly sold or offered for sale an
24   Infringing Product first sold prior to January 3, 2013, stating:

25        *Each Campbell Advisor Advanced Pedestrian Station provided by*
26   *Campbell prior to January 3, 2013 is affected by a Permanent Injunction*
27   *entered by the United States District Court for the Central District of*
28   *California in [Case] No. SA CV 13-00007-DFM. A copy of this*

Appx66

*Permanent Injunction is included with this notice. The Campbell Advisor Advanced Pedestrian Station has been found to infringe U.S. Patent No[]. 7,145,476, which is assigned to Polara Engineering, Inc. Accordingly, certain acts associated with the Campbell Advisor Advanced Pedestrian Station are prohibited.*

*As result of this Permanent Injunction, Campbell and its distributors, successors, assigns, officers, directors, agents, servants, employees, representatives and attorneys, and those persons in active concert or participation with them have been enjoined from maintaining, servicing, repairing or otherwise providing technical support for any Campbell Advisor Advanced Pedestrian Station sold prior to January 3, 2013, including the Campbell Advisor Advanced Pedestrian Stations provided to you having the following part numbers:*

*[to be inserted by Campbell].*

IT IS FURTHER ORDERED that within 28 days of issuance of this order, the Campbell Entities shall file with the Court a list identifying each entity to which, as set forth above, the Campbell Entities provided written notice of this judgment and order, and the injunction ordered herein.

See Dkt. 453-12 at 1-3.

Polara's proposed injunction is overbroad. As an initial matter, Polara does not justify the relief it seeks with respect to Campbell's past sales. It has been awarded damages on those sales in the form of a reasonable royalty. This award acts as an implied license on such sales. See King Instrument Corp. v. Otari Corp., 814 F.2d 1560, 1564 (Fed. Cir. 1987); see also Itron, Inc. v. Benghiat, No. 99-501, 2003 WL 22037710, at *14 (D. Minn. Aug. 29, 2003) ("By paying the damages that it owes in full, [infringer] will receive an implied license on its past infringing sales."). The Court accordingly will not order that

52

Appx67

1  Campbell be barred from "maintaining, servicing, repairing or otherwise
2  providing technical support" for any of its infringing products.

3      The Court will, however, order Campbell to send notice to its customers
4  of the injunction issued by the Court. This notice requirement is necessary to
5  protect Polara's rights in the '476 Patent. See Braintree Labs., Inc. v. Nephro-
6  Tech, Inc., 81 F. Supp. 2d 1122, 1137 (D. Kan. 2000).

7      The remaining issue is the language barring Campbell's sale of devices
8  that infringe Claims 1 through 4 of the '476 Patent. Polara defines "Infringing
9  Product" as Campbell's AAPS. The Court agrees that Campbell's AAPS
10  should be subject to injunctive relief to the extent that the device infringes
11  Claims 1 through 4 of the '476 Patent. And there is the problem with Polara's
12  language. A version of Campbell's AAPS that does not rely on Polara's data-
13  over-power feature to operate over two wires would not infringe the '476
14  Patent. The injunction's definition of Infringing Product must reflect that. The
15  Court will accordingly order Polara to submit revised proposed injunction
16  language that limits its definition of Infringing Product consistent with the
17  Court's views herein. Within seven (7) days of Polara's submission, Campbell
18  shall file any objections thereto.

19      Related to the Court's concern, Polara has also asked for authority to
20  inspect a working exemplar of Campbell's new "wireless" AAPS, what
21  Campbell calls its "WiAAPS." See Dkt. 489. Campbell objects to Polara's
22  request. See Dkt. 490. Polara's request for inspection is denied. Once an
23  appropriate injunction is in place, Polara may, to the extent it believes that
24  Campbell's WiAAPS violates the injunction, seek to have Campbell held in
25  contempt.

26  ///
27  ///
28  ///

53

Appx68

**D.    Polara's Motion for a Judgment of Willfulness and an Award of Enhanced Damages**

Polara seeks enhanced damages in the form of trebling the jury's damages award to punish Campbell's willful conduct. Dkt. 455.

Courts have the discretion to award "damages up to three times the amount found or assessed." 35 U.S.C. § 284. Such enhanced damages are not required by a finding of egregious misconduct. Halo, 136 S. Ct. at 1933. Courts should "continue to take into account the particular circumstances of each case," reserving enhanced damages for "egregious cases typified by willful misconduct." Id. at 1933-34.

Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed. Cir. 1992), identified nine factors relevant to the egregious conduct inquiry: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the infringer's size and financial condition; (5) closeness of the case; (6) duration of the infringer's misconduct; (7) remedial action by the infringer; (8) the infringer's motivation for harm; and (9) whether the infringer attempted to conceal its misconduct. After Halo, courts have continued to look to these factors. See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., No. 09-5235, 2017 WL 130236, at *4 (N.D. Cal. Jan. 13, 2017) (calling the Read factors "useful guideposts"); Sociedad Espanola de Electromedicina y Calidad, S.A. v. Blue Ridge X-Ray Co, Inc., No. 10-159, 2016 WL 7473422, at *7 (W.D. N.C. Dec. 28, 2016) (calling the Read factors "helpful" but "not dispositive").

The Court analyzes the Read factors as follows:

*Deliberate copying.* Polara argues that Campbell deliberated copied its '476

54

1    Patent when it made its AAPS a two-wire device. As noted above, the

2    evidence showed that Campbell was aware of Polara's two-wire Navigator and

3    intended to develop a product with similar capabilities. See, e.g., 3 Tr. 121-22

4    ("[W]e needed to develop a product to compete with the two-wire system.").

5    The evidence showed Campbell eschewed the suggestion that it implement a

6    three-wire solution. Although the evidence of deliberate copying may only be

7    circumstantial, it is nonetheless compelling. This factor favors an award of

8    enhanced damages.

9        *Good faith belief of invalidity or noninfringement.* Polara argues that

10   Campbell ignored warnings about the '476 Patent and implemented a two-wire

11   design without a competent opinion that its design would not infringe or that

12   the '476 Patent was invalid. The evidence supports Polara's argument. Jones,

13   the University of Idaho lawyer, identified "problems" with the '476 Patent and

14   did not give Campbell's proposed AAPS a "clean bill of health." Id. at 146-47;

15   see Tr. Exh. 316 at 2. The Court agrees with the jury's implicit finding that

16   Lindsey's analysis offered little support for an argument that Campbell

17   believed the '476 Patent was invalid; Lindsey's analysis (Tr. Exh. 317) was

18   limited to Claim 11. As a result, the record does not support Tate's testimony

19   that he believed that Campbell's device did not infringe and that the '476

20   Patent was invalid. This factor also favors an award of enhanced damages.

21       *Campbell's litigation behavior.* Polara argues that Campbell's behavior

22   during this litigation supports an award of enhanced damages. The Court

23   disagrees. "Typically, 'litigation misconduct' refers to bringing vexatious or

24   unjustified suits, discovery abuses, failure to obey orders of the court, or acts

25   that unnecessarily prolong litigation." i4i Ltd. P'ship, 598 F.3d at 859. Both

26   sides assail their opponent's litigation tactics. But the record reveals little

27   behavior by either side that cannot be fairly characterized as zealous and

28   aggressive advocacy. Campbell's invalidity and unenforceability defenses

55

Appx70

1    required a trial, indicating that neither position was vexatious or unjustified.

2    While counsel represented their clients vigorously at trial, both parties acted

3    professionally throughout the proceedings in front of this Court, and neither

4    party points to any findings by Judge Carney or Judge Rosenbluth of flagrant

5    or sanctionable behavior.[13] Accordingly, the Court finds that this factor weighs

6    against awarding enhanced damages.

7        *Campbell's size and financial condition.* Polara argues that Campbell's size

8    and financial condition support an award of enhanced damages. The Court

9    heard little evidence at trial on this topic. Polara and Campbell are both

10   relatively small companies, each employing fewer than 100 employees. 1 Tr.

11   44; 2 Tr. 12. But the damages awarded by the jury are not colossal, and there is

12   no evidence that trebling those damages would threaten to destroy Campbell's

13   financial condition. As a result, the Court finds that this factor is neutral.

14       *Closeness of the case.* Polara argues that "[n]othing about this case was

15   'close.'" Dkt. 460-1 at 15. This is an overstatement.  In particular, the

16   affirmative defense of invalidity due to obviousness was a close call; although

17   Polara did not bear the burden of proof, it did not marshal overwhelming

18   evidence to refute Campbell's arguments that its two-wire system was obvious.

19   But Campbell's other invalidity theories were weaker, and the fact that those

20   issues required a resolution at trial does not indicate that they were particularly

21   close. See PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC, No.

22   11-761, 2016 WL 6537977, at *7 (N.D.N.Y. Nov. 3, 2016). In sum, the Court

23   finds that this factor is also neutral.

24       *Duration of the infringer's misconduct.* Polara argues that the duration of

25   Campbell's infringement weighs in favor of enhancement. The Court agrees.

26         [13] Before the parties consented to this Court, U.S. Magistrate Judge Jean

27   Rosenbluth handled the pretrial discovery disputes in this matter, of which

28   there were several.

1   Campbell's infringement began more than six years ago. Courts have

2   concluded that similarly lengthy periods of infringement weigh in favor of

3   enhancement. See, e.g., I-Flow Corp. v. Apex Med. Tech., Inc., No. 07-1200,

4   2010 WL 114005, at *3 (S.D. Cal. Jan. 6, 2010) (finding six years of

5   misconduct was "substantial," favoring enhancement).

6       *Campbell's remedial actions.* Polara argues that Campbell's failure to take

7   any remedial action, most notably its failure to discontinue sales of the

8   infringing product after Polara filed suit and Judge Carney granted partial

9   summary judgment, weighs in favor of enhancement. The Court agrees.

10  Courts have concluded that continuing to sell the infringing products after

11  notice of infringement and during the course of litigation supports

12  enhancement. See Novozymes A/S v. Genencor Int'l, Inc., 474 F. Supp. 2d

13  592, 611 (D. Del. 2007) ("That Defendants failed to take remedial action and

14  continued to infringe until after the liability trial also supports an enhanced

15  award."). The record shows that Campbell took no remedial action. This

16  factor weighs in favor of enhancement.

17      *Campbell's motivation for harm.* Polara argues that Campbell, as its direct

18  competitor, was motivated to take market share from Polara. It is undisputed

19  that Polara and Campbell are direct competitors in a relatively small market

20  for APS systems; "infringement by a direct competitor in such a market

21  mitigates in favor of enhanced damages." TruePosition Inc. v. Andrew Corp.,

22  611 F. Supp. 2d 400, 412 (D. Del. 2009). Moreover, the evidence supports the

23  conclusion that Campbell preferred taking the risk of infringement over

24  designing a non-infringing device, and that Campbell did so to divert business

25  from Polara. See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp., 593 F. Supp.

26  2d 1088, 1116-17 (N.D. Cal. 2009) (agreeing that "where, as here, the infringer

27  engages in infringing conduct to gain an edge over the patentee in a

28  competitive market, this factor favors an award of enhanced damages."). This

1 factor weighs in favor of enhancement.

2      *Whether Campbell attempted to conceal its misconduct.* Polara does not argue

3 that Campbell attempted to conceal its misconduct. This factor weighs against

4 enhancement.

5      Taking into account the jury's verdict, the <u>Read</u> factors, and, most

6 importantly, the rationale underlying enhanced damages, the Court is

7 persuaded that enhanced damages are appropriate. Five of the nine <u>Read</u>

8 factors—deliberate copying, no good faith belief in non-infringement or

9 invalidity, duration of infringement, the absence of remedial actions, and

10 motivation for harm—weigh in favor of enhancement. Two factors are neutral,

11 and two factors weigh against enhancement.

12      Although Campbell's misconduct warrants an enhancement, the Court

13 recognizes that there is a spectrum of improper conduct. <u>See</u> <u>Cleancut, LLC v.</u>

14 <u>Rug Doctor, Inc.</u>, No. 08-836, 2013 WL 441209, at *4 (D. Utah Feb. 5, 2013).

15 Trebling damages is reserved for the cases at the most egregious end of the

16 spectrum. <u>See</u> <u>PPC Broadband</u>, 2016 WL 6537977 at *9. Here, the Court

17 exercises its discretion and finds that increasing the damages award by two-

18 and-a-half times is a sufficiently punitive sanction for Campbell's misconduct.

19 <u>See</u> <u>Halo</u>, 136 S. Ct. at 1932; <u>see</u> <u>Dominion Res. Inc.</u>, 2016 WL 5674713 at

20 *20-24 (awarding double damages because of the jury's willfulness finding and

21 two <u>Read</u> factors weighed in infringer's favor); <u>Metso Minerals, Inc. v.</u>

22 <u>Powerscreen Int'l Distrib. Ltd.</u>, 833 F. Supp. 2d 333, 341 (E.D.N.Y. 2011)

23 (concluding that full enhancement of treble damages was not warranted

24 because of mitigating factors, especially the lack of litigation misconduct).

25 **E.**   <u>**Polara's Motion to Award Attorney's Fees**</u>

26      Polara moves for an order awarding attorney's fees under 35 U.S.C. §

27 285, which provides that reasonable attorney's fees may be awarded to the

28 prevailing party in "exceptional cases." Dkt. 454.

Appx73

1      In <u>Octane Fitness, LLC v. Icon Health & Fitness, Inc.</u>, --- U.S. ---, 134 S.

2  Ct. 1749 (2014), the Supreme Court held that an "exceptional" case is "one

3  that stands out from others with respect to the substantive strength of a party's

4  litigating position (concerning both the governing law and the facts of the case)

5  or the unreasonable manner in which the case was litigated." <u>Id.</u> at 1756. The

6  courts must look at the totality of the circumstances to decide if a case is

7  "exceptional." <u>Id.</u> In making this determination, courts may consider the

8  "frivolousness, motivation, objective unreasonableness (both in the factual and

9  legal components of the case) and the need in particular circumstances to

10  advance considerations of compensation and deterrence." <u>Id.</u> at 1756 n.6.

11  Courts may also award fees in a case presenting "either subjective bad faith or

12  exceptionally meritless claims." <u>Id.</u> at 1757.

13      Here, although Campbell's infringement and invalidity defenses were

14  unsuccessful, its litigating positions were not objectively unreasonable. <u>See</u>

15  <u>SFA Sys., LLC v. Newegg Inc.</u>, 793 F.3d 1344, 1347-48 (Fed. Cir. 2015)

16  (clarifying that what matters is the substantive strength of a party's litigating

17  position rather than the eventual success of that position); <u>see also</u> <u>Gaymar</u>

18  <u>Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.</u>, 790 F.3d 1369, 1373 (Fed.

19  Cir. 2015) (noting that "fees are not awarded solely because one party's

20  position did not prevail"). Campbell's anticipation, obviousness, and

21  unenforceability defenses all proceeded to trial; although ultimately the jury

22  and the Court found those defenses unpersuasive, there was evidence in the

23  record to support them. The substantive strength of Campbell's litigating

24  position does not "stand out" from other cases to merit a finding that this case

25  is "exceptional" under § 285.

26      Nor was the case litigated in an unreasonable manner. Both parties

27  spend much of their briefs assailing the other side's litigation conduct. The

28  Court finds that none of the parties' allegations demonstrates substantial

<center>59</center>

<center>Appx74</center>

1  litigation misconduct. As the Court noted above, both counsel litigated this

2  case vigorously on behalf of their respective clients.

3       In sum, this case is not exceptional. While Campbell's decisions outside

4  the litigation warrant enhanced damages, its litigation conduct does not "stand

5  out" from other hard-fought cases as unreasonable. Polara's motion for an

6  award of attorney's fees is denied.

7  **F.    Polara's Motion for an Accounting**

8       Polara requests supplemental damages for the "entire scope" of

9  Campbell's infringement. Dkt. 452. Polara also requests prejudgment and

10  postjudgment interest. Id. Campbell does not resist Polara's request for

11  supplemental damages, but contends that any accounting should run from

12  February 1, 2016. Dkt. 462 at 4. Campbell argues that no prejudgment interest

13  is warranted. Id. at 1-4.

14       **1.    Supplemental Damages and Accounting**

15       The Court begins with Polara's request for supplemental damages. Upon

16  a finding of infringement, the patentee is entitled to "damages adequate to

17  compensate for the infringement, but in no event less than a reasonable royalty

18  for the use made of the invention by the infringer." 35 U.S.C. § 284. Patentees

19  are entitled to supplemental damage awards for any infringement prior to the

20  entry of a permanent injunction that was not considered by the jury. See

21  Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1212-13 (Fed. Cir.

22  2010). "Courts routinely grant motions for a further accounting where the jury

23  did not consider certain periods of infringing activity post-verdict." Metso

24  Minerals, 833 F. Supp. 2d at 347. This reasoning has been applied to situations

25  like this one in which an infringer provides sales data that does not cover all

26  sales made before trial. See Hynix Semiconductor Inc. v. Rambus Inc., 609 F.

27  Supp. 2d 951, 960-61 (N.D. Cal. 2009) (awarding supplemental damages for

28  infringement occurring between verdict and entry of judgment, which could

60

1    not have been considered by jury); <u>Activevideo Networks, Inc. v. Verizon</u>

2    <u>Comms., Inc.</u>, No. 10-248, 2011 WL 4899922, at *4 (E.D. Va. Oct. 14, 2011)

3    (holding that supplemental "damages may take into account pre-verdict

4    infringing sales that were not covered by the jury verdict due to deficiencies in

5    the discovery production"). In calculating supplemental damages to correct

6    this deficiency, the Court may apply the reasonable royalty rate found by the

7    jury. <u>See</u> <u>Hynix</u>, 609 F. Supp. 2d at 964-65 (applying jury's royalty

8    determination to all infringement); <u>Mondis Tech. Ltd. v. Chimei Innolux</u>

9    <u>Corp.</u>, 822 F. Supp. 2d 639, 643 (E.D. Tex. 2011) ("The Court holds that the

10   proper rate for the supplemental damages is the same rates the jury answered

11   were applicable, which are 0.5% for monitors and 0.75% for televisions.").

12          Here, the jury decided that 15% of total sales was a reasonable royalty.

13   Dkt. 440 at 4. The jury also found that the total infringing sales were

14   $2,752,842. <u>Id.</u> This figure is the amount, as stipulated by the parties, that

15   Polara's damages expert, David Hanson, would have testified to as total

16   infringing sales since January 2, 2013. <u>See</u> 7 Tr. 36; Tr. Exh. 350.[14] Hanson did

17   testify that his sales numbers "go through January of 2016." 5 Tr. 18, 32. His

18   report shows that he included sales figures through January 29, 2016. <u>See</u> Tr.

19   Exh. 345 at 55. A later stipulation was only necessary because Hanson had not

20   provided a damages figure dating from January 2, 2013—not because he was

21   changing his "end" date. <u>See</u> 5 Tr. 54-55; 7 Tr. 35-36. Polara is entitled to

22   supplemental damages of 15% of Campbell's total sales of the AAPS from

23   January 30, 2016 through the date of this Order.

24          **2.    Prejudgment Interest**

25          Damages for infringement should be awarded "together with interest

26   and costs as fixed by the court." 35 U.S.C. § 284. Prejudgment interest should

27   _____

28          [14] The transcript and exhibit mistakenly list the figure as $12,752,842.

61

Appx76

1    ordinarily be awarded to a victorious patentee. See Gen. Motors Corp. v.

2    Devex Corp., 461 U.S. 648, 655-56 (1983). Prejudgment interest is meant to be

3    compensatory, not punitive. Oiness v. Walgreens Co., 88 F.3d 1025, 1033

4    (Fed. Cir. 1996). The purpose of prejudgment interest is to put the patent

5    owner "in as good a position as he would have been in had the infringer

6    entered into a reasonable royalty agreement." Gen. Motors, 461 U.S. at 655.

7    The rate of prejudgment interest is "left largely to the discretion of the district

8    court." Bio-Rad Labs., Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 969

9    (Fed. Cir. 1986). Prejudgment interest may not be awarded on enhanced

10   damages. See Metso Minerals, 833 F. Supp. 2d at 342 ("[P]re-judgment

11   interest can only be applied to the primary or actual damage portion and not to

12   the punitive or enhanced portion of a damage award.").

13          Campbell argues that the Court should award no prejudgment interest.

14   See Dkt. 462 at 1-2. Campbell claims that because the two experts disagreed on

15   a reasonable royalty rate, Polara's royalties are "indefinite" and "not subject to

16   liquidation," meaning that prejudgment interest should not be assessed. Id.

17   This argument flies in the face of the aforementioned authorities. As noted

18   above, the jury concluded that 15% was a reasonable royalty rate. Prejudgment

19   interest should ordinarily be awarded absent some justification for withholding

20   such an award. DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1263

21   (Fed. Cir. 2014). Campbell offers no such justification.

22          The parties propose different rates and compounding methods for

23   calculating prejudgment interest. Polara argues that the Court should apply

24   California's breach-of-contract law for a rate of 10% per annum. Dkt. 452-1 at

25   5-6. Campbell argues that the appropriate rate is the prime rate, calculated at a

26   simple rate. Dkt. 462 at 2-4.

27          The Court agrees with Campbell that the prime rate is appropriate. As

28   the "rate charged by banks to its most credit-worthy customers," the prime rate

Appx77

1  is frequently found to be the appropriate rate for calculation of prejudgment

2  interest in a patent case. Atmel Corp. v. Silicon Storage Tech., Inc., 202 F.

3  Supp. 2d 1096, 1101 (N.D. Cal. 2002); see also IMX, Inc. v. Lendingtree,

4  L.L.C., 469 F. Supp. 2d 203, 227 (D. Del. 2007) (holding that prime rate

5  provides best compensation to corporate patentee because it "represents the

6  cost of borrowing money, which is 'a better measure of the harm suffered as a

7  result of the loss of the use of money over time'" (citation omitted)). And,

8  because a patentee's damages include the foregone use of money, annual

9  compounding is warranted. See Fresenius Med. Care Holdings, Inc. v. Baxter

10 Int'l, Inc., No. 03-1431, 2008 WL 928535, at *2 (N.D. Cal. Apr. 4, 2008).

11     **3.     Postjudgment Interest**

12         Under 28 U.S.C. § 1961, Polara requests postjudgment interest

13 calculated at the statutory rate on the total money award, including damages,

14 enhanced damages, and prejudgment interest. Campbell does not oppose

15 Polara's request.

16                              **III.**

17                         **CONCLUSION**

18         For the foregoing reasons,

19     1.     Campbell's motion for judgment as a matter of law is DENIED.

20     2.     Judgment shall be entered denying Campbell's inequitable conduct

21 defense.

22     3.     Polara's motion for a permanent injunction is GRANTED. Polara

23 is ORDERED to submit a proposed injunction consistent with this Order.

24 Campbell will file any objections to Polara's proposed injunction within seven

25 (7) days of Polara's submission. Polara's request for inspection is DENIED.

26     4.     Polara's motion for an accounting and supplemental damages for

27 previously unaccounted-for infringing sales is GRANTED. Campbell shall

28 provide Polara a full accounting of all infringing sales from the period

                              63

                         Appx78

1  beginning January 30, 2016, through the date of this Order within seven (7)

2  days of the date of this Order.

3         5.     Polara's motion for pre- and postjudgment interest is GRANTED.

4  With respect to prejudgment interest, it shall be calculated at the prime rate,

5  compounded annually. Prejudgment interest shall not be awarded on any

6  enhanced damages. Polara is ORDERED to submit calculations for

7  supplemental damages and prejudgment interest consistent with this Order,

8  and a form of judgment reflecting the same, within fourteen (14) days of

9  receiving Campbell's updated sales figures as ordered in the preceding

10  paragraph. Campbell may submit its objections, if any, to Polara's form of

11  judgment, within seven (7) days after the judgment is submitted. Polara may

12  reply within seven (7) days thereafter.

13         6.     Polara's motion to enhance the damages award is GRANTED,

14  but only to the extent that any damages award shall be increased by two-and-a-

15  half times.

16         7.     Polara's motion for attorney's fees pursuant to 35 U.S.C. § 285 is

17  DENIED.

18         8.     In light of the aforementioned rulings, Polara's request for a status

19  conference (Dkt. 493) is DENIED. The Court will schedule any further

20  hearing it deems necessary on any remaining issues related to the scope of the

21  injunction and the calculation of damages and interest.

22         IT IS SO ORDERED.

23

24  Dated:  February 27, 2017

25                                            _____

26                                            DOUGLAS F. McCORMICK
                                             United States Magistrate Judge
27

28

Appx79

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                        SOUTHERN DIVISION

11   POLARA ENGINEERING, INC.,          Case No. SA CV 13-00007-DFM

12              Plaintiff,

13        v.                            ORDER ENTERING
                                        PERMANENT INJUNCTION
14   CAMPBELL COMPANY,

15              Defendant.

16

17

18        For the reasons set forth in the Court's February 27, 2017 Order, and

19   having entered judgment in favor of Plaintiff Polara Engineering, Inc.

20   ("Polara"), the Court hereby ENJOINS and RESTRAINS Defendant

21   Campbell Company ("Campbell"), as well as Campbell's successors, assigns,

22   officers, directors, agents, employees, and representatives and attorneys from

23   infringing claims 1, 2, 3, or 4 of United States Patent No. 7,145,476 (the "'476

24   Patent") until the expiration of the '476 Patent by making, using, offering for

25   sale or selling in the United States, or importing in the United States, or

26   causing to be made, used, offered for sale, or sold in the United States, or

27   imported into the United States, the Campbell Advisor Advanced Pedestrian

28   Station ("AAPS") device or any product not more than colorably different

Appx80

1  therefrom.

2      Within fourteen (14) days of entry of this Permanent Injunction,

3  Campbell shall provide written notice of the injunction to each customer to

4  whom Campbell has sold an AAPS device, as follows:

5

6      **Campbell Company's Advisor Advanced Pedestrian**

7      **Station ("AAPS") device is affected by a Permanent Injunction**

8      **entered by the United States District Court for the Central**

9      **District of California in Civil Action No. SA CV 13-0007-DFM.**

10     **A copy of the Order Entering Permanent Injunction is included**

11     **with this notice. The AAPS device has been found to infringe**

12     **United States Patent No. 7,145,476, which is assigned to Polara**

13     **Engineering, Inc.**

14     **As a result of the Permanent Injunction, Campbell**

15     **Company and its successors, assigns, officers, directors, agents,**

16     **employees, and representatives and attorneys have been**

17     **enjoined from manufacturing and selling the AAPS device.**

18

19     Within twenty-eight (28) days of entry of the Permanent Injunction,

20 Campbell shall file with the Court a list identifying every customer to whom

21 Campbell has provided the above written notice.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28

2

Appx81

1    The Court specifically retains jurisdiction to enforce, modify, extend, or

2  terminate this injunction as the equities may require, upon a proper showing,

3  and to adopt procedures for resolution of any dispute whether a product not

4  specifically covered by this injunction is more than colorably different from the

5  AAPS device.

6    IT IS SO ORDERED.

7

8  Dated:  March 31, 2017

9  _____

10   DOUGLAS F. McCORMICK
    United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

Appx82

1
2                                                                    JS-6
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA
10                       SOUTHERN DIVISION
11   POLARA ENGINEERING, INC.,          Case No. SA CV 13-00007-DFM
12               Plaintiff,
                                        JUDGMENT
13          v.
14   CAMPBELL COMPANY,
15               Defendant.
16
17
18        This action came on for trial before the Court and a jury, the Honorable
19   Douglas F. McCormick, United States Magistrate Judge, presiding. The issues
20   having been duly tried, and the jury having duly rendered its verdict as to the
21   claims presented to it, and the Court having rendered its decision,
22        IT IS HEREBY ORDERED:
23        That, in accordance with United States District Judge Cormac J.
24   Carney's June 10, 2014 Order finding that Defendant Campbell Company
25   ("Campbell") has infringed United States Patent No. 7,145,476 (the "'476
26   Patent"), the jury's verdict that the '476 Patent is not invalid, and the Court's
27   February 27, 2017 Order finding the '476 Patent enforceable, judgment is
28   entered in favor of Plaintiff Polara Engineering, Inc. ("Polara") and against

1   Campbell in the amount of $1,678,586.08. This amount is comprised of: (1) the
2   damages accrued for all infringing sales from January 3, 2013 through the date
3   of judgment, in the amount of $653,841.53; (2) enhanced damages for
4   Campbell's willful infringement of the '476 Patent in the amount of
5   $980,762.30; and (3) in accordance with the Court's February 27, 2017 Order
6   awarding Polara prejudgment interest at the prime rate, the amount of
7   $43,982.25. Campbell shall pay postjudgment interest on any delinquent
8   amounts pursuant to 28 U.S.C. § 1961.
9        In a separate order, the Court also issues a permanent injunction against
10  Campbell.
11       IT IS SO ORDERED.
12
13  Dated: March 31, 2017
14
15                                        DOUGLAS F. McCORMICK
                                          United States Magistrate Judge
16
17
18
19
20
21
22
23
24
25
26
27
28

2



US007145476B2

(12) **United States Patent**    (10) **Patent No.:**    **US 7,145,476 B2**
Beckwith et al.    (45) **Date of Patent:**    Dec. 5, 2006

(54) **2-WIRE PUSH BUTTON STATION CONTROL SYSTEM FOR A TRAFFIC LIGHT CONTROLLED INTERSECTION**

(75) Inventors: **Leslie A. Beckwith**, La Mirada, CA (US); **Randy V. Cruz**, La Habra, CA (US)

(73) Assignee: **Polara Engineering, Inc.**, Fullerton, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 240 days.

(21) Appl. No.: **10/911,655**

(22) Filed: **Aug. 5, 2004**

(65) **Prior Publication Data**

US 2006/0028357 A1    Feb. 9, 2006

(51) **Int. Cl.**
  *G08B 1/095*    (2006.01)
  *H04B 3/36*    (2006.01)
  *G01S 15/00*    (2006.01)
(52) **U.S. Cl.** ................... **340/944**; 340/407.1; 367/116
(58) **Field of Classification Search** ............... 340/944, 340/407.1, 392.1–396.1, 384.3; 367/116; 704/721; 166/205, 172
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,886,496 A * 5/1975 Spilo et al. ................. 340/917

4,253,083 A * 2/1981 Imamura .................... 340/944
4,590,474 A * 5/1986 Patterson et al. .......... 340/944
4,851,836 A * 7/1989 Wilkinson et al. ......... 340/944
5,103,223 A * 4/1992 Humphrey ................. 340/944
5,241,307 A * 8/1993 Bidault et al. ............. 340/944
6,127,943 A * 10/2000 Tauchi et al. .............. 340/944
6,340,936 B1 * 1/2002 McGaffey et al. .......... 340/944

* cited by examiner

*Primary Examiner*—Daniel Wu
*Assistant Examiner*—Jennifer Mehmood
(74) *Attorney, Agent, or Firm*—Morland C. Fischer

(57) **ABSTRACT**

A 2-wire control system which communicates with a plurality of pole mounted push button stations of the kind that are found at a traffic light controlled intersection via existing pairs of underground wires over which power and data signals are transmitted so as to enable a visually impaired pedestrian to receive both audible and tactile signals regarding the flow of vehicular traffic through the intersection. The 2-wire control system includes a central control unit that is located at a traffic light cabinet and is connected to a standard traffic signal light controller. The control unit includes a plurality of 2-wire output ports that are connected to respective pairs of the plurality of push button stations. The central control unit also includes a corresponding plurality of on/off controls and data interfaces by which each of the 2-wire output ports thereof is provided with the power and data signals to be transmitted to respective pairs of push button stations depending upon the entry of a pedestrian request and the illumination of a WALK or DON'T WALK message.

**21 Claims, 5 Drawing Sheets**



Case: 17-1974    Document: 17    Page: 152    Filed: 06/30/2017



Fig. 1

U.S. Patent    Dec. 5, 2006    Sheet 2 of 5    US 7,145,476 B2

Appx87



Fig. 2



2 WIRE CENTRAL CONTROL UNIT 14
AC INPUT
L
N
GND
18
FUSES
POWER SUPPLY
20
24 VDC
POWER INTERFACE
26
5 VDC
TO ALL CIRCUITS
COM
22-1
A
ON/OFF CONTROL
CURRENT/ VOLTAGE MONITOR
24-1
A'
A DATA INTERFACE
28-1
22-2
B
ON/OFF CONTROL
CURRENT/ VOLTAGE MONITOR
24-2
B'
B DATA INTERFACE
28-2
22-3
C
ON/OFF CONTROL
CURRENT/ VOLTAGE MONITOR
24-3
C'
C DATA INTERFACE
28-3
22-4
D
ON/OFF CONTROL
CURRENT/ VOLTAGE MONITOR
24-4
D'
D DATA INTERFACE
28-4
40
LED STATUS DISPLAY
34
32
74
72
MICROCONTROLLER
30
42
A DW
A W
B DW
B W
C DW
C W
D DW
D W
COM
WALK/ DON'T WALK INPUTS (ISOLATED)
46
GENERAL PURPOSE INPUTS (ISOLATED)
1
2
3
4
5
6
7
8
COM
A
B
C
D
COM
PED BUTTON OUTPUTS (ISOLATED)
44
48
GENERAL PURPOSE OUTPUTS (ISOLATED)
1
2
3
COM

Fig. 3

U.S. Patent

Dec. 5, 2006

Sheet 4 of 5

US 7,145,476 B2

Appx89



Fig. 4

## 2 WIRE PUSH BUTTON STATION 1-1



Fig. 5

US 7,145,476 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# 2-WIRE PUSH BUTTON STATION CONTROL SYSTEM FOR A TRAFFIC LIGHT CONTROLLED INTERSECTION

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates to a 2-wire control system which communicates with pole mounted push button stations of the kind found at a traffic light controlled intersection via existing pairs of underground wires over which power and data signals are transmitted to enable a visually impaired pedestrian to receive both audible and tactile signals in response to depressing a push button head at a push button station when it is intended for the pedestrian to cross the intersection once vehicular traffic has been halted.

### 2. Background Art

It has long been known to combine a visual display with a series of traffic lights that are located at an intersection to control vehicular traffic and thereby enable pedestrians to enter the intersection once vehicular traffic has been halted. That is to say, the usual visual display conveys both a written message (i.e., WALK or DON'T WALK) as well as a color sensitive message (i.e., red, green or white) to instruct pedestrians when to cross the intersection. However, such visual warnings are of little value to those pedestrians who are visually impaired. Consequently, a visually impaired pedestrian who activates the push button of a traffic signal will have no way to accurately know when the intersection has been cleared of traffic so that it is time to cross.

In order to come into compliance with federal guidelines, such as the Americans With Disabilities Act, cities are required to increase the number of accessible signals that are available to pedestrians at the pole mounted push button stations associated with a traffic light controlled intersection. In particular, to accommodate the needs of visually impaired pedestrians, audible and/or tactile signals are generated at each push button station by which an audible message, a vibration, or the like, is generated when a push button is depressed by one wishing to cross an intersection. In this way, not only will the usual visual message be displayed to sighted pedestrians, but other sensory messages will also become available to coincide with the aforementioned visual message so as to alert visually impaired pedestrians when it is time to cross the intersection after the signal light has changed to halt vehicular traffic.

In the past, the pedestrian accessible signaling means has typically been powered at each corner of an intersection by the 115 VAC available at each existing pedestrian lighted sign. Although this approach does not require that additional wires be pulled from each push button station to the traffic control cabinet, the resulting disadvantage is that each push button station operates independently of the others so that sounds cannot be coordinated or synchronized for optimum audible and vibro-tactile presentation to visually impaired pedestrians.

The labor costs and the interruption in both vehicular and pedestrian movement at each intersection can be significant as a result of having to install new underground wiring to the push button stations in order to enable the additional signal function to be generated and made accessible to visually impaired pedestrians following the depression of a push button. However, most intersections already contain previously installed pairs of wires that run underground from the existing push button stations to a remote traffic light control box.

In this regard, cost sensitive cities would be able to avoid many of the expenditures and inconveniences of having to pull additional wires or even dig trenches and lay new field wires in order to install the new push button stations for each intersection if a control system were available that could incorporate the existing underground wire pairs to transmit power and data signals in order to generate the accessible signal functions for both sighted and visually impaired pedestrians.

Reference may be made to U.S. Pat. No. 5,241,307 issued Aug. 31, 1993 for a microprocessor operated sound signaling and optical signaling generation device that is activated by means of a pedestrian depressing a push button at a traffic light controlled intersection.

## SUMMARY OF THE INVENTION

Disclosed herein is a 2-wire push button station control system by which pole mounted push button stations that are located at a traffic light controlled intersection are provided with visual, audible and tactile accessible signals to enable both sighted and visually impaired pedestrians to receive information concerning the status of the intersection to be crossed once vehicular traffic has been halted. A pair of pole mounted push button stations located at opposite sides of a crosswalk are connected to a central control unit at a traffic light control cabinet via the same pair of wires. The central control unit is connected to a conventional traffic light controller so that the traffic lights which control access to the intersection can be cycled and the usual WALK or DON'T WALK visual messages displayed in response to pedestrian requests that are entered at the push buttons of the push button stations. The pairs of wires of the 2-wire push button station control system of this invention for connecting the push button stations to the central control unit are, in the preferred embodiment, the existing underground wires that were previously installed for the purpose of connecting the heretofore conventional push buttons to a traffic light control cabinet. In this manner, cities can advantageously minimize labor costs and interruptions in pedestrian and vehicular movements by not having to pull additional wires or dig trenches and lay new pairs of wires when the new push button stations are installed.

The central control unit of the 2-wire push button control system includes a microcontroller that is responsive to pedestrian requests that are entered at the push button stations and controls the voltage at a plurality of 2-wire output ports of the control unit which are interconnected with respective ones of the push button stations. An on/off control and a data interface are connected between the microcontroller and respective ones of the 2-wire output ports of the control unit to enable both power and data signals to be transmitted between the control unit, at an output port thereof, and a corresponding push button station.

Each on/off control of the central control unit includes a (e.g., transistor) switch which, during normal system operation, is closed to supply a 24 volt DC signal from a power supply to one of the push button stations from a corresponding one of the 2-wire output ports of the control unit. Each on/off control also includes current and voltage monitoring means by which to cause the switch to open and thereby disconnect the output port from the voltage supply in the event that the operating voltage or current of the 2-wire push button control system should exceed predetermined limits.

Each data interface of the central control unit includes a driver H-bridge and a transformer that is located between the driver and a corresponding one of the 2-wire output ports of

US 7,145,476 B2

3

the central control unit so that a serial stream of data pulses (lying in a range of voltages between 0 and 48 volts DC) can be provided to a respective one of the push button stations depending upon the pedestrian requests that are entered at the push button station. A receiver is coupled to the primary winding of the transformer to detect the output voltage of the transformer. The driver H-bridge and the receiver cooperate with one another to enable the microcontroller to control the output voltage of the driver which is transmitted through the transformer as digital data at the corresponding 2-wire output port.

Each pole mounted push button station includes a microcontroller which is responsive to a pedestrian request that is entered by depressing a push button head having a coil and a magnet. The microcontroller controls the operation of a vibration driver and a sound chip so that both tactile and audible pedestrian accessible signals are available at each push button head. That is, the sound chip stores prerecorded messages that are particularly useful to a visually impaired pedestrian to indicate the status of the intersection to be crossed. In this same regard, the vibration driver generates a magnetic field for causing the push button head to vibrate at the same time that the usual WALK signal is displayed to sighted pedestrians.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a 4-way traffic light controlled intersection and eight pedestrian activated, pole mounted push button stations connected to a traffic light control cabinet via pairs of underground wires over which power and data signals are transmitted;

FIG. 2 illustrates the underground wire run between the eight pedestrian activated push button stations of FIG. 1 and the remote traffic light control cabinet;

FIG. 3 is a block diagram showing a 2-wire central control unit of the traffic light control cabinet connected to the push button stations via the underground wire run of FIGS. 1 and 2;

FIG. 4 is a block diagram to detail the interconnection of an on/off control and a data interface of the central control unit of FIG. 3 to generate a voltage at an output port thereof to be supplied to a corresponding one or more of the push button stations of FIGS. 1 and 2; and

FIG. 5 is a block diagram to detail one of the pedestrian activated push button stations of FIGS. 1 and 2 to receive both audible and tactile pedestrian accessible signals.

DETAILED DESCRIPTION

FIGS. 1 and 2 of the drawings illustrate a 4-way traffic light controlled intersection having eight (e.g., pole mounted) push button stations 1-1 . . . 1-8 located at opposite sides of four crosswalks, designated A, B, C and D, and traffic light control hardware located at a traffic light control cabinet 10 and interconnected to the push button stations via existing (i.e., previously laid) push button wiring that typically runs underground. Although the four pairs of push button stations illustrated in FIGS. 1 and 2 are installed for a standard 4-way traffic light controlled intersection, where one push button station is located at each end of a crosswalk for controlling the flow of vehicular traffic, it is to be understood that a different number of push button stations for complex intersections or intersections with pedestrian islands may also be used to provide audible and tactile information by which to enable both sighted and visually impaired pedestrians to cross an intersection once vehicular traffic has been halted.

4

Each of the push button stations 1-1 . . . 1-8 of FIGS. 1 and 2 is intended to replace a conventional push button of the kind having a pair of normally open electrical switch contacts that are closed in response to a pushing force that is manually applied to a pole mounted push button. However, to advantageously reduce the labor and cost of installing the push button stations of the present invention, the existing two wires that run underground from each of the conventional push buttons is preserved and reused for connecting each pair of push button stations 1-1 and 1-2 . . . 1-7 and 1-8 from crosswalks A–D in electrical parallel to traffic light control cabinet 10 for transmitting power and data signals therebetween.

The remote traffic light control cabinet 10 to which a pair of wires is connected from each crosswalk A–D of the pole mounted push button stations 1-1 . . . 1-8 includes a conventional traffic signal light controller 12. As will be understood by those skilled in the art, the controller 12 is adapted to recognize the activation (i.e., depression) of one of the push button heads (designated 80 in FIG. 5) in response to a pedestrian request so as to operate the traffic light which controls traffic and pedestrian access to the intersection. The traffic light control cabinet 10 also includes a 2-wire central control unit 14 that is connected to the traffic signal light controller 12 by a bundle of control connections 16.

Control unit 14 as well as the push button stations 1-1 . . . 1-8 are powered by a 115 volt AC line voltage. As will be explained in greater detail when referring to FIG. 3, the central control unit 14 applies pedestrian requests entered at the push button stations 1-1 . . . 1-8 on crosswalks A–D to the traffic signal light controller 12 so as to generate tactile, audible and visual signals which inform both sighted and visually impaired pedestrians when to WALK or DON'T WALK into the crosswalks of the traffic light controlled intersection. As will also be explained when referring to FIG. 3, the central control unit 14 is connected to the underground push button wiring at 2-wire output ports, designated A', B', C' and D'. In this same regard, the control unit 14 includes a common (i.e., ground) port for connection to one line which is common to each of the push button stations 1-1 . . . 1-8.

Turning now to FIG. 3 of the drawings, there is shown a block diagram that is illustrative of the 2-wire central control unit 14 within the traffic light control cabinet 10 of FIGS. 1 and 2. As previously described, the central control unit 14 is powered by a 115 volt signal that is applied to a conventional power supply 20 via fuses 18. The power supply 20 converts the AC input signal to a 24 volt DC output signal. The 24 volt DC output signal is applied from the power supply 20 to one terminal of each of a plurality of electronic (e.g., MOSFET transistor) switches 24-1 . . . 24-4 that are associated with a respective plurality of on/off controls 22-1 . . . 22-4. The number (e.g., four) of on/off controls 22-1 . . . 22-4 of the central control unit 14 is equal to the number of crosswalks A–D in FIGS. 1 and 2 to be controlled and the corresponding number of pairs of push button stations 1-1 and 1-2 . . . 1-7 and 1-8 located at the opposite ends of each crosswalk. The 24 volt DC output signal from power supply 20 is also applied to a power interface 26 where the 24 volt DC signal is converted to a 5 volt DC output signal for powering the remaining circuitry of central control unit 14.

As will be explained when referring to FIG. 4, the on/off controls 22-1 . . . 22-4 provide current and voltage monitoring means. When any of the transistor switches 24-1 . . . 24-4 of the on/off controls 22-1 . . . 22-4 is closed under

5

normal operating conditions, a 24 volt DC signal will be applied by way of a respective data interface 28-1 . . . 28-4 to a corresponding one of the 2-wire output ports A', B', C' or D' of the central control unit 14 to which reference was previously made when referring to FIGS. 1 and 2. As will also be explained when referring to FIG. 4, the data interfaces 28-1 . . . 28-4 include transformers that are adapted to drive respective output ports A'-D' to a voltage lying in a range of voltages between 0 to 48 volts DC corresponding to a set of information coded pulses.

The 2-wire central control unit 14 at the traffic light control cabinet 10 of FIGS. 1 and 2 is controlled by a suitable microcontroller 30, such as that manufactured by Microchip Technology of Phoenix, Ariz. under Part No. PIC 18F452. A pair of pins (e.g., designated 32 and 34) of the microcontroller 30 is dedicated to each of the on/off controls 22-1 . . . 22-4. One of the pins 32 that is connected to a first on/off control 22-1 receives an indication of the voltage at a first of the output ports A' associated with a first of the push button stations A of the traffic light controlled intersection. The first on/off control 22-1 checks for a system fault condition at output port A' of central control circuit unit 14. That is, in any case where the voltage at output port A' is not 24 volts DC (at a maximum of 5 amps), the microcontroller 30 generates a signal at pin 34, whereby to cause the transistor switch 24-1 to open and thereby interrupt the circuit connection between power supply 20 and the output port A'. The voltage at output port A' in this case drops to 0. Additional pairs of pins of the microcontroller 30 are dedicated to similar fault monitoring functions with respect to output ports B', C' and D' of central control unit 14 by opening the corresponding switches 24-2, 24-3 and 24-4 of respective on/off controls 22-2, 22-3 and 22-4 depending upon predetermined voltage and current monitoring conditions to be described while referring to FIG. 4.

The central control unit 14 at the traffic control cabinet 10 of FIGS. 1 and 2 also includes an LED status display 40 which is connected to the microcontroller 30. Display 40 has a bank of light emitting diodes to indicate to workmen in the field the status of each input and output to the microcontroller 30 so as to verify normal system operation as well as fault condition in need of repair.

The central control unit 14 further includes a set of pedestrian output terminals 44 that are connected between the microcontroller 30 and the traffic signal light controller (designated 12 in FIGS. 1 and 2). The set of pedestrian output terminals 44 provides output signals that are responsive to the pedestrian requests entered at the push button stations 1-1 . . . 1-8 at the crosswalks A–D. The set of output terminals 44 may include a corresponding set of (e.g., four) relays which are operated by the microcontroller 30 to duplicate the push button functions performed by pedestrians at the push button stations 1-1 . . . 1-8.

The central control unit 14 also includes four pairs of parallel connected DON'T WALK/WALK input terminals 42 (designated DW and W) for the four pairs of push button stations at crosswalks A–D that are interfaced with the traffic signal light controller 12 (also located at the traffic control cabinet 10 of FIGS. 1 and 2) via connections 16. Each time a pedestrian activates one of the push button stations 1-1 . . . 1-8 at a crosswalk A–D, the event is transmitted through one of the pedestrian output terminals 44 to the traffic signal light controller 12. The traffic signal light controller 12 initiates the timing sequence by which a WALK or DON'T WALK visual signal will be illuminated to pedestrians at crosswalks A–D. The voltage to illuminate the pedestrian visual signals is supplied to one of the input

6

terminals 42 to be converted to 5 volts DC and then applied to the microcontroller 30. Thus, the central control unit 14 receives its timing from the WALK and DON'T WALK signals.

To maximize the versatility of the central control unit 14 to accomplish a variety of applications now and in the future, a set of optional general purpose terminals 46 are connected to the microcontroller 30 to selectively control the functions relating to the audible, visual and tactile signals to be supplied to the push button stations 1-1 . . . 1-8. Such general purpose terminals may provide (e.g., 24 volt DC) input signals to the microcontroller 30 for such purposes as, for example, to vary the volume of the audible signal or the length of a tactile vibration that is accessible to a pedestrian following his activation of a push button station 1-1 . . . 1-8 in order to cross an intersection.

In this same regard, and to further maximize the versatility of the control unit 14, a set of optional general purpose output terminals 48 are also connected to the microcontroller 30. In this case, the microcontroller 30 is programmed to provide output signals which, for example, may trigger a flashing device, or some other external event (e.g., a relay), for a predetermined period of time to maximize pedestrian awareness as to the status of vehicular traffic with respect to the intersection to be entered.

Turning now to FIG. 4 of the drawings, there is shown a block diagram for an on/off control and a data interface (designated 22-1 and 28-1) that are connected between the microcontroller 30 and one output port (designated A') of the central control unit 14 FIG. 3. The four on/off controls 22-1 . . . 22-4 and data interfaces 28-1 . . . 28-4 of control unit 14 are identical. Therefore, for purposes of convenience, only one on/off control 22-1 and data interface 28-1 will be described in detail while referring to FIG. 4.

As previously described, each on/off control 22-1 of the central control unit 14 includes an electronic (e.g., MOSFET transistor) switch 24-1 that is connected to a power supply (designated 20 in FIG. 3) to receive a 24 volt DC input signal. As also described, the on/off control 22-1 has current and voltage monitoring means to ensure the normal operation of the 2-wire control system. More particularly, a current monitoring and limiting circuit 50 is responsive to the current flowing through a current shunting resistor 52 to control the gate voltage of transistor switch 24-1. Resistor 52 is connected in electrical series with switch 24-1 and a 24 VDC input terminal 54 of the on/off control 22-1.

During normal operation, a 5 volt DC control signal is supplied from a pin (designated 34 in FIG. 3) of the microcontroller 30 to the current monitoring and limiting circuit 50 at a transistor ON/OFF control terminal 56 of the on/off control 22-1 of central control unit 14. Accordingly, the current monitoring and limiting circuit 50 causes the switch 24-1 to be closed (i.e., turned on), whereby the first output port A' of control unit 14 is provided with an output signal of approximately 24 volts DC to be supplied to the first pair of push button stations 1-1 and 1-2 at a first crosswalk (designated A in FIGS. 1 and 2). In the event that the input current flowing through resistor 52 exceeds a predetermined maximum level (e.g., 5 amps), the current monitoring and limiting circuit 50 causes the resistance of transistor switch 24-1 to increase, whereby the output voltage of the central control unit 14 at the output port A' thereof is correspondingly reduced, an indication of which is transmitted to the first pair of push button stations 1-1 and 1-2.

A conventional voltage monitoring device 58 (e.g., a voltage divider network) is responsive to voltage changes at the output terminal A' of data interface 28-1. That is, the

US 7,145,476 B2

7

voltage monitoring device 58 supplies an analog signal to a pin (designated 32 in FIG. 3) of the microcontroller 30 from a VOLTAGE MONITOR output terminal 60 of on/off control 22-1. In the event that the voltage at output terminal A' falls below 24 volts DC, the control signal supplied to the transistor ON/OFF control terminal 56 from pin 34 will now be at 0 volts. Accordingly, the current monitoring and limiting circuit 50 will cause the switch 24-1 to be opened (i.e., turned off), with the result that the output voltage of central control unit 14 at output port A' will drop to 0 volts by which to signify a malfunction.

The data interface 28-1 includes a conventional transformer 64 that is coupled to the output port A' of central control unit 14 in order to supply the first pair of push button stations 1-1 and 1-2 at the first crosswalk (designated A in FIGS. 1 and 2) with both data and 24 volt DC power signals. The primary winding of transformer 64 is connected to a driver H-bridge 66. As will be recognized by those skilled in the art, driver 66 functions as a transmitter by which to enable the transformer 64 to produce a series of coded data pulses corresponding to output voltages which lie in a range of voltages between 0 and 48 volts DC depending upon whether a pedestrian has activated one of the corresponding pair of push button stations 1-1 or 1-2 at crosswalk A.

The input to a receiver 68 is connected across the primary winding of transformer 64. In this case, the receiver 68 functions as an electronic comparator so as to compare the magnitude of the voltage at the two output terminals of the transformer 64 as the coded data pulses change. To this end, the output of receiver 68 is connected through a RECEIVE data terminal 70 of data interface 28-1 to provide a data signal (e.g., 5 volts DC or 0 volts) to a corresponding pin (designated 72 in FIG. 3) of the microcontroller 30. An additional pin (designated 74 in FIG. 3) of microcontroller 30 is connected through a TRANSMIT data terminal 76 of data interface 28-1 to provide a data signal to an input of the driver H-bridge 66 to control the operation thereof for driving the output port A' of central control unit 14 above or below 24 volts DC to create a string of information coded pulses. Accordingly, it may be appreciated that the driver H-bridge 66 and the receiver 68 cooperate with one another to form a receiver-transmitter pair to control the output voltage of central control unit 14 at the output port A' thereof to be supplied from control unit 14 to the first pair of push button stations 1-1 and 1-2 in response to the requests entered by a pedestrian to cross an intersection that is controlled by the push button stations of crosswalk A.

FIG. 5 is a block diagram to illustrate one of the pair of 2-wire push button stations (e.g., designated 1-1 in FIG. 2) from a first crosswalk A, whereby audible and tactile messages are accessible to visually impaired pedestrians following a depression of a vibrating push button head 80. Push button head 80 includes a magnet and a coil to generate a tactile feedback signal (e.g., a vibration) by which to inform a visually impaired pedestrian when to cross the intersection of FIG. 2 that is controlled by the push button station 1-1. Reference may be made to patent application Ser. No. 10/749,848 filed Jan. 2, 2004 for a detailed explanation of a vibrating push button head 80 that is suitable for use within the push button station 1-1 of FIG. 5.

Push button head 80 is connected to a microcontroller 82 so as to provide a digital code thereto to indicate a pedestrian request when push button head 80 is depressed and released. By way of example, the microcontroller 82 that is used in push button station 1-1 is manufactured by Microchip Technology under Part No. PIC18F252. The microcontroller 82 is programmed to energize a vibration driver 84 a certain

8

time after the request of a pedestrian at the push button head 80 to coincide with the usual illumination of a visual signal (e.g., WALK) that is provided to sighted pedestrians. The vibration driver 84 includes a coil through which a current will flow to create a magnetic field for the purpose of causing a corresponding vibration that can be felt by a pedestrian whose hand rests against the push button head 80.

The microcontroller 82 of push button 1-1 is also programmed to cooperate with an indicator light 88, an infrared transmitter 90 and an infrared receiver 92. The indicator light (e.g., a red LED) is illuminated to provide a visual indication to sighted pedestrians that the push button head 80 has been depressed so as to initiate the traffic light sequence to halt vehicular traffic. The infrared transmitter and receiver 90 and 92 are optional devices to be used to communicate with a remote hand held configurator (not shown) by which to change the operational options of the microcontroller 82. That is, the remote configurator may be a wireless device that links to the infrared transmitter and receiver 90 and 92 so as to enable configuration changes to be implemented by remote control by workmen in the field during installation and maintenance procedures.

The microcontroller 82 of push button 1-1 is coupled to each of a microphone amplifier 94, a sound chip 96, and an attenuation chip 98. The microphone amplifier 94 is interfaced with a microphone 100 which is capable of listening for ambient noise in the vicinity of push button station 1-1. Microcontroller 82 processes an analog signal from the microphone amplifier 94 which is indicative of the background noise generated by traffic and individuals at the intersection being controlled by push button station 1-1 at crosswalk A. Prerecorded information is stored in a digital format in the sound chip 96. In the present embodiment, the sound chip 96 functions as a digital tape recorder that emits an audible sound or a verbal message (e.g., WALK) to pedestrians following the activation of push button head 80. The microcontroller 82 causes an appropriate stored message to be played at the appropriate time depending upon vehicular traffic conditions and the pedestrian's request.

The sound chip 96 is interfaced with the attenuation chip 98, an audio amplifier 102, and a speaker 104. The attenuation chip 98 provides digital volume control and is capable of adjusting the volume of the audible verbal message to be emitted by sound chip 96. The volume of the message is adjusted depending upon the analog signal that is transmitted to microcontroller 82 by the microphone amplifier 84 in response to the background ambient noise detected by microphone 100. A volume controlled audible signal is supplied to the audio amplifier 102 which drives the speaker 94 so that the prerecorded sound or message stored in the sound chip 96 will be accessible to a visually impaired pedestrian about to enter crosswalk A so as to verbally alert him to the status of vehicular traffic at the intersection controlled by push button station 1-1.

The push button station 1-1 also includes a data interface 106. Data interface 106 is identical to the data interface (designated 28-1) of the 2-wire central control unit 14 that was previously described when referring to FIGS. 3 and 4. Therefore, the data interface 106 of push button 1-1 includes a transformer and a receiver/transmitter pair (like those designated 64, 66 and 68 in FIG. 4), as previously described. The data interface 106 receives both input digital data (i.e., the coded data pulses) from the data interface 28-1 of FIG. 4 and 24 volt DC power signals from the on/off control 22-1 of FIG. 4 via the corresponding 2-wire output port A' of the central control unit 14 (best shown in FIGS. 1 and 2). The input data supplied to push button station 1-1 from central

Appx94

US 7,145,476 B2

9

control unit **14** typically initiates the WALK, flashing DON'T WALK, and DON'T WALK visual messages to pedestrians. In this regard, the coded data pulses could be superimposed (i.e., multiplexed) over the power signals. Data interface **106** provides a 24 volt DC output signal to a power regulator **110**. Power regulator **110** provides 5 volt DC and 3 volt DC output signals to power the microcontroller **82** as well as certain ones of the sound and vibration emitting devices shown in FIG. **5** as part of the 2-wire push button station **1-1**.

The data interface **106** is connected to a voltage monitor **112**. Voltage monitor **112** monitors the power signals that are supplied to the 2-wire push button station **1-1** from the on/off control **22-1** (of FIG. **4**) via the 2-wire output port Δ' of central control unit **14** and the pair of underground wires illustrated in FIGS. **1** and **2**. In the event a threshold voltage indicative of a fault condition is detected, the voltage monitor **112** notifies the microcontroller **82** at an analog pin thereof, whereby the push button station **1-1** is disabled and a record of the fault condition is recorded.

Like the data interface **28-1** of FIG. **4**, a pair of pins of the microcontroller **82** of push button station **1-1** are connected to the driver H-bridge and the receiver (not shown) of the data interface **106** over a pair of incoming and outgoing data lines **114** and **116**. As previously indicated, a digital data signal (e.g., 0 volts or 5 volts DC) is provided over the incoming data line **114** from the receiver of data interface **106** to a first pin of microcontroller **82** depending upon the output voltage of the transformer like that designated **64** in FIG. **4**. Another digital data signal is provided over outgoing data line **116** from a second pin of the microcontroller **82** to the driver H-bridge of data interface **106** to control the output voltage of the driver H-bridge. Accordingly, and as previously described, the driver H-bridge of the data interface **106** functions as a transmitter which communicates with the data interface **28-1** of the central control unit **14** of FIG. **3** to send digital data (e.g., by which to indicate that the push button head **80** of push button **1-1** has been depressed or released) back to control unit **14** at the 2-wire output port Δ' thereof.

It may, be appreciated that the 2-wire push button control system herein disclosed uses pairs of underground wires over which both power and data signals are transmitted between the central control unit **14** at the traffic light control cabinet **10** and pairs of pole mounted push button stations **1-1** and **1-2** . . . **1-7** and **1-8** at crosswalks A–D to enable visual (e.g., WALK), tactile (e.g., a vibration), and audible (e.g., a prerecorded message) accessible signals to be available to both sighted and visually impaired pedestrians at a traffic light controlled intersection. In this case, parallel connected inputs (i.e., the WALK/DON'T WALK terminals **42** of FIG. **3**) are converted to a serial stream of digital output at the 2-wire output terminals Δ'–D' of central control unit **14**.

We claim:

1. A control system by which vibro-tactile messages are provided to alert pedestrians when to cross a traffic light controlled intersection, said control system comprising:

at least one push button station located at the traffic light controlled intersection to be crossed by pedestrians, said push button station including a push button head that is depressed by the pedestrians and message generating means adapted to cause said push button head to vibrate to provide a tactile indication to a visually impaired pedestrian when to cross the intersection; and

a control unit that is responsive to the depression of the push button head of said push button station to transmit

10

to the push button station both power and digital data signals over a single pair of wires by which to power and control the operation of said message generating means.

2. The control system recited in claim **1**, wherein said at least one push button station also includes a microcontroller to receive the power and digital data signals from said control unit, said microcontroller providing output signals to control the operation of said message generating means.

3. The control system recited in claim **2**, wherein said message generating means of said at least one push button station includes a vibration driver connected to said microcontroller to cause said push button head to vibrate and thereby provide said tactile indication to the visually impaired pedestrian that it is safe to cross the intersection.

4. The control system recited in claim **2**, wherein said message generating means of said at least one push button station includes a sound chip in which prerecorded messages are stored and from which an audible indication is provided to the visually impaired pedestrian whether to enter the intersection depending upon the flow of vehicular traffic therethrough.

5. The control system recited in claim **1**, wherein said message generating means of said at least one push button station also includes:

a microphone connected to the microcontroller and responsive to the ambient noise in the vicinity of the push button station;

a speaker through which the prerecorded messages stored in said sound chip are emitted to pedestrians; and

an attenuation chip connected to the microcontroller and adapted to vary the volume of the prerecorded messages that are stored in said sound chip and emitted by said speaker depending upon the ambient noise detected by said microphone.

6. The central control system recited in claim **1**, wherein said control unit includes a 2-wire output port to which said single pair of wires is connected from said at least one push button station, said power and digital data signals being transmitted from said control unit to said push button station over a first of said pair of wires, and the second of said pair of wires being connected to ground.

7. The control system recited in claim **6**, wherein said control unit includes a power supply, an electronic switch that is closed to connect said power supply to said 2-wire output port to provide power signals to said at least one push button station over the first of said pair of wires connected to said 2-wire output port, and fault detection means by which to cause said electronic switch to open and said power supply to be disconnected from said 2-wire output port in the event said fault detecting means detects a fault condition in the operation of said control unit.

8. The control system recited in claim **7**, wherein said fault detection means includes a microcontroller and current and voltage monitoring means connected to said microcontroller and responsive to the output of said power supply, said microcontroller causing said electronic switch to open in the event that the output voltage or current of said power supply exceeds predetermined limits.

9. The control system recited in claim **8**, wherein said control unit also includes a data interface including a driver and a transformer connected between said driver and said 2-wire output port, said driver generating said digital data signals through said transformer to said 2-wire output port to be transmitted from said control unit to said at least one push button station over the first of said pair of wires connected to said 2-wire output port.

US 7,145,476 B2

11    12

**10.** The control system recited in claim **9,** wherein the data interface of said control unit also includes a receiver connected to said transformer to monitor the digital data signals generated by said driver, said receiver communicating to said microcontroller an indication of the magnitude of the digital data signals generated by said driver, and said microcontroller controlling the digital data signals generated by said driver to said transformer in response to the indication provided by said receiver.

**11.** A control system by which accessible signals are provided to pedestrians regarding the status of vehicular traffic at a traffic light controlled intersection, said system comprising:

a source of power;

at least one push button station located at the traffic light controlled intersection to be crossed by pedestrians, said push button station including a push button head that is depressed by the pedestrians and message generating means by which to provide at least one accessible message to advise a pedestrian when vehicular traffic through the intersection has been halted; and

a control unit connected to said source of power to receive an input signal provided thereby, said control unit being responsive to the depression of the push button head of said push button station to control the operation of said message generating means, said control unit including an on/off control and a data interface,

the on/off control of said control unit having means by which to monitor the input signal provided by said source of power, said on/off control connecting said push button station to said source of power to energize said message generating means provided that said input signal is above a predetermined level, and said on/off control disconnecting said push button station from said source of power to disable said message generating means provided that said input signal is below the predetermined level,

the data interface of said control unit providing data signals to said push button station to initiate said message generating means.

**12.** The control system recited in claim **11,** wherein each of the on/off control and the data interface of said control unit is connected to said push button station by way of the same electrical conductor.

**13.** The control system recited in claim **11,** wherein said control unit includes a 2-wire output port, said control system further comprising a pair of wires connected between said 2-wire output port and said push button station, the on/off control and the data interface of said control unit connected from said 2-wire output port to said push button station via a first of said pair of wires, and the second of said pair of wires connected to ground.

**14.** The control system recited in claim **11,** wherein the on/off control of said control unit includes an electronic switch connected between said source of power and said push button station, said control unit including a microcontroller adapted to generate control signals to cause said electronic switch to open and close depending upon the level of the input signal provided by said source of power and monitored by said on/off control.

**15.** The control system recited in claim **14,** wherein the input signal monitoring means of said on/off control includes a current shunting resistor connected in electrical series with said electronic switch and a switch control responsive to the current flowing through said current shunting resistor, said switch control causing said electronic switch to open in the event that the current flowing through said current shunting resistor exceeds a predetermined current.

**16.** The control system recited in claim **15,** wherein the input signal monitoring means of said on/off control also includes a voltage monitor connected to said microcontroller and responsive to the voltage of said input signal, said microprocessor generating one of the control signals for causing said electronic switch to open in the event that the voltage to which said voltage monitor is responsive is below a predetermined voltage.

**17.** The control system recited in claim **14,** wherein the data interface of said control unit includes a driver and a transformer, said driver generating said data signals to be provided to said push button station through said transformer.

**18.** The control system recited in claim **17,** wherein said data interface also includes a receiver connected to said transformer and responsive to the data signals generated by said driver through said transformer, said receiver communicating to said microcontroller an indication of the magnitude of said data signals, and said microcontroller controlling the data signals generated by said driver in response to the indication provided by said receiver.

**19.** The control system recited in claim **11,** wherein said push button station includes a microcontroller coupled to each of said on/off control and said data interface of said control unit by which to power said message generating means and initiate said message generating means a certain time after the depression of said push button head.

**20.** The control system recited in claim **19,** wherein the message generating means of said push button station includes a vibration driver connected to said microcontroller to cause said push button head to vibrate and thereby provide a tactile indication to a pedestrian when vehicular traffic through the intersection has been halted.

**21.** A control system by which messages are provided to alert pedestrians when to cross a traffic light controlled intersection, said control system comprising:

at least one push button station located at the traffic light controlled intersection to be crossed by pedestrians, said push button station including a push button head that is depressed by the pedestrians and a message generator by which to provide at least one message to advise the pedestrians when to cross the intersection; and

a control unit responsive to the depression of the push button head of said push button station to transmit to the push button station power and digital data signals over a single pair of wires by which to power and control the operation of said message generator, one of said pair of wires carrying both of said power and digital data signals and the second of said pair of wires connected to ground.

*    *    *    *    *

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 30, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system on the following:

Nathaniel L. Dilger, Esq.
ONE LLP
4000 MacArthur Boulevard
East Tower, Suite 500
Newport Beach, California 92660
ndilger@onellp.com

*Attorney for Cross-Appellant,*
*Polara Engineering, Inc.*

Upon acceptance by the Court of the electronically submitted document, six paper copies of the foregoing will be shipped to the Court, via Federal Express, within the time provided in the Court's rules.

/s/ Christopher T. Holland
Christopher T. Holland

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.   This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a) or Federal Rule of Federal Circuit Rule 28.1.

☒   This brief contains   *[state the number of ]*   _____13,180_____   words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

☐   This brief uses a monospaced typeface and contains   *[state the number of ]*   _____

lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒   This brief has been prepared in a proportionally spaced typeface using

*[state name and version of word processing program ]*   _____Microsoft Word 2013_____   in

*[state font size and name of type style ]*   _____14-point Times New Roman_____ , or

☐   This brief has been prepared in a monospaced typeface using

*[state name and version of word processing program ]*   _____   with

*[state number of characters per inch and name of type style]*   _____ .

_____/s/ Christopher T. Holland_____

(Signature of Attorney)

_____Christopher T. Holland_____

(Name of Attorney)

_____Defendant-Appellant_____

(State whether representing appellant, appellee, etc.)

_____June 30, 2017_____

(Date)

[ Reset Fields ]